# EXHIBIT 1

## Part 1

NATIONAL EVENT SERVICES, INC.          :     IN THE COURT OF COMMON PLEAS
501 Bailey Road                        :     PHILADELPHIA COUNTY
Yeadon, PA 19050                       :              TERM, 2021
                                       :
                                       :
                 v.                    :     NO.
                                       :
                                       :     COMMERCE COURT
                                       :
                                       :
NATIONAL FIRE & MARINE                 :
INSURANCE COMPANY                      :
1314 Douglas Street, Suite 1400        :
Omaha, NE 68102                        :
                 AND                   :
                                       :
(SEE ATTACHED SHEET)                   :

## NOTICE TO PLEAD

|  NOTICE  |  AVISO  |

### NOTICE

You have been sued in court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

PHILADELPHIA BAR ASSOCIATION
LAWYER REFERRAL AND INFORMATION
SERVICE
One Reading Center
Philadelphia, Pennsylvania 19107
Telephone: 215-238-1701

### AVISO

Le han demando a usted en la corte.   Si usted quiere defenderse de estas demandos expuestas en las páginas sigiuentes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparesencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona.   Sea avisado que si usted no se defiende, la corte tomará medidas y puede continuar la demanda en corte suya sin previo aviso o notificación. Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda.   Usted puede perder diner or sus propiedades u otros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE.  SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELÉFONO A LA OFICINA CUYA DIRECCIÓN SE ENCUENTRA ESCRITO ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

ASOCIACIÓN DE LA LICENCIADOS DE
FILADELFIA
SERVICIO DE REFERENCIA E INFORMACIÓN
LEGAL
One Reading Center
Filadelfia, Pennsylvania 19107
Teléfono: 215-238-1701

NATIONAL EVENT SERVICES, INC.  :  IN THE COURT OF COMMON PLEAS
501 Bailey Road                :  PHILADELPHIA COUNTY
Yeadon, PA 19050               :              TERM, 2021
                               :
            v.                 :  NO.
                               :
                               :  COMMERCE COURT
                               :
                               :
NATIONAL FIRE & MARINE         :
INSURANCE COMPANY              :
1314 Douglas Street, Suite 1400 :
Omaha, NE 68102                :
            AND                :
                               :
(SEE ATTACHED SHEET)           :

## NOTICE TO PLEAD

| NOTICE | AVISO |
|---|---|
| You have been sued in court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you. | Le han demando a usted en la corte.  Si usted quiere defenderse de estas demandos expuestas en las páginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparesencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona.  Sea avisado que si usted no se defiende, la corte tomará medidas y puede continuar la demanda en corte suya sin previo aviso o notificación. Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda.  Usted puede perder diner o sus propiedades u otros derechos importantes para usted. |
| YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP. | LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE.  SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELÉFONO A LA OFICINA CUYA DIRECCIÓN SE ENCUENTRA ESCRITO ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL. |
| PHILADELPHIA BAR ASSOCIATION LAWYER REFERRAL AND INFORMATION SERVICE One Reading Center Philadelphia, Pennsylvania 19107 Telephone: 215-238-1701 | ASOCIACIÓN DE LA LICENCIADOS DE FILADELFIA SERVICIO DE REFERENCIA E INFORMACIÓN LEGAL One Reading Center Filadelfia, Pennsylvania 19107 Teléfono: 215-238-1701 |

Court of Common Pleas of Philadelphia County
Trial Division

# Civil Cover Sheet

| For Prothonotary Use Only (Docket Number) |
|---|
| **SEPTEMBER 2021**     **000366** |
| E-Filing Number 2109005316 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| NATIONAL EVENT SERVICES, INC. | NATIONAL FIRE & MARINE INSURANCE COMPANY |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 501 BAILEY ROAD<br>YEADON PA 19050 | 1314 DOUGLAS STREET SUITE 1400<br>OMAHA NE 68102 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| | MEDPRO GROUP |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| | 5814 REED ROAD<br>FORT WAYNE IN 46835 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| | BARRI ORLOW |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| | 5814 REED ROAD<br>FORT WAYNE IN 46835 |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NUMBER OF DEFENDANTS | COMMENCEMENT OF ACTION |
|---|---|---|
| 1 | 13 | [X] Complaint  [ ] Petition Action  [ ] Notice of Appeal<br>[ ] Writ of Summons  [ ] Transfer From Other Jurisdictions |

| AMOUNT IN CONTROVERSY | COURT PROGRAMS | | |
|---|---|---|---|
| [ ] $50,000.00 or less<br>[X] More than $50,000.00 | [ ] Arbitration<br>[ ] Jury<br>[ ] Non-Jury<br>[ ] Other: | [ ] Mass Tort<br>[ ] Savings Action<br>[ ] Petition | [X] Commerce<br>[ ] Minor Court Appeal<br>[ ] Statutory Appeals | [ ] Settlement<br>[ ] Minors<br>[ ] W/D/Survival |

CASE TYPE AND CODE

1D - INSURANCE, DECLARATORY JUDGMNT

STATUTORY BASIS FOR CAUSE OF ACTION

| RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER) | **FILED**<br>**PRO PROTHY**<br><br>SEP **07** 2021<br><br>**M. BRYANT** | IS CASE SUBJECT TO<br>COORDINATION ORDER?<br><br>YES          NO |
|---|---|---|

TO THE PROTHONOTARY:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: NATIONAL EVENT SERVICES, INC.

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY | ADDRESS |
|---|---|
| JAMES C. HAGGERTY | 1801 MARKET STREET<br>SUITE 1100<br>PHILADELPHIA PA 19103 |

| PHONE NUMBER | FAX NUMBER | |
|---|---|---|
| (267)350-6600 | (215)665-8201 | |

| SUPREME COURT IDENTIFICATION NO. | E-MAIL ADDRESS |
|---|---|
| 30003 | jhaggerty@hgsklawyers.com |

| SIGNATURE OF FILING ATTORNEY OR PARTY | DATE SUBMITTED |
|---|---|
| JAMES HAGGERTY | Tuesday, September 07, 2021, 04:43 pm |

FINAL COPY (Approved by the Prothonotary Clerk)

R. Brandon McCullough, Esquire
Houston Harbaugh
3 Gateway Three Center
401 Liberty Avenue
22nd Floor
Pittsburgh, PA  15222
412-288-4008
mcculloughb@hh-law.com

Attorney for MedPro, Inc. and
National Fire & Marine Insurance Company

| | |
|---|---|
| NATIONAL EVENT SERVICES, INC.<br>501 Bailey Road<br>Yeadon, PA 19050 :<br>:<br>:<br> v.          :<br>:<br>:<br>:<br>NATIONAL FIRE & MARINE<br>INSURANCE COMPANY :<br>          AND :<br>MEDPRO GROUP :<br>          AND :<br>BARRI ORLOW :<br>          AND :<br>PETER BEHNKE :<br>          AND :<br>EDGEWOOD HEALTH CARE<br>ADVISORS :<br>          AND :<br>INTEGRO GROUP :<br>          AND :<br>EPIC INSURANCE BROKERS &<br>ADVISORS :<br>          AND :<br>CRC GROUP :<br>          AND :<br>MAURIZIO BIANCHI,<br>ADMINISTRATOR OF THE ESTATE<br>OF MARCO BIANCHI, DECEASED :<br>IN HIS OWN RIGHT AND ON<br>BEHALF OF DECEDENT'S NEXT OF :<br>KIN<br>          AND : | IN THE COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY<br>  SEPTEMBER        TERM, 2021<br><br>NO.    000366<br><br>COMMERCE COURT |

## COMPLETE LIST OF DEFENDANTS:

1. NATIONAL FIRE & MARINE INSURANCE COMPANY
   1314 DOUGLAS STREET SUITE 1400
   OMAHA NE 68102
2. MEDPRO GROUP
   5814 REED ROAD
   FORT WAYNE IN 46835
3. BARRI ORLOW
   5814 REED ROAD
   FORT WAYNE IN 46835
4. PETER BEHNKE
   1034 FARMINGTON AVENUE
   WEST HARTFORD CT 06831
5. EDGEWOOD HEALTH CARE ADVISORS
   1034 FARMINGTON AVENUE
   WEST HARTFORD CT 06831
6. INTEGRO GROUP
   1 STATE STREET PLAZA 9TH FLOOR
   NEW YORK NY 10004
7. EPIC INSURANCE BROKERS & ADVISORS
   1034 FARMINGTON AVENUE
   WEST HARTFORD CT 06831
8. CRC GROUP
   ONE METROPLEX DRIVE SUITE 400
   BIRMINGHAM AL 35209
9. ALEX BIANCHI
   424 HARRISON DRIVE
   HOCKESSING DE 19707
10. MAURIZIO BIANCHI
    1213 ARUNDEL DRIVE
    WILMINGTON DE 19808
11. THE PHILADELPHIA EAGLES
    NOVACARE COMPLEX ONE NOVACARE WAY
    PHILADELPHIA PA 19145
12. LINCOLN FINANCIAL FIELD
    ONE LINCOLN FINANCIAL  FIELD WAY
    PHILADELPHIA PA 19148
13. NATIONAL FOOTBALL LEAGUE
    345 PARK AVENUE
    NEW YORK NY 10154

MEDPRO GROUP     :
5814 Reed Road      :
Fort Wayne, IN 46835    :
   AND      :
BARRI ORLOW      :
5814 Reed Road      :
Fort Wayne, IN 46835    :
   AND      :
PETER BEHNKE      :
1034 Farmington Avenue   :
West Hartford, CT  06831   :
   AND      :
EDGEWOOD HEALTH CARE :
ADVISORS       :
1034 Farmington Avenue   :
West Hartford, CT  06831   :
   AND      :
INTEGRO GROUP     :
1 State Street Plaza, 9th Floor  :
New York, NY  10004    :
   AND      :
EPIC INSURANCE BROKERS & :
ADVISORS       :
1034 Farmington Avenue   :
West Hartford, CT  06831   :
   AND      :
CRC GROUP       :
One Metroplex Drive, Suite 400  :
Birmingham, AL 35209    :
   AND      :
MAURIZIO BIANCHI,    :
ADMINISTRATOR OF THE ESTATE :
OF MARCO BIANCHI, DECEASED :
IN HIS OWN RIGHT AND ON  :
BEHALF OF DECEDENT'S NEXT OF :
KIN         :
1213 Arundel Drive     :
Wilmington, DE 19808    :
   AND      :
ALEX BIANCHI      :
424 Harrison Drive     :
Hockessing, Delaware, 19707  :
   AND      :
THE PHILADELPHIA EAGLES  :
NovaCare Complex, One NovaCare Way :
Philadelphia, Pennsylvania 19145  :

AND                                     :
LINCOLN FINANCIAL FIELD                 :
One Lincoln Financial Field Way         :
Philadelphia, Pennsylvania 19148        :
AND                                     :
NATIONAL FOOTBALL LEAGUE                :
345 Park Avenue                         :
New York, NY 10154                      :

**HAGGERTY, GOLDBERG, SCHLEIFER & KUPERSMITH, P.C.**
BY:  James C. Haggerty, Esquire
I.D. # 30003
1801 Market Street, Suite 1100
Philadelphia, PA  19103
(267) 350-6600

| | | |
|---|---|---|
| NATIONAL EVENT SERVICES, INC. | : | IN THE COURT OF COMMON PLEAS |
| 501 Bailey Road | : | PHILADELPHIA COUNTY |
| Yeadon, PA 19050 | : | TERM, 2021 |
| | : | |
| v. | : | NO. |
| | : | |
| | : | COMMERCE COURT |
| | : | |
| NATIONAL FIRE & MARINE | : | |
| INSURANCE COMPANY | : | |
| 1314 Douglas Street, Suite 1400 | : | |
| Omaha, NE 68102 | : | |
| AND | : | |
| MEDPRO GROUP | : | |
| 5814 Reed Road | : | |
| Fort Wayne, IN 46835 | : | |
| AND | : | |
| BARRI ORLOW | : | |
| 5814 Reed Road | : | |
| Fort Wayne, IN 46835 | : | |
| AND | : | |
| PETER BEHNKE | : | |
| 1034 Farmington Avenue | : | |
| West Hartford, CT  06831 | : | |
| AND | : | |
| EDGEWOOD HEALTH CARE | : | |
| ADVISORS | : | |
| 1034 Farmington Avenue | : | |
| West Hartford, CT  06831 | : | |
| AND | : | |
| INTEGRO GROUP | : | |
| 1 State Street Plaza, 9th Floor | : | |
| New York, NY  10004 | : | |
| AND | : | |
| EPIC INSURANCE BROKERS & | : | |
| ADVISORS | : | |
| 1034 Farmington Avenue | : | |
| West Hartford, CT  06831 | : | |
| AND | : | |

1

CRC GROUP                                          :
One Metroplex Drive, Suite 400                     :
Birmingham, AL 35209                               :
       AND                                        :
MAURIZIO BIANCHI,                                  :
ADMINISTRATOR OF THE ESTATE                        :
OF MARCO BIANCHI, DECEASED                         :
IN HIS OWN RIGHT AND ON                            :
BEHALF OF DECEDENT'S NEXT OF                       :
KIN                                                :
1213 Arundel Drive                                 :
Wilmington, DE 19808                               :
       AND                                        :
ALEX BIANCHI                                       :
424 Harrison Drive                                 :
Hockessing, Delaware, 19707                        :
       AND                                        :
THE PHILADELPHIA EAGLES                            :
NovaCare Complex, One NovaCare Way                 :
Philadelphia, Pennsylvania 19145                   :
       AND                                        :
LINCOLN FINANCIAL FIELD                            :
One Lincoln Financial Field Way                    :
Philadelphia, Pennsylvania 19148                   :
       AND                                        :
NATIONAL FOOTBALL LEAGUE                           :
345 Park Avenue                                    :
New York, NY 10154                                 :

## CIVIL ACTION – COMPLAINT SEEKING DECLARATORY RELIEF, COMPENSATORY DAMAGES AND BAD FAITH DAMAGES

### Generally

1.　　The present action seeks declaratory relief under a Health care Liability Policy ("Primary Policy") and an Excess Health care Liability Policy ("Excess Policy") issued by National Fire & Marine Insurance Company ("National Fire") and MedPro Group ("MedPro") to National Event Services, Inc. ("National Event") through the insurance agents and brokers, Peter Behnke, CRC Group ("CRC"), Edgewood Health care Advisors ("Edgewood"), Integro Group ("Integro") and Epic Insurance Brokers & Advisors ("Epic").

2

2.      The present action additionally seeks compensatory damages from Peter Behnke, CRC, Edgewood, Integro and Epic in the event that there is found to be no coverage under the Primary Policy and/or the Excess Policy for all monies: (a) which may be found to be due and owing by National Event in the pending lawsuit instituted in the Court of Common Pleas of Philadelphia County (<u>Maurizio Bianchi, Administrator of the Estate of Marco Bianchi, Deceased, in his own right and on behalf of said decedent's next of kin and Alex Bianchi v. The Philadelphia Eagles, Lincoln Financial Field, National Event Services, Inc. and National Football League</u>, August Term, 2020, No. 01739) ("Bianchi Lawsuit"), which otherwise would have been covered by insurance but were not insured by reason of the negligent and careless acts of the agents and brokers in failing to place coverage to properly and adequately protect National Event;  and (b) any and all consequential damages for any and all other losses caused by the act or failure to act of the agents and brokers.

3.      The present action also seeks extra-contractual bad faith damages from National Fire, MedPro and Barri Orlow in connection with the handling of the claims asserted in the Bianchi Lawsuit.

## **Underling Claim – Bianchi Lawsuit**

4.      On September 22, 2019 Marco Bianchi was a spectator at a Philadelphia Eagles National Football game at Lincoln Financial Field.

5.      While at the Philadelphia Eagles game, Marco Bianchi allegedly suffered a heart attack from which he died.

6.      After the incident, Maurizo Bianchi, Administrator of the Estate of Marco Bianchi, Deceased and in his own right and Alex Bianchi, instituted suit in the Court of Common Pleas of Philadelphia County against, *inter alia*, National Event.  ("Bianchi Lawsuit").  True and

3

correct copies of the Complaint and the Amended Complaint of the Bianchi Lawsuit are attached hereto and marked Exhibits "A" and "B".

7.      The Bianchi Lawsuit has given rise to insurance coverage disputes under the Primary Policy and the Excess Policy.

## Parties

8.      National Event is a corporation organized and existing under the laws of the State of New Hampshire, with its principal place of business located at 501 Bailey Road, Yeadon, Pennsylvania 19050.

9.      National Fire is a corporation organized and existing under the laws of the State of Nebraska, with its principal place of business located Omaha, Nebraska, being duly authorized to and conducting business in the Commonwealth of Pennsylvania.

10.     MedPro is a is a corporation organized and existing under the laws of the State of Indiana, with its principal place of business located at 5814 Reed Road, Fort Wayne, Indiana 46835, being duly authorized to and conducting business in the Commonwealth of Pennsylvania.

11.     National Fire and MedPro, issued a Health care Liability Policy ("Primary Policy") and an Excess Health care Liability Policy ("Excess Policy") to National Event under which the legal coverage disputes have arisen with respect to the Bianchi Lawsuit.

12.     Barri Orlow is the agent, servant, workman and employee of National Event and MedPro, who, at all times material hereto, handled the claims asserted in the Bianchi Lawsuit and made the determinations as to the available coverages under the Primary Policy and the Excess Policy for those claims.

4

13.     Peter Behnke is Managing Principal of Edgewood, Integro and Epic, working at the business locations of those operations at 1034 Farmington Avenue, West Hartford, CT 06831.

14.     Edgewood is a corporation organized and existing under the laws of the State of Connecticut, with its principal place of business located in West Hartford, CT, being duly authorized to and conducting business in the Commonwealth of Pennsylvania.

15.     Integro is a corporation organized and existing under the laws of the State of Connecticut, with its principal place of business located West Hartford, CT, being duly authorized to and conducting business in the Commonwealth of Pennsylvania.

16.     Epic is a corporation organized and existing under the laws of the State of Connecticut, with its principal place of business located at West Hartford, CT, being duly authorized to and conducting business in the Commonwealth of Pennsylvania.

17.     CRC is a corporation organized and existing under the laws of the State of Alabama, with its principal place of business located in Birmingham, AL being duly authorized to and conducting business in the Commonwealth of Pennsylvania.

18.     At all times material hereto, Peter Behnke was acting on behalf of CRC, Edgewood, Integro and Epic in securing coverage on behalf of National Event in order to fully protect its business from any and all potential liabilities.

19.     CRC, Edgewood, Integro and Epic are agents and brokers who were involved in procuring and obtaining the Primary Policy and the Excess Policy for National Event under which the legal coverage disputes have arisen.

20.     Maurizio Bianchi, the duly appointed Administrator of the Estate of Marco Bianchi, Deceased, is an individual resident and citizen of the State of Delaware, residing at 1213 Arundel Drive, Wilmington, Delaware 19808.

21.     Alex Bianchi is an adult individual citizen of the State of Delaware residing at 424 Harrison Drive, Hockessing, Delaware, 19707.

22.     Maurizio Bianchi and Alex Bianchi have instituted the Bianchi Lawsuit in the Court of Common Pleas of Philadelphia County and thus are a necessary parties to the litigation.

23.     The Philadelphia Eagles ("Eagles") is a business entity organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business located at NovaCare Complex, One NovaCare Way, Philadelphia, Pennsylvania 19145.

24.     Eagles is a defendant in the Bianchi Lawsuit and thus a necessary party to this litigation.

25.     Lincoln Financial Field ("Lincoln") is a business entity organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business located at One Lincoln Financial Field Way, Philadelphia, Pennsylvania 19148.

26.     Lincoln is a defendant in the Bianchi Lawsuit and thus a necessary party to this litigation.

27.     The National Football League ("NFL") is a non-profit entity organized and existing under the laws of the State of New York with its principal place of business located at 345 Park Avenue, New York, NY 10154.

28.     NFL is a defendant in the Bianchi Lawsuit and thus a necessary party to this litigation.

6

## Insurance Policies
## (Generally)

29.     National Event entered into an Agreement for the Provision of the Emergency

Medical Services for Lincoln Financial Field with the Eagles ("Agreement") on February 27,

2017.  A true and correct copy of the Agreement is attached hereto and marked Exhibit "C".

30.     The Agreement was in full force and effect at the time of the incident giving rise

to the Bianchi Lawsuit.

31.     Part VI of the Agreement sets forth specific provisions with respect to Insurance

and states, in pertinent part:

>       VI.  INSURANCE
>
>       Provider shall at all time throughout the term of this agreement maintain
>       professional and commercial general liability with minimum limits of five million
>       dollars ($5,000,000.00) per occurrence and in the aggregate, motor vehicle
>       insurance coverage (applying to owned, hired and non-owned vehicles) with
>       combined single limits of Five Million Dollars ($5,000,000.00), workers
>       compensation with statutory limits, and employers liability in the amount of One
>       Hundred Thousand Dollars ($100,000.00) each accident for bodily injury by
>       accident, One Hundred Thousand Dollars ($100,000.00) each employee for bodily
>       injury by disease, One Hundred Thousand Dollars ($100,000.00) policy limit for
>       bodily injury by disease.  Such limits may be provided by a combination of primary
>       and excess or umbrella policies.

See Exhibit "C".

32.     National Event hired Peter Behnke to secure insurance coverage to protect it

against any and all potential liabilities in the operation of his business and to fully comply with

the specific insurance terms of the Agreement.

33.     Peter Behnke, acting on behalf of CRC, Edgewood, Integro and Epic thereafter

placed and secured coverage for National Event with National Fire and MedPro under a Health

7

care Liability Policy (No. HN021513) ("Primary Policy") and an Excess Health care Liability Policy (No. EN021513) ("Excess Policy").

34.     The Primary Policy and the Excess Policy procured for National Event by Peter Behnke had effective dates as follows:

(a)     February 1, 2018 to February 1, 2019;

(b)     February 1, 2019 to February 1, 2020;

(c)     February 1, 2020 to February 1, 2021

True and correct copies of the Primary Policies for these terms are attached hereto and marked Exhibits "D", "E" and "F".   True and correct copies of the Excess Policies for these terms are attached hereto and marked Exhibits "G", "H" and "I".

## (Primary Policy – Generally)

35.     The Primary Policy for each term provided the following coverages:

Professional Liability

Claims Made and Reported
Per event limit $1,000,000.00
Aggregate limit $10,000,000.00

General Liability

Occurrence
Per event limit $1,000,000.00
Aggregate limit $3,000,000.00

See Exhibits "D", "E", "F".

## (Primary Policy – Professional Liability)

36.     The Insuring Clause of the Professional Liability Coverage Part of the Primary Policy provides, in pertinent part:

1.     Claims-Made And Reported

If "Claims Made And Reported" is shown on the Declarations with respect to this Coverage Part, the following provisions apply:

    a.    The company will pay on behalf of any insured all loss and claims expense, subject to any applicable deductible or self insured retention, and up to the limits of liability shown on the Declarations with respect to this coverage part, arising from the health care event that took place on or after the applicable retroactive date shown on the Declarations.

See Exhibits "D", "E" and "F", Professional Liability Coverage Part 1 of 4.

    37.    The Professional Liability Coverage Part of the Primary Policy defines health care event as:

Health care event means any event in the rendering of, or failure to render, professional services that results in an injury. All injuries arising out of, or in connection with, the same or related acts or omissions in furnishing professional services shall be considered one health care event.

See Exhibits "D", "E" and "F", Common Policy Provisions and Conditions, p. 3 of 19.

    38.    The Primary Policy defines, in pertinent part, professional services as:

Professional services means treatment, peer review and utilization management not involving managed care services.

See Exhibits "D", "E" and "F", Common Policy Provisions and Conditions, p. 7 of 19.

    39.    The Professional Liability Coverage Part of the Primary Policy provides coverage for the claims asserted in the Bianchi Lawsuit.

9

**(Primary Policy – General Liability)**

40.     The Insuring Agreement of the General Liability Coverage Part of the Primary

Policy provides, in pertinent part:

2.     Occurrence

If "Occurrence" is shown on the Declarations with respect to this Coverage Part, the
following provisions apply:

a.     The company will pay on behalf of an insured all loss and claims expense, subject
to any applicable deductible or self insured retention, and up to the limits of
liability shown on the Declarations with respect to this Insuring Clause, arising
from an event resulting from bodily injury or property damage that occurs during
the policy period.

See Exhibit "D", "E" and "F", General Liability Coverage Part 1 of 11.

41.     The Primary Policy defines event as:

Event means an accident.  All injuries arising out of, or in connection with:

1.     The same or related acts or omissions; or

2.     The continuous or repeated exposure to substantially the same harmful
conditions;

will be considered one event.  For purposes of this definition, all injuries to a
mother and fetus (or fetuses) from conception through delivery shall constitute
one event.

See Exhibits "D", "E" and "F", Common Policy Provisions and Conditions, p. 2 of 19.

42.     The Primary Policy defines bodily injury as:

Bodily injury means any damage to the human body, including sickness and disease of
any mental injury, shock, emotional distress or death arising therefrom.  In addition, it
includes damages claimed for the cost of any care, loss of service or loss of consortium
arising therefrom.

See Exhibits "D", "E" and "F", Common Policy Provisions and Conditions, p. 1 of 19.

43.     The General Liability Coverage Part of the Primary Policy provides coverage for the claims asserted in the Bianchi Lawsuit.

### (Excess Policy – Generally)

44.     The Excess Policy for the term February 1, 2018 to February 1, 2019 provided the following coverages:

General Liability/Follow Form

>     Occurrence
>     Per event limit $9,000,000.00
>     Aggregate limit $9,000,000.00

See Exhibit "G"

45.     The Excess Policy for the February 1, 2019 to February 1, 2020 term and the February 1, 2020 to February 1, 2021 term provided the following coverages:

Professional Liability

>     Claims Made and Reported
>     Per event limit $9,000,000.00
>     Aggregate limit $9,000,000.00

General Liability/Follow Form

>     Occurrence
>     Per event limit $9,000,000.00
>     Aggregate limit $9,000,000.00

See Exhibits "H" and "I".

### (Excess Policy – General Liability)

46.     The Insuring Agreement of the General Liability Coverage Part of the Excess Policy provides, in pertinent part:

>     2.      Occurrence.
>
>     If "occurrence" is shown on the declarations with respect to this coverage part, the following provisions apply:

11

a. the company will pay on behalf of an insured all loss and claims expense which is excess of any underlying coverage, and subject to any applicable maintenance retention, up to the limits of liability shown on the Declarations with respect to this coverage part, arising from an event resulting in bodily injury or property damage that occurred during the policy period.

See Exhibits "G", "H" and "I", General Liability Coverage Part, p. 1 of 9.

47.     The Excess Policy defines event as:

Event means an accident.  All injuries arising out of, or in connection with:

1.  The same or related acts or omissions; or

2.  The continuous or repeated exposure to substantially the same harmful conditions;

will be considered one event.  For purposes of this definition, all injuries to a mother and a fetus (or fetuses) from conception through delivery shall constitute one event.

See Exhibits "G", "H" and "I", Common Policy Provisions and Conditions, pp. 2-3.

48.     The Excess Policy defines bodily injury as:

Bodily injury means any damage to the human body, including sickness and disease of any mental injury, shock, emotional distress or death arising therefrom.  In addition, it includes damages claimed for the cost of any care, loss of service or loss of consortium arising therefrom.

See Exhibits "G", "H" and "I", Common Policy Provisions and Conditions, p. 1.

49.     The General Liability Coverage Part of the Excess Policy provides coverage for the claims asserted in the Bianchi Lawsuit.

### (Excess Policy – Professional Liability)

50.     The Insuring Agreement of the Professional Liability Coverage Part of the Excess Policy provides:

1.      Claims Made and Reported:

If "claims made and reported" is shown on the declarations with respect to this coverage part, the following provisions apply:

> a.   The company will pay on behalf of any insured all loss and claims expense, which is excess of any underlying coverage, and subject to any applicable maintenance retention, up to the limits of liability shown on the declarations with respect to this coverage part, arising from a health care event that took place on or after the applicable retroactive date shown on the declarations.

See Exhibits "G", "H" and "I", Professional Liability Coverage Part, p. 1 of 3.

51.    The Excess Policy defines health care event as:

> Health care event means any event in the rendering of, or failure to render, professional services that results in an injury.  All injuries arising out of, or in connection with, the same or related acts or omissions in furnishing professional services shall be considered one health care event.

See Exhibits "G", "H" and "I", Common Policy Provisions and Conditions, p. 3 of 19.

52.    The Excess Policy defines event as:

> Event means an accident.  All injuries arising out of, or in connection with:

> 1.   The same or related acts or omissions; or

> 2.   The continuous or repeated exposure to substantially the same harmful conditions;

> will be considered one event.  For purposes of this definition, all injuries to a mother and a fetus (or fetuses) from conception through delivery shall constitute one event.

See Exhibits "G", "H" and "I", Common Policy Provisions and Conditions, pp. 2-3.

53.    The Excess Policy defines bodily injury as:

> Bodily injury means any damage to the human body, including sickness and disease of any mental injury, shock, emotional distress or death arising therefrom.  In addition, it includes damages claimed for the cost of any care, loss of service or loss of consortium arising therefrom.

See Exhibits "G", "H" and "I", Common Policy Provisions and Conditions, p. 1.

13

54.     The Excess Policy defines professional services as, in pertinent part:

> Professional services means treatment, peer review and utilization management not involving managed care services.

See Exhibits "G", "H" and "I", Common Policy Provisions and Conditions, p. 7 of 19.

55.     The Professional Liability Coverage Part of the Excess Policy provides coverage for the claims asserted in the Bianchi Lawsuit.

### Issuance of Policy

56.     National Event provides, *inter alia*, emergency medical services for large public events.

57.     In the course of its business, National Event obtained insurance coverage for its operations in order to fully protect it from any and all potential liabilities.

58.     National Event provided services for the Eagles at Lincoln Financial Field.

59.     National Event entered into a contract with the Eagles for the provision of services at Lincoln Financial Field.  See Exhibit "C".

60.     The Agreement contains specific provisions regarding insurance to be obtained and provided by National Event.

61.     In this regard, Part VI of the Agreement provides, in pertinent part:

> VI.  INSURANCE
>
> Provider shall at all time throughout the term of this agreement maintain professional and commercial general liability with minimum limits of five million dollars ($5,000,000.00) per occurrence and in the aggregate, motor vehicle insurance coverage (applying to owned, hired and non-owned vehicles) with combined single limits of Five Million Dollars ($5,000,000.00), workers compensation with statutory limits, and employers liability in the amount of One Hundred Thousand Dollars ($100,000.00) each accident for bodily injury by accident, One Hundred Thousand Dollars ($100,000.00) each employee for bodily injury by disease, One Hundred Thousand Dollars ($100,000.00) policy limit for

14

bodily injury by disease.  Such limits may be provided by a combination of primary and excess or umbrella policies.

See Exhibit "C".

62.     National Event hired Peter Behnke to secure insurance coverage in order to fully comply with the insurance obligations of the Agreement.

63.     National Event relied upon Peter Behnke as an insurance professional with the requisite skill and knowledge to obtain and secure all necessary insurance coverages as required for the operation of its business and to comply with the requirements of the Agreement.

64.     Peter Behnke obtained and secured the Primary Policy and the Excess Policy for National Event in the course of providing professional insurance services to National Event for the following policy terms:

      (a)     February 1, 2018 to February 1, 2019;

      (b)     February 1, 2019 to February 1, 2020;

      (c)     February 1, 2020 to February 1, 2021

See Exhibits "D", "E", "F", "G", "H" and "I".

65.     National Event was not advised by National Fire or MedPro of any coverage issues in connection with the applicability of the Primary Policy and the Excess Policy to the claims asserted in the Bianchi Lawsuit until well after National Fire and MedPro had assumed the defense of the Bianchi Lawsuit without providing any reservation of rights.

66.     In fact, National Event was led to believe by Peter Behnke, acting on behalf of CRC, Edgewood, Integro and Epic, that the coverages provided by the Primary Policy and the Excess Policy fully complied with the insurance requirements of the Agreement.

67.     National Event relied upon the professional services and advice of Peter Behnke in order to secure and obtain insurance coverage to protect its business operations from any and all potential liabilities and to comply with the requirements of the Agreement.

68.     In the course of dealings between National Event and Peter Behnke regarding the procurement of insurance coverage, Daniel P. Monzo, Chief Operating Officer of National Event wrote to Peter Behnke by email dated February 21, 2018 providing the specific insurance requirements of the Agreement.  A true and correct copy of the February 21, 20218 email is attached hereto as Exhibit "J".

69.     The February 21, 2018 email from Daniel P. Monzo to Peter Behnke specified the following insurance requirements:

13.  Insurance

(a)  without limiting or qualifying Contractor's liabilities, obligations or indemnities, the Contractor will obtain before the Event, at its sole cost and expense, the insurance coverages listed below.

\*                          \*                          \*

(i)  Commercial General Liability Insurance, including broad form contractual liability, bodily injury, personal injury liability, advertising liability and product/completed operations liability coverage with minimal limits of liability of $1,000,000.00 each occurrence, $2,000,000.00 general aggregate, $1,000,000.00 products completed operations aggregate, and $50,000.00 damage to rented premises.

(ii)  Umbrella or Excess Liability Insurance with available coverage limits of not less than $9,000,000.00 general aggregate and $9,000,000.00 per occurrence.

(iii) Medical Malpractice/Professional Liability Insurance coverage with limits of not less than $10,000,000.00 each occurrence and $10,000,000.00 general aggregate covering the provision of the Services provided by Contractor (including Contractor's employees, agents, subcontractors) and any other entity or individual providing any medical care at the direction of or on behalf of Contractor.  If coverage is provided on a claims-made basis, Contractor agrees that upon expiration of the current policy, it will continue to purchase similar coverage for Contractor's operations.  At such time, Contractor ceases to purchase the coverage as described above, Contractor must

purchase unlimited tail coverage covering all claims that may arise from the provision of Services under this Agreement.

See Exhibit "J". Although the quoted sections regarding insurance coverage requirements were actually from a prior contract, the terms reflect the limits of General Liability and Professional Liability Coverage required to be provided.

70.     Peter Behnke represented to National Event that he had obtained and secured insurance coverage for National Event which fully complied with the terms and requirements of the Agreement.

71.     Peter Behnke secured insurance coverage for National Event from National Fire and MedPro.

72.     National Fire and MedPro issued the Primary Policy and the Excess Policy to National Event in accordance with the specific instructions of Peter Behnke.

73.     The Primary Policy and the Excess Policy were obtained in order to comply with the insurance requirements of the Agreement and the expectations of National Event.

74.     Peter Behnke represented to National Event that the Primary Policy and the Excess Policy fully complied with the insurance requirements of the Agreement.

75.     National Event believed, based upon the representations of Peter Behnke, that the insurance coverage provided by the Primary Policy and the Excess Policy fully complied with the insurance requirements of the Agreement.

76.     The Primary Policy and the Excess Policy were in effect at the time of the incident giving rise to the Bianchi Lawsuit.

77.     National Event was not advised by National Fire or MedPro of any coverage issues in connection with the applicability of the Primary Policy and the Excess Policy to the

claims asserted in the Bianchi Lawsuit until well after National Fire and MedPro had assumed the defense of the Bianchi Lawsuit and without providing any reservation of rights.

78.     The Excess Policy was required to provide both Professional Liability and General Liability Coverage in accordance with the Agreement and the expectations of National Event.

79.     The February 21, 2018 email from Daniel P. Monzo of National Event to Peter Behnke set forth the specific insurance requirements of the Agreement; the email set forth the expectations of National Event and the understanding of National Event as to the coverage that Peter Behnke had obtained from National Fire and MedPro.  See Exhibit "J".

80.     Peter Behnke was aware of the specific insurance requirements of the Agreement; National Event expected and understood that Peter Behnke had obtained the coverage necessary to protect the interests of National Event and to comply with the requirements of the Agreement thereby confirming his understanding of the coverage that Peter Behnke was obtaining for National Event.  See Exhibit "J".

81.     It is believed, and therefore averred, that the specific terms of the Agreement were conveyed to National Fire and MedPro by Peter Behnke prior to the binding and issuance of the Primary Policy and the Excess Policy.

82.     The Primary Policy and the Excess Policy issued by National Fire and MedPro, however, did not provide insurance coverage as required by the Agreement and as expected by National Event.

83.     Apparently, unbeknownst to National Event, Peter Behnke requested and/or National Fire and MedPro issued insurance coverage which did not fully comply with the requirements of the Agreement.

84.    The Primary Policy issued by National Fire and MedPro to National Event for the policy period February 1, 2018 to February 1, 2019 provided the following coverages:

Professional Liability

>Claims Made and Reported
>Per event limit $1,000,000.00
>Aggregate limit $10,000,000.00

General Liability

>Occurrence
>Per event limit $1,000,000.00
>Aggregate limit $3,000,000.00

See Exhibit "D".

85.    The Excess Policy issued by National Fire and MedPro to National Event for the policy period February 1, 2018 to February 1, 2019 provided the following coverages:

General Liability/Following Form

>Occurrence
>Per event limit $9,000,000.00
>Aggregate limit $9,000,000.00

See Exhibit "G".

86.    Peter Behnke never advised National Event that the Primary Policy and the Excess Policy did not provide coverage as required by the Agreement and as requested by National Event.

87.    Instead, Peter Behnke apparently attempted to remedy the mistake without advising National Event of the potential problem.

88.    By email dated March 22, 2018 Peter Behnke wrote to Scott Scheiblin and Natalie Payne of CRC asking that Professional Liability Coverage be added to the Excess Policy.  A true and correct copy of the March 22, 2018 email is attached hereto as Exhibit "K".

19

89.     In requesting the addition of Professional Liability Coverage to the Excess Policy, Peter Behnke also apparently, for some unknown reason, requested that the coverage be provided for only five specific events.  See Exhibit "K".

90.     National Event did not request, nor did it authorize Peter Behnke to request, that the insurance coverages provided by the Excess Policy be limited only to five specific events.

91.     On March 22, 2018 Scott Scheiblin of CRC wrote to Leslie Armstrong of MedPro asking that the limits of the Excess Policy issued by National Fire be changed in accordance with the email from Peter Behnke.  A true and correct copy of the March 22, 2018 email is attached hereto as Exhibit "L".

92.     National Event was unaware of any deficiency in the coverage limits of the National Fire policies in violation of the Agreement.

93.     National Event was unaware of the request to have the limits of coverage under the National Fire policies restricted to five events.

94.     On March 23, 2018, Leslie Armstrong of MedPro sent an email to Scott Scheiblin of CRC stating:

And they just need 9M PL limits correct? plus the primary of 1M would be 10M.. Effective 03/22/18?

A true and correct copy of the March 23, 2018 email is attached hereto as Exhibit "M".

95.     By email dated March 23, 2018 Scott Scheiblin of CRC wrote to Leslie Armstrong of MedPro stating:

Correctamundo.  We're adding $9M for these events to get to a total of $10M effective 3/22/18

A true and correct copy of the March 23, 2018 email is attached hereto as Exhibit "N".

20

96.     By email dated March 23, 2018, Leslie Armstrong of MedPro wrote to Todd Ernsberger stating:

> We need to add 9M in PL coverage to the excess under this policy – EN021513.
>
> Total premium will be $22,500.00 annually.  That would need to be pro rated for the short term policy period.
>
> We need to add the PL to the schedule of underlying obviously. . .  But then also add 3340-TPX-00 restricted practice.
>
> The PL should be restricted to the following events:
>
> > In Bloom – used in Texas, Lollapalooza – Chicago IL, Austin City Limits – Austin TX, Voodoo Music Festival – New Orleans LA, Bonnaroo

A true and correct copy of the March 22, 2018 email is attached hereto as Exhibit "O".

97.     National Event remained unaware of the deficiencies in the insurance coverage and that the Professional Liability Coverage Part of the Excess Policy was restricted to five events.

98.     Effective March 22, 2018 National Fire and MedPro issued three endorsements (Nos. 5, 6 & 7) to the Excess Policy as follows:

> (a)     Endorsement No. 5:  Amending the excess schedule of underlying insurance for the Professional Liability Coverage Part;
>
> (b)     Endorsement No. 6:  Increasing the professional liability limits to $9M per event with a $9M aggregate limit; and
>
> (c)     Endorsement No. 7:  Restricting the professional liability coverage to five covered employer, location, procedures and states.

True and correct copies of the Endorsements are attached hereto and collectively marked Exhibit "P".

99.     National Fire and MedPro did not advise National Event of the Change Endorsements and did not provide National Event with copies of Change Endorsements Nos. 5, 6 & 7.

100.    Peter Behnke did not advise National Event of the Change Endorsements and did not provide National Event with copies of Change Endorsements Nos. 5, 6 & 7.

101.    The Primary Policy and the Excess Policy were renewed for the policy period February 1, 2019 to February 1, 2020.   See Exhibits "E" and "H".

102.    The Primary Policy issued by National Fire and MedPro to National Event for the policy period February 1, 2019 to February 1, 2020 provided the following coverages:

Professional Liability

  Claims Made and Reported
  Per event limit $1M
  Aggregate limit $10M

General Liability

  Occurrence
  Per event limit $1M
  Aggregate limit $10M

See Exhibit "E".

103.    The Excess Policy issued by National Fire and MedPro to National Event for the policy period February 1, 2019 to February 1, 2020 provided the following coverages:

Professional Liability

  Claims Made and Reported
  Per event limit $9M
  Aggregate limit $9M

General Liability/Follow Form

  Occurrence
  Per event limit $9M

22

Aggregate limit $9M

See Exhibit "H".

104.    National Event was unaware that the Excess Policy contained a Restricted

Practice – Covered Practice Endorsement which limited Professional Liability Coverage to five

events.

105.    By email dated August 31, 2019, Michael Diienno, Vice President of National

Event, wrote to Peter Behnke stating, in pertinent part:

> We are in the process of redoing our contract with the Philadelphia Eagles and they have
> the following in it pertaining to insurance requirements:
>
> VI.  INSURANCE
>
> Provider shall at all time throughout the term of this agreement maintain
> professional and commercial general liability with minimum limits of five million
> dollars ($5,000,000.00) per occurrence and in the aggregate, motor vehicle
> insurance coverage (applying to owned, hired and non-owned vehicles) with
> combined single limits of Five Million Dollars ($5,000,000.00), workers
> compensation with statutory limits, and employers liability in the amount of One
> Hundred Thousand Dollars ($100,000.00) each accident for bodily injury by
> accident, One Hundred Thousand Dollars ($100,000.00) each employee for bodily
> injury by disease, One Hundred Thousand Dollars ($100,000.00) policy limit for
> bodily injury by disease.  Such limits may be provided by a combination of primary
> and excess or umbrella policies.
>
> *                          *                          *
>
> Prior to executing the contract, I would like to be sure that we have the appropriate
> levels as requested.  Can you take a look at this and let Danny and I knew if we are
> covered here?

A true and correct copy of the August 31, 2019 email is attached hereto as Exhibit "Q".

106.    By email dated September 16, 2019, Peter Behnke wrote to Michael Diienno of

National Event stating, in pertinent part:

> Limits are on the primary:

23

Professional liability
$1,000,000.00 per event limit
$10,000,000.00 aggregate
Claims expenses        Defense outside limits

Commercial General Liability

$1,000,000.00 per event limit of liability
$50,000.00 damage to premises rented to an insured business
$1,000,000.00 personal injury and advertising injury limit of liability (per person)
$1,000,000.00 general liability aggregate
$1,000,000.00 products & completed operations hazard aggregate limit of liability

Excess:

$9M/$9M

**So limits on these lines are fine.**

A true and correct copy of the September 16, 2019 email is attached hereto as Exhibit "R" (emphasis added).

107.    Peter Behnke did not advise National Event that the Professional Liability Coverage of the Excess Policy was limited to five specific events.

108.    National Event relied upon the representations of Peter Behnke with respect to the adequacy of the limits of coverage under the Primary Policy and the Excess Policy, namely that the coverage limits satisfied the requirements of the Agreement.

109.    National Event relied upon the representations of Peter Behnke with respect to compliance with the insurance requirements of the Agreement, Policy, namely that the coverage limits satisfied the requirements of the Agreement.

110.    National Event was unaware of any deficiency in the limits of coverage or any restriction of coverage in the Primary Policy and/or the Excess Policy which failed to fully

24

protect the interests of National Event and which failed to comply with the requirements of the Agreement.

111.    By email dated September 19, 2019, Peter Behnke wrote to Michael Diienno of National Event stating:

> Gents, Here is the blanket endorsement and an additional endorsement for the Eagles Contract to make clear the AI status is fulfilled.

A true and correct copy of the September 19, 2019 email is attached hereto as Exhibit "S".  At no time did Peter Behnke advise National Event that the insurance coverage failed to satisfy the requirements of the Agreement.

112.    Peter Behnke led National Events to believe that it was fully insured so that its business interests were protected.

113.    Peter Behnke led National Event to believe that the coverage under the Primary Policy and the Excess Policy fully complied with the insurance requirements of the Agreement.

114.    The Primary Policy issued by National Fire and MedPro to National Event was renewed for the policy period February 1, 2020 through February 1, 2021.  See Exhibit "F".

115.    The Primary Policy issued by National Fire and MedPro to National Event for the policy period February 1, 2020 to February 1, 2021 providing the following coverages:

Professional Liability

> Claims Made and Reported
> Per event limit $1M
> Aggregate limit $10M

General Liability

> Occurrence
> Per event limit $1M
> Aggregate limit $10M

See Exhibit "F".

116.    The Excess Policy issued by National Fire and MedPro to National Event was renewed for the policy period February 1, 2020 through February 1, 2021.  See Exhibit "I".

117.    The Excess Policy issued by National Fire and MedPro to National Event for the policy period February 1, 2020 to February 1, 2021 provided the following coverages:

Professional Liability

    Claims Made and Reported
    Per event limit $9M
    Aggregate limit $9M

General Liability/Follow Form

    Occurrence
    Per event limit $9M
    Aggregate limit $9M

See Exhibit "H".

118.    The Professional Liability Part of the Primary Policy and the Excess Policy provides coverage for the claims asserted in the Bianchi Lawsuit.

119.    The General Liability Part of the Primary Policy and the Excess Policy provides coverage for the claims asserted in the Bianchi Lawsuit.

## Insurance Coverage Issues

120.    The Bianchi Lawsuit was filed in the Court of Common Pleas of Philadelphia County on August 20, 2020.

121.    The Bianchi Lawsuit arises from a September 22, 2019 incident.

122.    Insurance coverage for National Event for the claims asserted in the Bianchi Lawsuit attaches under the Primary Policy and the Excess Policy as follows:

    (a)    Under the General Liability Coverage Part of the Primary Policy for the February 1, 2019 to February 1, 2020 policy term since it is an Occurrence Policy;

(b)     Under the General Liability/Follow Form Coverage Parts of the Excess Policy for the February 1, 2019 to February 1, 2020 policy term since it is an Occurrence Policy;

(c)     Under the Professional Liability Coverage Part of the Primary Policy for the February 1, 2020 to February 1, 2021 policy term since it is a Claims Made Policy; and

(d)     Under the Professional Liability Coverage Part of the Excess Policy for the February 1, 2020 to February 1, 2021 policy term since it is a Claims Mande Policy.

123.    Following the filing of the Bianchi Lawsuit, National Fire and MedPro assumed the defense of National Event.

124.    While providing a defense to the National Event in the Bianchi Lawsuit, National Fire and MedPro did so without issuing any reservation of rights to National Event.

125.    National Fire and MedPro did not raise any potential coverage issues or defenses under the Primary Policy and the Excess Policy to National Event in a timely manner.

126.    National Event was led to believe by the actions of National Fire and MedPro that coverage was being afforded under the Professional Liability and General Liability Coverage Parts of the Primary Policy and the Excess Policy.

127.    Having failed to raise any coverage issues or defenses in a timely manner, National Fire and MedPro have waived any such coverage issues or defenses.

128.    National Fire and MedPro are estopped from asserting any coverage issues or defenses which were not previously raised in a timely manner.

129.    By letter dated January 12, 2021, Barri Orlow of National Fire and MedPro wrote to counsel for the Eagles stating:

In follow up to our conversation of January 5, 2021, please allow this letter to confirm that there is no excess policy issued by National Fire & Marine Insurance or MedPro that applies to the above referenced matter.  [Bianchi Lawsuit].

A true and correct copy of the January 12, 2021 letter is attached hereto as Exhibit "T".

130.    In the January 12, 2021 letter, Barri Orlow of National Fire and MedPro failed to preserve any specific coverage issues or defenses.  See Exhibit "T".

131.    The January 12, 2021 letter was only sent to National Event by way of carbon copy, without any specific coverage defenses or issues being conveyed directly to National Event.

132.    National Fire and MedPro did not direct any correspondence or communication regarding any coverage issues or defenses to National Event.

133.    National Fire and MedPro reserved no rights or coverage defenses as against National Event.

134.    By letter dated January 19, 2021, counsel for the Eagles wrote to National Fire and MedPro requesting clarification of the coverage position.  A true and correct copy of the January 19, 2021 letter is attached hereto as Exhibit "U".

135.    By letter dated January 27, 2021, Barri Orlow of National Fire and MedPro, for the first time, advised National Event of any insurance coverage issues and defenses under the Primary and the Excess Policy.  A true and correct copy of the January 27, 2021 letter is attached hereto as Exhibit "V".

136.    In the January 27, 2021 letter, Barri Orlow of National Fire and MedPro advised National Event, for the first time that it was raising coverage issues, contending that:

(a)    The claims in the Bianchi Lawsuit fall within the Professional Liability Coverage Part of the Liability Policy and the Excess Policy, alone;

(b)    The General Liability Coverage Parts of the Liability Policy and the Excess Policy are not applicable since the allegations in the Bianchi Lawsuit are based upon Professional Liability, alone; and

28

(c)     The Professional Liability Coverage Part of the Excess Policy does not apply since Lincoln Financial Field is not identified a covered location on the Restricted Practice – Covered Practice Endorsement.

See Exhibit "V".

137.    The coverage position of National Fire and MedPro ignores the fact that National Fire and MedPro were requested to issue a Primary Policy and an Excess Policy which specifically complied with the requirements of the Agreement.

138.    The coverage position of National Fire and MedPro, namely that the allegations in the Bianchi Lawsuit only fall within the Professional Liability Coverage Part of the Primary Policy and the Excess Policy, ignores the clear averments of the Complaint and the Amended Complaint in that case.

139.    The coverage position of National Fire and MedPro, namely that the allegations in the Bianchi Lawsuit only fall within the Professional Liability Coverage Part of the Primary Policy and the Excess Policy, ignores the Four Corners Rule of insurance coverage interpretation.

140.    The allegations of the Complaint and the Amended Complaint filed in the Bianchi Lawsuit fall within the coverages afforded by the Professional Liability Coverage Part and the General Liability Coverage Part of the Primary Policy and the Excess Policy.

141.    The coverage position of National Fire and MedPro, namely that the Restricted Practice – Covered Practice Endorsement excludes coverage under the Excess Policy, ignores the reasonable expectations of National Event.

142.    The coverage position of National Fire and MedPro, namely that the Restricted Practice – Covered Practice Endorsement excludes coverage under the Excess Policy, ignores the tenets of insurance contract construction since the Restricted Practice – Covered Practice

Endorsement was added to the Excess Policy in mid-policy term without proper notice of the coverage limitation being provided to National Event, thereby rendering the limitation imposed by the endorsement void and unenforceable.

143.    The coverage position of National Fire and MedPro, namely that the Restricted Practice – Covered Practice Endorsement excludes coverage under the Excess Policy, ignores the tenets of insurance contract construction since the Restricted Practice – Covered Practice Endorsement is ambiguous and, therefore, coverage must be extended to National Event under the Excess Policy.

144.    After learning, for the first time, of any potential coverage issues, National Event retained the services of an insurance another insurance agent/broker, Ascend Insurance Brokerage ("Ascend"), to provide expert insurance services and to secure insurance coverage for the February 1, 2021 through February 1, 2022 policy term.

145.    By email dated February 3, 2021, Peter Behnke wrote to Daniel Monzo of National Event misstating and mischaracterizing any prior instructions and communications with National Event in order to attempt to shield himself from the liability arising from his prior actions.  A true and correct copy of the February 3, 2021 email is attached hereto as Exhibit "W".

146.    The February 3, 2021 email specifically states that Kevin Wright, Esquire, the attorney hired by National Fire and MedPro to defend National Event in the Bianchi Lawsuit was directly involved in the coverage issues, a clear conflict of interest potentially disqualifying him as counsel for National Event in that case.

147.     Had National Event been advised of the coverage issues in a timely manner, it could have chosen to forego the defense being provided by National Fire and MedPro and instead retained its own attorney to represent it in the Bianchi Lawsuit.

148.     On February 4, 2021, Ascend prepared for National Event an Insurance Proposal for coverage for the February 1, 2021 through February 1, 2022 policy term.  A true and correct copy of the Insurance Proposal is attached hereto as Exhibit "X".

149.     The Ascend Insurance Proposal listed the insurer for the Primary Policy and the Excess Policy for the February 1, 2021 through February 1, 2022 policy term as National Fire and MedPro.

150.     The Ascend Insurance Proposal set forth the following coverages for the Primary Policy:

Professional Liability

    Claims Made and Reported
    Per event limit $1M
    Aggregate limit $10M

General Liability

    Occurrence
    Per event limit $1M
    Aggregate limit $10M

See Exhibit "X".

151.     The Ascend Insurance Proposal set forth the following coverage for the Excess Policy:

Professional Liability

    Claims Made and Reported
    Per event limit $9M
    Aggregate limit $9M

General Liability/Follow Form

> Occurrence
> Per event limit $9M
> Aggregate limit $9M

See Exhibit "X".

152.    The Ascend Insurance Proposal does not include any Restricted Coverage –

Coverage Practice Endorsement for the Excess Policy.

153.    The Ascend Insurance Proposal set forth the insurance coverage requests and

expectations of National Event, as previously communicated to Peter Behnke by National Event,

and presumably communicated to National Fire and MedPro by Peter Behnke, prior to the

issuance of the Primary Policy and the Excess Policy for the policy terms:  (a) February 1, 2018

to February 1, 2019; (b) February 1, 2019 to February 1, 2020; and (c)      February 1, 2020 to

February 1, 2021.

154.    National Fire and MedPro renewed the Primary Policy and the Excess Policy for

National Event for the policy term February 1, 2021 to February 1, 2022 in accordance with the

requirements and reasonable expectations of National Event.

155.    By letter dated February 18, 2021, Michelle Carroll, Sr. Claims Executive of

Ascend, wrote to Barri Orlow of National Fire and MedPro stating, in part:

> (a)     the allegations of the Bianchi Lawsuit fall within the General Liability and
> Professional Liability Coverage Part of the Liability Policy and the Excess Policy;
>
> (b)     the coverage issues and disputes raised by National Fire and MedPro were
> untimely and thus waived;
>
> (c)     the Restricted Practice – Covered Practice Endorsement of the Excess
> Policy is contrary to the reasonable expectations of National Event and, thus, is
> unenforceable;
>
> (d)     the Restricted Practice – Covered Practice Endorsement of the Excess
> Policy is ambiguous and cannot be used to avoid coverage; and

32

(e)    coverage is available to National Event for the claims presented in the Bianchi Lawsuit under the pertinent Liability Policy and the pertinent Excess Policy.

A true and correct copy of the February 18, 2021 letter is attached hereto as Exhibit "Y".

156.    The February 18, 2021 letter from Ascend to Barri Orlow of National Fire and MedPro requested that National Fire and MedPro reconsider their prior position and extend insurance coverage to National Event for the claims asserted in the Bianchi Lawsuit.  See Exhibit "Y".

157.    By email dated March 5, 2021, Barri Orlow of National Fire and MedPro responded to the letter from Ascend, refusing to reconsider their coverage position.   A true and correct copy of the March 5, 2021 email is attached as Exhibit "Z".

158.    In the March 5, 2021 email, Barri Orlow of National Fire and MedPro advises that the Restricted Practice – Covered Practice Endorsement, which was added to the Excess Policy without the knowledge of National Event, could have been removed upon payment of an additional premium, a fact also never disclosed to National Event.  See Exhibit "Z".

159.    Accordingly, the Excess Policy was amended mid-term to add coverage, presumably at the cost of additional premiums, with restrictions which could have been removed at the cost of additional premiums, all without the knowledge of National Event.

160.    National Fire, MedPro and Barri Orlow have acted in bad faith in refusing to extend coverage to National Event to the extent requested and required under the pertinent Primary Policy and the pertinent Excess Policy.

161.    The National Fire and MedPro Primary Policy and Excess Policy issued to National Event is required to provide General Liability and Professional Liability Coverage for the claims asserted in the Bianchi Lawsuit.

## COUNT I
## (Declaratory Relief – National Fire and MedPro)

### Generally

162.    The plaintiff, National Event, hereby incorporates by reference the foregoing Paragraphs 1 through 161 of this Complaint as though same were fully set forth herein.

163.    The Bianchi Lawsuit was filed in the Court of Common Pleas of Philadelphia County on August 20, 2020.

164.    The Bianchi Lawsuit arises from a September 22, 2019 incident.

165.    Insurance coverage for National Event for the claims asserted in the Bianchi Lawsuit attaches under the Primary Policy and the Excess Policy as follows:

(a)    Under the General Liability Coverage Part of the Liability Policy for the February 1, 2019 to February 1, 2020 policy term since it is an Occurrence Policy;

(b)    Under the General Liability/Follow Form Coverage Parts of the Excess Policy for the February 1, 2019 to February 1, 2020 policy term since it is an Occurrence Policy;

(c)    Under the Professional Liability Coverage Part of the Liability Policy for the February 1, 2020 to February 1, 2021 policy term since it is a Claims Made Policy; and

(d)    Under the Professional Liability Coverage Part of the Excess Policy for the February 1, 2020 to February 1, 2021 policy term since it is a Claims Made Policy.

166.    National Fire and MedPro have refused to extend full coverage to National Event for the claims asserted in the Bianchi Lawsuit under the pertinent Primary Policy and the pertinent Excess Policy.

167.    National Event maintains the position that the Primary Policy and the Excess Policy must be reformed to provide coverage for the claims asserted in the Bianchi Lawsuit.

34

168.    National Event maintains the position that the Primary Policy and the Excess Policy must be interpreted so as to provide coverage for the claims asserted in the Bianchi Lawsuit.

## **Reformation of Coverage**

169.    National Event retained Peter Behnke to obtain and secure insurance coverage which complied with the requirements of the Agreement.

170.    It is believed, and therefore averred, based upon the representations of Peter Behnke, that Peter Behnke communicated the specific requirements of the Agreement to National Fire and MedPro prior to the issuance and the binding of coverage.

171.    The Primary Policy and the Excess Policy issued by National Fire and MedPro did not, however, provide coverage in accordance with the insurance coverage requirements of the Agreement and the expectations of National Event.

172.    Specifically, the Excess Policy contained a Restricted Practice – Covered Practice endorsement which, National Fire and MedPro contend, eliminates Professional Liability Coverage for the claims asserted in the Bianchi Lawsuit.

173.    The Excess Policy issued by National Fire and MedPro to National Event for the policy period February 1, 2018 to February 1, 20219 provided the following coverages:

General Liability/Following Form

    Occurrence
    Per event limit $9,000,000.00
    Aggregate limit $9,000,000.00

See Exhibit "G".

174.    The Excess Policy issued by National Fire and MedPro to National Event for the policy period February 1, 2018 to February 1, 2019 failed to include Professional Liability Coverage, without the knowledge or consent of National Event.

175.    The Excess Policy issued by National Fire and MedPro to National Event was renewed for the policy term February 1, 2019 to February 1, 2020.

176.    The Excess Policy issued by National Fire and MedPro to National Event for the policy term February 1, 2019 to February 1, 2020 did not provide, as initially renewed, Professional Liability Coverage, without the knowledge or consent of National Event.

177.    In March of 2018, National Fire and MedPro amended the Excess Policy to include Professional Liability Coverage, again without advising National Event.

178.    In amending the Excess Policy to include Professional Liability Coverage, National Fire and MedPro also included a Restricted Practice – Covered Practice Endorsement which, as contended by National Fire and MedPro, restricts coverage to only five specific events, a contention which is challenged by National Event.

179.    The amendments to the Excess Policy made by National Fire and MedPro were completed without any knowledge of or notice to National Event.

180.    The Primary Policy and Excess Policy as issued by National Fire and MedPro did not provide coverage as required by the Agreement and as requested by National Event.

181.    National Fire and MedPro are required to provide coverages consistent with the specific requests of National Event as communicated to National Fire and MedPro by Peter Behnke prior to the initial issuance of the Primary Policy and the Excess Policy.

182.    The Primary Policy and the Excess Policy are to be reformed to provide coverage as required by the Agreement and as requested by National Event.

36

183.    The controversy poses an issue for judicial determination under the Declaratory Judgment Act.

184.    The controversy involves substantial rights of the parties to the action.

185.    A judgment of this Court in this action will serve a useful purpose in clarifying and settling the legal relations at issue between the parties.

186.    A judgment of this Court will determine, terminate and afford relief from the uncertainty and controversy giving rise to this action.

## **Waiver and Estoppel**

187.    Following the filing of the Bianchi Lawsuit, National Fire and MedPro assumed the defense of National Event and the Eagles.

188.    The defense of National Event by National Fire and MedPro was not provided pursuant to any reservation of rights.

189.    National Fire and MedPro did not raise any potential coverage issues or defenses under the Primary Policy and the Excess Policy and did not communicate any coverage issues or defenses to National Event in a timely manner.

190.    Having failed to raise and communicate any coverage issues or defenses to National Event in a timely manner, National Fire and MedPro have waived any such coverage issues or defenses.

191.    National Fire and MedPro are estopped from asserting any coverage issues or defenses which were not previously raised and communicated to National Event in a timely manner.

192.     National Fire and MedPro did not reserve any rights with respect to any coverage issues or defenses under the pertinent Primary Policy and the pertinent Excess Policy in a timely manner to National Event.

193.     By letter dated January 12, 2021, Barri Orlow of National Fire and MedPro wrote to counsel for the Eagles stating:

> In follow up to our conversation of January 5, 2021, please allow this letter to confirm that there is no excess policy issued by National Fire & Marine Insurance or MedPro that applies to the above referenced matter.  [Bianchi Lawsuit].

See Exhibit "T".

194.     In the January 12, 2021 letter, National Fire and MedPro failed to preserve any specific coverage issues or defenses.  See Exhibit "T".

195.     The January 12, 2021 letter was only sent to National Event by way of carbon copy.

196.     National Fire and MedPro did not direct any correspondence or communication regarding any coverage issues or defenses to National Event.

197.     National Fire and MedPro reserved no rights or coverage defenses as against National Event in a timely manner when it undertook the defense of National Event in the Bianchi Lawsuit.

198.     National Event was led to believe by the actions of National Fire and MedPro that coverage was being afforded under the Professional Liability and General Liability Coverage Parts of the Primary Policy and the Excess Policy.

199.     Had National Event been advised of the coverage issues in a timely manner, it could have chosen to forego the defense being provided by National Fire and MedPro and instead retained its own attorney to represent it in the Bianchi Lawsuit.

38

200.     Any potential coverage issues now asserted by National Fire and MedPro as a defense to insurance coverage have been waived and may not be used to deny coverage to the claims asserted in the Bianchi Lawsuit.

201.     National Fire, MedPro and Barri Orlow have acted in bad faith in refusing to extend coverage to National Event to the extent requested and required under the pertinent Primary Policy and the pertinent Excess Policy.

202.     The Primary Policy and the Excess Policy are required to provide coverage as required by the Agreement and as requested by National Event.

203.     The controversy poses an issue for judicial determination under the Declaratory Judgment Act.

204.     The controversy involves substantial rights of the parties to the action.

205.     A judgment of this Court in this action will serve a useful purpose in clarifying and settling the legal relations at issue between the parties.

206.     A judgment of this Court will determine, terminate and afford relief from the uncertainty and controversy giving rise to this action.

**Reasonable Expectations**

207.     At all times material hereto, Peter Behnke acted in the course and scope of his employment with CRC, Edgewood, Integro and Epic.

208.     In procuring insurance coverage on behalf of National Event, Peter Behnke provided professional insurance services in the course and scope of his employment with CRC, Edgewood, Integro and Epic.

209.     It is believed, and therefore averred, based upon the representations of Peter Behnke, that Peter Behnke advised National Fire and MedPro of the requirements of the

39

Agreement and the expectations of National Event as to insurance coverage prior to the issuance and binder of coverage under the Primary Policy and the Excess Policy.

210.    In the course of dealings between National Event and Peter Behnke regarding the procurement of insurance coverage, Daniel P. Monzo, Chief Operating Officer of National Event wrote to Peter Behnke by email dated February 21, 2018 providing the specific insurance requirements of the Agreement.  See Exhibit "J".

211.    National Event entered into a contract with the Eagles for the provision of emergency medical services at Lincoln Financial Field.  See Exhibit "C".

212.    The Agreement contains specific provisions regarding insurance to be obtained and provided by National Event.

213.    In this regard, Paragraph VI of the Agreement provides, in pertinent part:

VI.  INSURANCE

Provider shall at all time throughout the term of this agreement maintain professional and commercial general liability with minimum limits of five million dollars ($5,000,000.00) per occurrence and in the aggregate, motor vehicle insurance coverage (applying to owned, hired and non-owned vehicles) with combined single limits of Five Million Dollars ($5,000,000.00), workers compensation with statutory limits, and employers liability in the amount of One Hundred Thousand Dollars ($100,000.00) each accident for bodily injury by accident, One Hundred Thousand Dollars ($100,000.00) each employee for bodily injury by disease, One Hundred Thousand Dollars ($100,000.00) policy limit for bodily injury by disease.  Such limits may be provided by a combination of primary and excess or umbrella policies.

See Exhibit "C".

214.    National Event relied upon Peter Behnke as an insurance professional with the requisite skill and knowledge to obtain and secure all necessary insurance coverages: (a) as required for the operation of its business; and(b) to comply with the requirements of the Agreement.

40

215.    Peter Behnke obtained and secured the Primary Policy and the Excess Policy for National Event in the course of providing professional insurance services to National Event.

216.    The February 21, 2018 email from Daniel P. Monzo to Peter Behnke specified the specific requirements of the Agreement; although the quoted sections regarding insurance coverage requirements were actually from a prior contract, the terms reflect the limits of General Liability and Professional Liability Coverage required to be provided.   See Exhibit "J".

217.    Peter Behnke, acting on behalf of National Fire and MedPro, represented to National Event that he had obtained and secured insurance coverage for National Event from National Fire and MedPro which fully complied with the terms and requirements of the Agreement in his email of September 16, 2019 that the "limits on these lines are fine."  See Exhibit "R".

218.    National Event believed, based upon the representations of Peter Behnke, acting on behalf of National Fire and MedPro, that it was fully insured in compliance with the requirements of the Agreement.

219.    It was not until well after National Fire and MedPro had assumed the defense of the Bianchi Lawsuit that National Event became aware of any potential issues with the amount of insurance coverage under the Primary Policy and the Excess Policy.

220.    Apparently, unbeknownst to National Event, Peter Behnke requested and/or National Fire and MedPro issued a Primary Policy and an Excess Policy which did not fully comply with the requirements of the Agreement.

221.    The Primary Policy issued by National Fire and MedPro to National Event for the policy period February 1, 2018 to February 1, 2019 provided the following coverages:

Professional Liability

41

Claims Made and Reported
Per event limit $1,000,000.00
Aggregate limit $10,000,000.00

General Liability

Occurrence
Per event limit $1,000,000.00
Aggregate limit $3,000,000.00

See Exhibit "D".

222.    The Excess Policy issued by National Fire and MedPro to National Event for the

policy period February 1, 2018 to February 1, 2019 provided the following coverages:

General Liability/Following Form

Occurrence
Per event limit $9,000,000.00
Aggregate limit $9,000,000.00

See Exhibit "G".

223.    The Primary Policy and the Excess Policy obtained by Peter Behnke from

National Fire and MedPro for National Event did not comply with the specific requirements and

requests of National Event.

224.    National Fire and MedPro failed to issue a Primary Policy and an Excess Policy in

accordance with the specific requests and requirements of National Event.

225.    National Fire and MedPro are required to provide coverage under the Primary

Policy and Excess Policy as represented to National Event by Peter Behnke and as reasonably

expected by National Event.

226.    In the event that Peter Behnke did not communicate the specific requirements of

the Agreement and the reasonable expectations of National Event to National Fire and MedPro,

42

then Peter Behnke was negligent and careless in securing insurance coverage for National Event from National Fire and MedPro.

227.    The terms and provisions of the Primary Policy and the Excess Policy issued by National Fire and MedPro to National Event failed to comply with the reasonable expectations of National Event.

228.    The pertinent Primary Policy and the pertinent Excess Policy are each required to provide coverage in accordance with the requirements and expectations of National Event.

229.    By email dated August 31, 2019, Michael Diienno, Vice President of National Event wrote to Peter Behnke stating, in pertinent part:

> We are in the process of redoing our contract with the Philadelphia Eagles and they have the following in it pertaining to insurance requirements:
>
> VI.  INSURANCE
>
> Provider shall at all time throughout the term of this agreement maintain professional and commercial general liability with minimum limits of five million dollars ($5,000,000.00) per occurrence and in the aggregate, motor vehicle insurance coverage (applying to owned, hired and non-owned vehicles) with combined single limits of Five Million Dollars ($5,000,000.00), workers compensation with statutory limits, and employers liability in the amount of One Hundred Thousand Dollars ($100,000.00) each accident for bodily injury by accident, One Hundred Thousand Dollars ($100,000.00) each employee for bodily injury by disease, One Hundred Thousand Dollars ($100,000.00) policy limit for bodily injury by disease.  Such limits may be provided by a combination of primary and excess or umbrella policies.
>
> *                           *                           *
>
> Prior to executing the contract, I would like to be sure that we have the appropriate levels as requested.  Can you take a look at this and let Danny and I knew if we are covered here?

See Exhibit "Q".

230.    By email dated September 16, 2019, Peter Behnke wrote to Michael Diienno of National Event stating, in pertinent part:

Limits are on the primary:

>    Professional liability
>    $1,000,000.00 per event limit
>    $10,000,000.00 aggregate
>    Claims expenses      Defense outside limits

Commercial General Liability

>    $1,000,000.00 per event limit of liability
>    $50,000.00 damage to premises rented to an insured business
>    $1,000,000.00 personal injury and advertising injury limit of liability (per person)
>    $1,000,000.00 general liability aggregate
>    $1,000,000.00 products & completed operations hazard aggregate limit of liability

Excess:

>    $9M/$9M

**_So limits on these lines are fine._**

See Exhibit "R" (emphasis added).

231.   National Event relied upon the representations of Peter Behnke made on behalf of National Fire and MedPro with respect to the adequacy of the limits of coverage under the Primary Policy and the Excess Policy.

232.   National Event relied upon the representations of Peter Behnke made on behalf of National Fire and MedPro with respect to compliance with the insurance requirements of the Agreement.

233.   National Event was unaware of any deficiency in or restriction of coverage in the Primary Policy and/or the Excess Policy which failed to fully protect the interests of National Event and/or failed to comply with the requirements of the Agreement.

234.   The pertinent Primary Policy and pertinent Excess Policy are required to provide insurance coverage under the Professional Liability Coverage Part and the General Liability

44

Coverage Part for the claims asserted in the Bianchi Lawsuit with coverage limits as requested by National Event.

235.    National Event and MedPro have refused to provide coverage under the Professional Liability Coverage Part and the General Liability Coverage Part under the Primary Policy and the Excess Policy in accordance with the requests and reasonable expectations of National Event.

236.    The Primary Policy and the Excess Policy are required to provide coverage as required by the Agreement and as requested by National Event.

237.    The controversy poses an issue for judicial determination under the Declaratory Judgment Act.

238.    The controversy involves substantial rights of the parties to the action.

239.    A judgment of this Court in this action will serve a useful purpose in clarifying and settling the legal relations at issue between the parties.

240.    A judgment of this Court will determine, terminate and afford relief from the uncertainty and controversy giving rise to this action.

## **Failure to Notify**

241.    By email dated March 22, 2018 Peter Behnke, without the knowledge of National Event, wrote to Scott Scheiblin and Natalie Payne of CRC asking that the limits of coverage of the National Fire Policy be increased.  See Exhibit "K".

242.    In requesting the increase of limits, Peter Behnke, without the knowledge of National Event, requested that the limits be increased only for five specific events.  See Exhibit "K".

243.   National Event did not request, nor did it authorize Peter Behnke to request, that the insurance coverages provided by the Excess Policy be limited only to five specific events.

244.   On March 22, 2018 Scott Scheiblin of CRC wrote to Leslie Armstrong of MedPro asking that the limits of the policies issued by National Fire be increased in accordance with the email from Peter Behnke.  See Exhibit "L".

245.   National Event was unaware of any deficiency in the coverage limits of the National Fire policies in violation of the Agreement and contrary to its expectations.

246.   National Event was unaware of the request to have the limits of coverage under the Excess Policy restricted to five events.

247.   On March 23, 2018, Leslie Armstrong of MedPro sent an email to Scott Scheiblin of CRC stating:

> And they just need 9M PL limits correct? plus the primary of 1M would be 10M..
>
> Effective 03/22/18?

See Exhibit "M".

248.   By email dated March 23, 2018 Scott Scheiblin of CRC wrote to Leslie Armstrong of MedPro stating:

> Correctamundo.  We're adding $9M for these events to get to a total of $10M effective 3/22/18

See Exhibit "N".

249.   By email dated March 23, 2018, Leslie Armstrong of MedPro wrote to Todd Ernsberger stating:

> We need to add 9M in PL coverage to the excess under this policy – EN021513.

Total premium will be $22,500.00 annually.  That would need to be pro rated for the short term policy period.

We need to add the PL to the schedule of underlying obviously. . .  But then also add 3340-TPX-00 restricted practice.

The PL should be restricted to the following events:

In Bloom – used in Texas, Lollapalooza – Chicago IL, Austin City Limits – Austin TX, Voodoo Music Festival – New Orleans LA, Bonnaroo

See Exhibit "O".

250.    National Event remained unaware of the deficiencies in the insurance coverage as well as the request that the limits of coverage be restricted to five events.

251.    Effective March 22, 2018 National Fire and MedPro issued three endorsements (Nos. 5, 6 & 7) to the Excess Policy as follows:

(a)    Endorsement No. 5:  Amending the excess schedule of underlying insurance for the Professional Liability Coverage Part;

(b)    Endorsement No. 6:  Increasing the professional liability limits to $9M per event with a $9M aggregate limit; and

(c)    Endorsement No. 7:  Restricting the professional liability coverage to five covered employer, location, procedures and states.

See Exhibit "P".

252.    National Fire and MedPro did not advise National Event of the Change Endorsements and did not provide National Event with copies of Change Endorsements Nos. 5, 6 & 7.

253.    Peter Behnke did not advise National Event of the Change Endorsements and did not provide National Event with copies of Change Endorsements Nos. 5, 6 & 7.

254.    National Fire and MedPro made changes and imposed limitations upon the coverage provided by the Primary Policy and the Excess Policy without providing notice to National Event.

255.    The addition of any limitations of coverage to a policy requires that the insurer provide sufficient and adequate notice to the insured so that it is aware of and has knowledge of the coverage limitations.

256.    National Fire and MedPro did not advise National Event of the Restricted Practice – Covered Practice Endorsement which had been added to the Excess Policy, thereby limiting Professional Liability Coverage to five specific events.

257.    The failure to give sufficient and adequate notice of the addition of the Restricted Practice – Covered Practice Endorsement to the Excess Policy renders the coverage limitations imposed by that endorsement void and unenforceable.

258.    National Event is entitled to be covered under the  Professional Liability and General Liability Coverage Parts of the Excess Policy for the claims asserted in the Bianchi Lawsuit.

259.    National Fire and MedPro have refused to extend Professional Liability Coverage under the Excess Policy for the claims asserted in the Bianchi Lawsuit by reason of the Restricted Practice – Covered Practice Endorsement.

260.    National Fire and MedPro are required to extend Professional Liability Coverage under the Excess Policy for the claims asserted in the Bianchi Lawsuit.

261.    The Primary Policy and the Excess Policy are required to provide coverage as required by the Agreement and as requested by National Event.

48

262.    The controversy poses an issue for judicial determination under the Declaratory Judgment Act.

263.    The controversy involves substantial rights of the parties to the action.

264.    A judgment of this Court in this action will serve a useful purpose in clarifying and settling the legal relations at issue between the parties.

265.    A judgment of this Court will determine, terminate and afford relief from the uncertainty and controversy giving rise to this action.

### **Ambiguity**

266.    The Restricted Practice – Covered Practice Endorsement to the Excess Policy was added without sufficient and adequate notice to National Event.

267.    The Restricted Practice – Covered Practice Endorsement which was appended in mid-policy term to the Excess Policy provides:

RESTRICTED PRACTICE – COVERED PRACTICE ENDORSEMENT

(PROFESSIONAL LIABILITY)

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all insureds, the company and the insureds agree to amend the policy as follows:

The following exclusion is added to the Exclusion section of the Common Policy Provisions and Conditions:

COVERED EMPLOYERS, LOCATIONS, PROCEDURES AND STATES

Any claim or potential claim arising out of, or in connection with, the alleged rendering of, or failure to render, professional services by an insured listed in any Schedule of Covered Employers, Locations, Procedures and States, unless such professional services were rendered or should have been rendered:

1. on behalf of a Covered Employer;
2. at a Covered Location;
3. as part of Covered Procedures;
4. in a Covered State;

49

listed for that insured in a Schedule of Covered Employers, Locations, Procedures and States.

SCHEDULE OF COVERED EMPLOYERS, LOCATIONS, PROCEDURES AND STATES

| Named Insured | I.D. Number | Covered Employer/Location/Procedures/States |
|---|---|---|
| National Event Services, Inc. | 933053 | In Bloom-Houston TX, Lollapalooza-Chicago IL, Auston City Limits – Austin TX, Voodoo Music Festival – New Orleans LA, and Bonnaroo |

See Exhibit "P".

268.   The Restricted Practice – Covered Practice Endorsement is susceptible to more than one meaning.

269.   The Restricted Practice – Covered Practice Endorsement is ambiguous.

270.   In the March 5, 2021 email, Barri Orlow of National Fire and MedPro advises that the Restricted Practice – Covered Practice Endorsement which was added to the Excess Policy without the knowledge of National Event could have been removed upon payment of an additional premium, a fact also never disclosed to National Event.  See Exhibit "Z".

271.   Accordingly, the Excess Policy was amended mid-term to add coverage, presumably at the cost of additional premiums, with restrictions which could have been removed at the cost of additional premiums, all without the knowledge of National Event.

272.   The Restricted Practice – Covered Practice Endorsement is confusing and contradictory.

273.   Any ambiguity in the Restricted Practice – Covered Practice Endorsement must be construed against National Fire and MedPro.

50

274.    The Restricted Practice – Covered Practice Endorsement may not be used to eliminate coverage under the Excess Policy for National Event for the claims asserted in the Bianchi Lawsuit.

275.    National Fire and MedPro have refused to extend coverage to National Event for the claims asserted in the Bianchi Lawsuit by reason of the Restricted Practice – Covered Practice Endorsement.

276.    The Restricted Practice – Covered Practice Endorsement is void and unenforceable.

277.    The Excess Policy should be reformed to remove the Restricted Practice – Covered Practice Endorsement.

278.    The controversy poses an issue for judicial determination under the Declaratory Judgment Act.

279.    The controversy involves substantial rights of the parties to the action.

280.    A judgment of this Court in this action will serve a useful purpose in clarifying and settling the legal relations at issue between the parties.

281.    A judgment of this Court will determine, terminate and afford relief from the uncertainty and controversy giving rise to this action.

### **Requested Relief**

282.    National Event is entitled to a declaration that the Professional Liability Coverage Part of the Primary Policy and the Excess Policy are applicable to the claims asserted in the Bianchi Lawsuit.

283.    National Event is entitled to a declaration that the General Liability Coverage Part of the Primary Policy and the Excess Policy is applicable to the claims asserted in the Bianchi Lawsuit.

284.    National Event is entitled to a declaration that National Fire and MedPro are required to defend and indemnify National Event with respect to all claims asserted in the Bianchi Lawsuit under the Professional Liability and General Liability Coverage Parts of the Primary Policy and the Excess Policy.

WHEREFORE, the plaintiff, National Event Services, Inc., respectfully request that the Court enter an Order declaring that:

(a)    insurance coverage for National Event for the claims asserted in the Bianchi Lawsuit attaches under the General Liability Coverage Part of the Primary Policy for the February 1, 2019 to February 1, 2020 policy;

(b)    insurance coverage for National Event for the claims asserted in the Bianchi Lawsuit attaches under the General Liability/Follow Form Coverage Part of the Excess Policy for the February 1, 2019 to February 1, 2020 policy term;

(c)    insurance coverage for National Event for the claims asserted in the Bianchi Lawsuit attaches under the Professional Liability Coverage Part of the Primary Policy for the February 1, 2020 to February 1, 2021 policy term;

(d)    insurance coverage for National Event for the claims asserted in the Bianchi Lawsuit attaches under the Professional Liability Coverage Part of the Excess Policy for the February 1, 2020 to February 1, 2021 policy term; and

(e)    such other relief as the Court deems appropriate.

## COUNT II
### (Negligence – Peter Behnke, CRC, Edgewood and Epic)

285.    The plaintiff, National Event, hereby incorporates by reference the foregoing Paragraphs 1 through 284 of this Complaint as though same were fully set forth herein.

286.    National Event hired Peter Behnke to secure insurance coverage which complied, inter alia, with the requirements of the Agreement.

287.    At all times material hereto, Peter Behnke acted in the course and scope of his employment with CRC, Edgewood, Integro and Epic.

288.    National Event relied upon Peter Behnke as an insurance professional with the requisite skill and knowledge to obtain and secure all necessary insurance coverages as required for the operation of its business.

289.    Peter Behnke obtained and secured the Primary Policy and the Excess Policy for National Event in the course of providing professional insurance services to National Event.

290.    In procuring insurance coverage on behalf of National Event, Peter Behnke provided professional insurance services in the course and scope of his employment with CRC, Edgewood, Integro and Epic.

291.    In the course of dealings between National Event and Peter Behnke regarding the procurement of insurance coverage, Daniel P. Monzo, Chief Operating Officer of National Event wrote to Peter Behnke by email dated February 21, 2018 providing the specific insurance requirements of the Agreement.  See Exhibit "J".

292.    National Event entered into a contract with the Eagles for the provision of emergency medical services at Lincoln Financial Field.  See Exhibit "C".

293.    The Agreement contains specific provisions regarding insurance to be obtained and provided by National Event.

293.    VI.  INSURANCE

Provider shall at all time throughout the term of this agreement maintain professional and commercial general liability with minimum limits of five million dollars ($5,000,000.00) per occurrence and in the aggregate, motor vehicle insurance coverage (applying to owned, hired and non-owned vehicles) with

combined single limits of Five Million Dollars ($5,000,000.00), workers compensation with statutory limits, and employers liability in the amount of One Hundred Thousand Dollars ($100,000.00) each accident for bodily injury by accident, One Hundred Thousand Dollars ($100,000.00) each employee for bodily injury by disease, One Hundred Thousand Dollars ($100,000.00) policy limit for bodily injury by disease.  Such limits may be provided by a combination of primary and excess or umbrella policies.

See Exhibit "C".

294.    National Event relied upon Peter Behnke as an insurance professional with the requisite skill and knowledge to obtain and secure all necessary insurance coverages as required for the operation of its business.

295.    Peter Behnke obtained and secured the Primary Policy and the Excess Policy for National Event in the course of providing professional insurance services to National Event.

296.    The February 21, 2018 email from Daniel P. Monzo to Peter Behnke specified the specific requirements of the Agreement; although the quoted sections regarding insurance coverage requirements were actually from a prior contract, the terms reflect the limits of General Liability and Professional Liability Coverage required to be provided.   See Exhibit "J".

297.    Peter Behnke represented to National Event that he had obtained and secured insurance coverage for National Event which fully complied with the terms and requirements of the Agreement.

298.    National Event believed, based upon the representations of Peter Behnke, that it was fully insured in compliance with the requirements of the Agreement.

299.    National Event was not advised by National Fire or MedPro of any coverage issues in connection with the applicability of the Primary Policy and the Excess Policy to the claims asserted in the Bianchi Lawsuit until well after National Fire and MedPro had assumed the defense of the Bianchi Lawsuit and without providing any reservation of rights.

300.     Apparently, unbeknownst to National Event, Peter Behnke requested and/or National Fire and MedPro issued insurance coverage which did not fully comply with the requirements of the Agreement.

301.     The Primary Policy and the Excess Policy obtained by Peter Behnke from National Fire for National Event did not comply with the specific requirements and requests of National Event.

302.     In the event that Peter Behnke did not communicate the specific requirements of the Agreement and the reasonable expectations of National Event to National Fire and MedPro, then Peter Behnke was negligent and careless in securing insurance coverage for National Event from National Fire and MedPro.

303.     National Fire and MedPro failed to issue a Primary Policy and an Excess Policy in accordance with the specific requests and requirements of National Event.

304.     The terms and provisions of the Primary Policy and the Excess Policy issued by National Fire and MedPro to National Event failed to comply with the reasonable expectations of National Event.

305.     The pertinent Primary Policy and the pertinent Excess Policy are each required to provide coverage in accordance with the requirements and expectations of National Event.

306.     By email dated August 31, 2019, Michael Diienno, Vice President of National Event wrote to Peter Behnke stating, in pertinent part:

> We are in the process of redoing our contract with the Philadelphia Eagles and they have the following in it pertaining to insurance requirements:
>
> VI.  INSURANCE
>
> Provider shall at all time throughout the term of this agreement maintain professional and commercial general liability with minimum limits of five million dollars ($5,000,000.00) per occurrence and in the aggregate, motor vehicle

55

insurance coverage (applying to owned, hired and non-owned vehicles) with combined single limits of Five Million Dollars ($5,000,000.00), workers compensation with statutory limits, and employers liability in the amount of One Hundred Thousand Dollars ($100,000.00) each accident for bodily injury by accident, One Hundred Thousand Dollars ($100,000.00) each employee for bodily injury by disease, One Hundred Thousand Dollars ($100,000.00) policy limit for bodily injury by disease.  Such limits may be provided by a combination of primary and excess or umbrella policies.

<p style="text-align:center">*     *     *</p>

Prior to executing the contract, I would like to be sure that we have the appropriate levels as requested.  Can you take a look at this and let Danny and I knew if we are covered here?

See Exhibit "Q".

307.   By email dated September 16, 2019, Peter Behnke wrote to Michael Diienno of National Event stating, in pertinent part:

Limits are on the primary:

Professional liability
$1,000,000.00 per event limit
$10,000,000.00 aggregate
Claims expenses      Defense outside limits

Commercial General Liability

$1,000,000.00 per event limit of liability
$50,000.00 damage to premises rented to an insured business
$1,000,000.00 personal injury and advertising injury limit of liability (per person)
$1,000,000.00 general liability aggregate
$1,000,000.00 products & completed operations hazard aggregate limit of liability

Excess:

$9M/$9M

***So limits on these lines are fine.***

See Exhibit "R" (emphasis added).

308.    National Event relied upon the representations of Peter Behnke with respect to the adequacy of the limits of coverage under the Primary Policy and the Excess Policy.

309.    National Event relied upon the representations of Peter Behnke with respect to compliance with the insurance requirements of the Agreement.

310.    National Event was unaware of any deficiency in or restriction of coverage in the Primary Policy and/or the Excess Policy which failed to fully protect the interests of National Event and/or failed to comply with the requirements of the Agreement.

311.    National Event exercised due diligence and was in no way responsible or negligent in the procurement of the insurance coverage from National Fire and MedPro through Peter Behnke.

312.    The pertinent Primary Policy and pertinent Excess Policy was requested by National Event to provide insurance coverage under the Professional Liability Coverage Part and the General Liability Coverage Part to comply with the terms of the Agreement so as to provide coverage for the claims asserted in the Bianchi Lawsuit.

313.    National Event and MedPro have refused to provide coverage under the Professional Liability Coverage Part and the General Liability Coverage Part under the Primary Policy and the Excess Policy in accordance with the requests and reasonable expectations of National Event.

314.    In the event that Peter Behnke did not communicate the specific requirements of the Agreement and the reasonable expectations of National Event to National Fire and MedPro, then Peter Behnke was negligent and careless in failing to secure and obtain insurance coverage for National Event in accordance with the specific requirements and requests of National Event.

315.    The negligence and carelessness of Peter Behnke, acting on behalf of CRC, Edgewood, Integro and Epic consisted of, but was not limited to:

(a)    failing to exercise due care under the circumstances;

(b)    failing to provide professional services required of an insurance agent/broker;

(c)    failing to demonstrate the requisite knowledge and professionalism as required of an insurance professional;

(d)    failing to act in a prudent and careful manner;

(e)    failing to secure insurance coverages as specifically required by National Event;

(f)    failing to render professional services to National Event;

(g)    failing to exercise due care as required by professionals in the field;

(h)    misrepresenting the terms and provisions of the policies issued by National Fire and MedPro;

(i)    misleading National Event into believing that the policies issued by National Fire and MedPro complied with the terms of the Agreement;

(j)    mischaracterizing the terms and provisions of the policies in communications with National Event;

(k)    deceiving National Event into believing that the terms and provisions of the policies issued by National Fire and MedPro complied with the requirements of the Agreement;

(l)    failing to keep National Event advised as to changes which had taken place with respect to the policies issued by National Fire and MedPro;

(m)    failing to advise National Event of any changes to the provisions and limits of the policies issued by National Fire and MedPro;

(n)    failing to advise National Event of the inclusion of the Restricted Practice – Covered Practice Endorsement to the Excess Policy; and

(o)    being otherwise negligent in law and in fact.

58

316.    If it is determined that the pertinent Primary Policy and the pertinent Excess Policy do not provide coverage for the claims asserted in the Bianchi Lawsuit as requested and expected by National Event, then Peter Behnke and CRC, Edgewood, Integro and Epic are responsible to make payment of any shortfall in coverage occasioned by their negligence and carelessness.

317.    As a result of the legal insurance coverage issues that have arisen in connection with the claims asserted in the Bianchi Lawsuit, the Eagles cancelled the Agreement with National Event.

318.    As a result of the cancellation of the Agreement, National Event has sustained a loss of profits.

319.    In addition, National Event has suffered damage to its reputation as a result of the cancellation of the Eagles' Contract caused by the problems associated with the legal insurance coverage issues arising from the claims asserted in the Bianchi Lawsuit, thereby sustaining further losses and damages.

320.    Peter Behnke, CRC, Edgewood, Integro and Epic are liable to National Event for all further consequential and compensatory damages, including but not limited to, the loss of profits and damage to reputation occasioned by the cancellation of the Agreement caused by the problems associated with the legal coverage issues arising from the claims asserted in the Bianchi Lawsuit.

321.    Peter Behnke, CRC, Edgewood, Integro and Epic are further liable to National Event for all consequential and compensatory damages caused by the coverage disclaimer of National Fire and MedPro including but not limited to:

    (a)    the loss of profits with respect to the cancellation of the contract with the Eagles;

(b)      damage to the reputation of National Event caused by the adverse publicity accompanying the cancellation of the Eagles Contract;

(c)      loss of profits occasioned by the adverse consequences of the insurance coverage issues; and

(d)      other losses or damages suffered by National Event as a result of the insurance coverage issues, the instant litigation and the adverse publicity occasioned by the ramifications of these events.

WHEREFORE, the plaintiff, National Event Services, Inc., demands judgment against the defendants, Peter Behnke, CRC Insurance Services, Edgewood Partners Insurance Center, Integro Group and Epic Brokerage, in an amount in excess of $50,000.00.

## COUNT III
### (Common Law and Statutory Bad Faith — National Fire, MedPro and Barri Orlow)

322.    The plaintiff, National Event, hereby incorporates by reference the foregoing Paragraphs 1 through 321 of this Complaint as though same were fully set forth herein.

323.    It is believed, and therefore averred based upon the representations of Peter Behnke, that Peter Behnke requested that National Fire and MedPro issue a Primary Policy and an Excess Policy which fully complied with the requirements of the Agreement.

324.    Peter Behnke, acting on behalf of National Fire and MedPro, represented to National Event that the Primary Policy and the Excess Policy provided coverage in accordance with the Agreement.

325.    National Fire and MedPro, however, apparently issued policies of insurance to National Event which did not fully comply with the Agreement and the requests and reasonable expectations of National Event.

60

326.     National Fire, MedPro and Barri Orlow have also misconstrued and misinterpreted the allegations of the Bianchi Lawsuit in wrongfully refusing to extend coverage under the Professional Liability Coverage Part and the General Liability Coverage Part of the Primary Policy and the Excess Policy for the claims asserted in the Bianchi Lawsuit.

327.     National Fire, MedPro and Barri Orlow have misconstrued and misinterpreted the allegations of the Bianchi Lawsuit in disclaiming coverage under portions of the Professional Liability Coverage Part and the General Liability Coverage Part of the Primary Policy and the Excess Policy for the claims asserted in the Bianchi Lawsuit.

328.     National Fire, MedPro and Barri Orlow have wrongfully refused to extend coverage for all of the claims asserted in the Bianchi Lawsuit under the Primary Policy and the Excess Policy.

329.     National Fire, MedPro and Barri Orlow have failed to comply with the implied covenants of good faith and fair dealing in handling the claims asserted in the Bianchi Lawsuit.

330.     National Fire, MedPro and Barri Orlow have breached the common law duty of good faith and fair dealing as contained within the Primary Policy and the Excess Policy issued to National Event.

331.     National Fire, MedPro and Barry Orlow are liable to National Event for common law bad faith damages.

332.     National Fire, MedPro and Barri Orlow are liable to National Event for all consequential and compensatory damages, including but not limited to, the loss of profits occasioned by the cancellation of the Agreement caused by the problems associated with the legal coverage issues arising from the Bianchi Lawsuit.

333.    National Fire, MedPro and Barri Orlow are liable to National Event for all consequential and compensatory damages caused by the common law bad faith conduct of National Fire, MedPro and Barri Orlow including but not limited to:

(a)    the loss of profits with respect to the cancellation of the contract with the Eagles;

(b)    damage to the reputation of National Event caused by the adverse publicity accompanying the cancellation of the Eagles Contract;

(c)    loss of profits occasioned by the adverse consequences of the insurance coverage issues; and

(d)    other losses or damages suffered by National Event as a result of the insurance coverage issues, the instant litigation and the adverse publicity occasioned by the ramifications of these events.


334.    National Fire, MedPro and Barri Orlow are also liable to National Event for statutory bad faith damages.

335.    The Pennsylvania Bad Faith Statute, 42 Pa.C.S.A. § 8371, provides:

In an action arising under an insurer policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

(1)    Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

(2)    Award punitive damages against the insurer.

(3)    Assess court costs and attorneys fees against the insurer.

42 Pa.C.S.A. § 8371.

336.    National Fire, MedPro and Barri Orlow have violated the Bad Faith Statute, 42 Pa.C.S.A. § 8371, in the investigation and evaluation of the coverage issues arising from the claims asserted in the Bianchi Lawsuit

337.    National Fire, MedPro and Barri Orlow are liable to National Event  for all statutory bad faith damages including interest, counsel fees, costs and punitive damages.

338.    National Fire, MedPro and Barri Orlow have acted in bad faith in violation of both the common law duties of good faith and fair dealing and the bad faith statute, 42 Pa.C.S.A. § 8371 in failing to properly, fairly and fully investigate and evaluate the claims asserted in the Bianchi Lawsuit by, *inter alia*:

(a)    engaging in unfair or deceptive acts or practices;

(b)    failing to fully, fairly and promptly evaluate the coverage claims arising under the Primary Policy and the Excess Policy;

(c)    refusing to extend coverage under the Professional Liability Coverage Part and the General Liability Coverage Part of the Primary Policy and the Excess Policy for the claims asserted in the Bianchi Lawsuit;

(d)    failing to fully, fairly and promptly evaluate and extend coverage for the claims asserted in the Bianchi Lawsuit;

(e)    intentionally interpreting the allegations in the Complaint and the Amended Complaint in such a way as to avoid coverage under the General Liability Coverage Part of the Primary Policy and the Excess Policy;

(f)    failing to reserve rights with respect to any coverage issues and defenses under the Primary Policy and the Excess Policy;

(g)    ignoring the reasonable expectations of National Event with respect to the Primary Policy and the Excess Policy;

(h)    involving defense counsel in the Bianchi Lawsuit in the coverage issues;

(i)    making changes to the Excess Policy in mid term without notifying National Event of these changes;

63

(j)    adding endorsements and limitations to the Excess Policy in mid policy term without providing any notice of these changes to National Event;

(k)    appending endorsements to the Excess Policy which were ambiguous and unenforceable;

(l)    attempting to enforce ambiguous policy limitations in the Excess Policy;

(m)    attempting to enforce the ambiguous Restricted Practice -- Covered Practice Endorsement appended to the Excess Policy;

(n)    failing to advise National Event of the terms, provisions and limitations of the Primary Policy and the Excess Policy;

(o)    failing to issue the Primary Policy and the Excess Policy with terms requested by National Event in order to comply with the insurance requirements of the Agreement;

(p)    forcing National Event to institute suit to ensure compliance with the coverage obligations of the Primary Policy and the Excess Policy;

(q)    breaching the implied covenant of good faith and fair dealing;

(r)    violating the Unfair Insurance Practices Act, 40 P.S. § 1171.1 et seq.;

(s)    acting in a dilatory and obdurate manner in evaluating the claims asserted under the Primary Policy and the Excess Policy;

(t)    forcing National Event to incur fees, costs and expenses in pursuing litigation to require National Fire and MedPro to honor its coverage obligations under the Primary Policy and the Excess Policy;

(u)    wantonly and willfully disregarding the rights of National Event;

(v)    elevating its own interests above those of its insured, National Event;

(w)    breaching the duty of good faith and fair dealing;

(x)    acting in bad faith in the handling the claims asserted against National Event in the Bianchi Lawsuit;

(y)    breaching the fiduciary duties owed to National Event;

(z)    violating the Unfair Claims Settlement Practices, 31 Pa. Code § 146.1 et seq.;

(aa)    violating the statutes and regulations governing the actions and practices of insurers in Pennsylvania;

(bb)    violating its own internal policies, procedures, practices and guidelines for the evaluation of coverage claims; and

(cc)    such other acts or omissions as may be developed during discovery.

339.    National Fire, MedPro and Barri Orlow are liable to National Event for payment of interest, fees, costs and punitive damages for the bad faith handling of the claims asserted against National Event in the Bianchi Lawsuit.

340.    National Fire, MedPro and Barri Orlow are liable for payment of all actual damages, consequential damages, interest, fees, costs and punitive damages to National Event by reason of the wanton, willful and reckless bad faith conduct in refusing to properly evaluate the claims asserted against National Event in the Bianchi Lawsuit.

341.    National Fire, MedPro and Barri Orlow wantonly and willfully ignored the rights of National Event under the policies in question.

342.    National Fire, MedPro and Barri Orlow have recklessly disregarded the rights of National Event with knowledge of its wanton and willful actions.

343.    National Event is entitled to recover all direct, indirect, compensatory, consequential and punitive damages from National Fire and MedPro by reason of common law and statutory bad faith.

WHEREFORE, the plaintiff, National Event Services, Inc., respectfully requests that the Court enter Judgment against National Fire & Marine Insurance Company, MedPro Group and

Barri Orlow in an amount in excess of $50,000.00.

<div style="margin-left:40%">

**HAGGERTY, GOLDBERG,**
**SCHLEIFER & KUPERSMITH, P.C.**

BY: _____
     James C. Haggerty, Esquire
     Attorney Id. Nos. 30003
     1801 Market Street
     Suite 1100
     Philadelphia, PA  19103
     (267) 350-6600

</div>

## VERIFICATION

I, Carl Monzo III, Representative of National Event Services, Inc., state that the facts set forth in this pleading are true and correct to the best of my knowledge, information and belief.  I understand that the statements are made subject to the penalties of 18 Pa.C.S.A. §4904 relating to unsworn falsification to authorities.


BY: _Carl Monzo III_

67

EXHIBIT A

# Supreme Court of Pennsylvania

## Court of Common Pleas
## Civil Cover Sheet

PHILADELPHIA _____ County

| For Prothonotary Use Only: |
| --- |
| Docket No: |

*Filed and Attested by the Office of Judicial Records 20 AUG 2020 12:14 pm S. RICE*

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

**SECTION A**

**Commencement of Action:**
- ☒ Complaint
- ☐ Writ of Summons
- ☐ Petition
- ☐ Transfer from Another Jurisdiction
- ☐ Declaration of Taking

Lead Plaintiff's Name:
Maurizio Bianchi

Lead Defendant's Name:
The Philadelphia Eagles

**Are money damages requested?** ☒ Yes  ☐ No

Dollar Amount Requested: (check one)
- ☐ within arbitration limits
- ☒ outside arbitration limits

**Is this a Class Action Suit?** ☐ Yes  ☒ No

**Is this an MDJ Appeal?** ☐ Yes  ☒ No

Name of Plaintiff/Appellant's Attorney: Joseph G. DeAngelo

☐ **Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)**

**Nature of the Case:** Place an "X" to the left of the **ONE** case category that most accurately describes your **PRIMARY CASE.** If you are making more than one type of claim, check the one that you consider most important.

**SECTION B**

**TORT** *(do not include Mass Tort)*
- ☐ Intentional
- ☐ Malicious Prosecution
- ☐ Motor Vehicle
- ☐ Nuisance
- ☒ Premises Liability
- ☐ Product Liability *(does not include mass tort)*
- ☐ Slander/Libel/ Defamation
- ☐ Other: _____

**MASS TORT**
- ☐ Asbestos
- ☐ Tobacco
- ☐ Toxic Tort - DES
- ☐ Toxic Tort - Implant
- ☐ Toxic Waste
- ☐ Other: _____

**PROFESSIONAL LIABLITY**
- ☐ Dental
- ☐ Legal
- ☐ Medical
- ☐ Other Professional: _____

**CONTRACT** *(do not include Judgments)*
- ☐ Buyer Plaintiff
- ☐ Debt Collection: Credit Card
- ☐ Debt Collection: Other

_____

- ☐ Employment Dispute: Discrimination
- ☐ Employment Dispute: Other

_____

- ☐ Other: _____

**REAL PROPERTY**
- ☐ Ejectment
- ☐ Eminent Domain/Condemnation
- ☐ Ground Rent
- ☐ Landlord/Tenant Dispute
- ☐ Mortgage Foreclosure: Residential
- ☐ Mortgage Foreclosure: Commercial
- ☐ Partition
- ☐ Quiet Title
- ☐ Other: _____

**CIVIL APPEALS**
Administrative Agencies
- ☐ Board of Assessment
- ☐ Board of Elections
- ☐ Dept. of Transportation
- ☐ Statutory Appeal: Other

_____

- ☐ Zoning Board
- ☐ Other: _____

**MISCELLANEOUS**
- ☐ Common Law/Statutory Arbitration
- ☐ Declaratory Judgment
- ☐ Mandamus
- ☐ Non-Domestic Relations Restraining Order
- ☐ Quo Warranto
- ☐ Replevin
- ☐ Other: _____

## <u>NOTICE</u>

**Pennsylvania Rule of Civil Procedure 205.5. (Cover Sheet) provides, in part:**

**Rule 205.5.   Cover Sheet**

(a)(1) This rule shall apply to all actions governed by the rules of civil procedure except the following:

      (i)      actions pursuant to the Protection from Abuse Act, Rules 1901 et seq.

      (ii)     actions for support, Rules 1910.1 et seq.

      (iii)    actions for custody, partial custody and visitation of minor children, Rules 1915.1 et seq.

      (iv)    actions for divorce or annulment of marriage, Rules 1920.1 et seq.

      (v)     actions in domestic relations generally, including paternity actions, Rules 1930.1 et seq.

      (vi)    voluntary mediation in custody actions, Rules 1940.1 et seq.

(2)     At the commencement of any action, the party initiating the action shall complete the cover sheet set forth in subdivision (e) and file it with the prothonotary.

(b)     The prothonotary shall not accept a filing commencing an action without a completed cover sheet.

(c)     The prothonotary shall assist a party appearing pro se in the completion of the form.

(d)     A judicial district which has implemented an electronic filing system pursuant to Rule 205.4 and has promulgated those procedures pursuant to Rule 239.9 shall be exempt from the provisions of this rule.

(e)     The Court Administrator of Pennsylvania, in conjunction with the Civil Procedural Rules Committee, shall design and publish the cover sheet. The latest version of the form shall be published on the website of the Administrative Office of Pennsylvania Courts at www.pacourts.us.

Case ID: 200801739

> THIS IS NOT AN ARBITRATION
> MATTER.  A JURY OF TWELVE
> (12) PERSONS IS DEMANDED.

**BARRETT DEANGELO, LLC**
BY: MICHAEL F. BARRETT/JOSEPH G. DEANGELO/MICHAEL MONGELUZZI
IDENTIFICATION NO. 42305/308004/318636                    ATTORNEYS FOR PLAINTIFFS
1221-1223 Locust Street
Philadelphia, Pennsylvania 19107
(215) 882-3443

| | |
|---|---|
| MAURIZIO BIANCHI, Administrator of the Estate of Marco Bianchi, Deceased, in his own right and on behalf of said Decedent's Next-of-Kin and Heirs-at-Law<br>1213 Arundel Drive<br>Wilmington, DE 19808<br><br>and<br><br>ALEX BIANCHI<br>424 Harrison Drive<br>Hockessin, DE 19707<br>*Plaintiffs*<br><br>v.<br><br>THE PHILADELPHIA EAGLES<br>NovaCare Complex<br>One Novacare Way<br>Philadelphia, PA 19145<br><br>and<br><br>LINCOLN FINANCIAL FIELD<br>1 Lincoln Financial Field Way<br>Philadelphia, PA 19148<br><br>and<br><br>NATIONAL EVENT SERVICES, INC.<br>501 Bailey Road<br>Yeadon, PA 19050 | *PHILADELPHIA COUNTY COURT OF COMMON PLEAS LAW DIVISION*<br><br><br>*AUGUST TERM*, 2020<br>*No.*<br><br><br><br><br>*JURY TRIAL DEMANDED* |

and

NATIONAL FOOTBALL LEAGUE
345 Park Ave
New York, NY 10154

and

JOHN DOE 1

and

JOHN DOE 2

*Defendants*

## NOTICE TO PLEAD

"NOTICE

"You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by an attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgement may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

"YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

PHILADELPHIA BAR ASSOCIATION
LAWYER REFERRAL and INFORMATION SERVICE
One Reading Center
Philadelphia, Pennsylvania 19107
(215) 238-1701"

"AVISO

"Le han demandado a usted en la corte. Si usted quiere defenderse do estas demandas expuestas en las páginas siguientes, usted tiene veinte (20) dias, de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparecea escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no de defiende, la corte tomará medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

"LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE. SI NO TIENE ABAGADO O SI NO TIENE EL DINERO SUFICIENTE DE PARGAR TAL SERVICO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL

ASSOCIACION DE LICENDIADOS DE FILADELFIA
SERVICO DE REFERENCA E INFORMACION LEGAL
One Reading Center
Filadelfia, Pennsylvania 19107
Telefono: (215) 238-1701"

## COMPLAINT

Plaintiffs, Maurizio Bianchi, Administrator of the Estate of Marco Bianchi, Deceased, in his own right and on behalf of said Decedent's Next-of-Kin and Heirs-at-Law and Alex Bianchi, claims of Defendants, The Philadelphia Eagles, Lincoln Financial Field, National Event Services, Inc., National Football League, John Doe 1 and John Doe 2, jointly and severally, and each of them, respectively, separate sums in excess of $50,000 in damages upon causes of action whereof the following are true statements:

1.      Plaintiff, Maurizio Bianchi, is an adult individual and the father and Administrator of the Estate of Marco Bianchi, Deceased, residing at 1213 Arundel Drive, Wilmington, DE 19808.

- 2 -

2.     Plaintiff, Alex Bianchi, is an adult individual and brother of Decedent, Marco Bianchi, residing at 424 Harrison Drive, Hockessin, DE 19707.

3.     Defendant, The Philadelphia Eagles ("Eagles"), is a business entity organized and existing under the laws of the Commonwealth of Pennsylvania and which at all times relevant hereto, engaged in regular, systematic, continuous and substantial business within Philadelphia County with its principal place of business located at NovaCare Complex, One Novacare Way, Philadelphia, PA, 19145.

4.     Defendant, Lincoln Financial Field ("Lincoln") is a business entity organized and existing under the laws of the Commonwealth of Pennsylvania and which at all times relevant hereto, engaged in regular, systematic, continuous and substantial business within Philadelphia County with its principal place of business located at 1 Lincoln Financial Field Way, Philadelphia, PA 19148.

5.     Defendant, National Event Services, Inc. ("Event"), is a business entity organized and existing under the laws of the Commonwealth of Pennsylvania and which at all times relevant hereto, engaged in regular, systematic, continuous and substantial business within Philadelphia County with its principal place of business located at 501 Bailey Road, Yeadon, PA 19050.

6.     Defendant, National Football League ("NFL"), is a non-profit organization entity organized and existing under the laws of the State of New York and which at all times relevant hereto, engaged in regular, systematic, continuous and substantial business within Philadelphia County with its principal place of business located at 345 Park Ave, New York, NY 10154.

7.     Defendants, John Doe 1 and John Doe 2, is an unknown fictious individual, individuals, and/or companies responsible for the ownership, hiring and maintaining of the premises known as Lincoln Financial Field located at 1 Lincoln Financial Field Way, Philadelphia, PA 19148 at the times referenced

- 3 -

herein who Plaintiff could not identify despite a reasonable search. A reasonable and diligent search was conducted to determine the actual names/identities of Defendants, John Doe 1 and John Doe 2.

8.    Pursuant to Pennsylvania Rule of Civil Procedure 2005, Defendants, John Doe 1 and John Doe 2, are currently unidentified, fictious defendants added Doe designated to this action where their actual name/identity is unknown despite a reasonable and diligent search.

9.    Plaintiffs reserve the right to amend this Complaint and name said unknown individuals and/or entities, as defendants pursuant to Pennsylvania Rule of Civil Procedure 2005 and 1033.

10.    At all relevant times, Defendants, John Doe 1 and John Doe 2, carried on substantial business activities within Philadelphia County and the Commonwealth of Pennsylvania.

11.    At all times mentioned herein and material hereto, Defendants, Eagles, Lincoln, Event, NFL and John Doe 1 and John Doe 2, owned, managed, maintained, operated, controlled, the property known as Lincoln Financial Field located at 1 Lincoln Financial Field Way, Philadelphia, PA 19148 ("hereinafter referred to as the premises").

12.    At all times mentioned herein and material hereto, Defendants, Eagles, Lincoln, Event, NFL, John Doe 1 and John Doe 2, undertook and/or maintained certain responsibilities and obligations for providing safety and emergency medical services to the spectators/invitees of the premises during Philadelphia Eagles NFL games.

13.    At all times mentioned herein and material hereto, Defendants, Eagles, Lincoln, NFL, John Doe 1 and/or John Doe 2 contracted with Defendant, Event, for emergency medical services provided to spectators/invitees of the premises during Philadelphia Eagles NFL games.

- 4 -

14.     At all times material hereto, Defendant, Lincoln was acting as an agent, servant and/or workman of Defendants, Eagles and/or NFL, and, as such, these Defendants are liable for the acts of Defendant Lincoln under theories of vicarious liability and agency (actual, apparent, ostensible or otherwise).

15.     At all times material hereto, Defendant, Eagles, was acting as an agent, servant and/or workman of Defendant, NFL, and, as such, Defendant is liable for the acts of Defendant Eagles under theories of vicarious liability and agency (actual, apparent, ostensible or otherwise).

16.     At all times material hereto, Defendant, Event was acting as an agent, servant and/or workman of Defendants, Eagles, Lincoln, and/or NFL, and, as such, these Defendants are liable for the acts of Defendant Event under theories of vicarious liability and agency (actual, apparent, ostensible or otherwise).

17.     On or about September 22, 2019, Decedent, Marco Bianchi, was a lawful and proper business invitee and spectator at Defendants' premises for the Philadelphia Eagles NFL game.

18.     At all times mentioned herein and relevant hereto, Decedent, Marco Bianchi, was a spectator located in the first few rows of Section 131 in the north endzone stands.



19.     As per the above included seating diagram published on the World Wide Web at www.lincolnfinancialfield.com, Section 131 is one of the designated "ADA Seating" sections for Americans with Disabilities.

20.     At all times mentioned herein and relevant hereto, Plaintiff, Alex Bianchi, was a spectator located on the field at the 50-yard line with his wife and daughter.

21.     Lincoln Financial Field advertises that "the staff at Lincoln Financial Field has been trained in proper procedures for emergency situations."

Case ID: 200801739

22.     In about 2000, Defendant Eagles agreed on a deal to construct a new NFL football stadium, including approval of the City of Philadelphia's funding of the construction.

23.     According to Pennsylvania filing records, Defendant National Event Services was created in or about 2001.

24.     Lincoln Financial Field completed construction in about 2003, a joint effort between and among Defendants, Eagles and NFL.

25.     Lincoln Financial Field has a seating capacity of 67,594 fans and regularly hosts as many fans for its NFL games.

26.     Lincoln Financial Field includes 685 wheelchair accessible seats, compared to the former Veterans Stadium which included 256 such seats.

27.     According to Forbes, in 2019 Defendant Eagles were valued at $3.05 Billion, with an estimated net operating income of at least $150,000,000.

28.     While attending the Eagles game on September 22, 2019, Decedent, Marco Bianchi, began to suffer a sudden medical emergency.

29.     At the time Decedent began to suffer a medical emergency, proper personnel of the Defendants were immediately alerted.

30.     At all times mentioned herein and relevant hereto, Plaintiff, Alex Bianchi, was alerted to the fact that his brother was suffering a medical emergency and immediately rushed over to the section of the stadium where his brother was attending.

31.     Spectators rushed over and began attempting life-saving CPR on the decedent.

- 7 -

32.     For an unreasonably long period of time while spectators were attempting life-saving services on the Decedent, the Defendants and/or their EMS personnel failed to arrive at the scene with proper equipment.

33.     For an unreasonably long period of time Defendants failed to appropriately and timely respond to the medical emergency.

34.     Upon information and belief, Defendants were not properly equipped with an AED to timely provide medical care/intervention to Decedent.

35.     Upon information and belief, only after an unreasonably long period of time did stadium personnel arrive with medical equipment.

36.     Decedent was eventually transported to Thomas Jefferson University Hospital via ambulance.

37.     At all times mentioned herein and relevant hereto, Plaintiff, Alex Bianchi, upon being alerted of his brother's dire situation rushed over to the section, but was immediately met by Defendants' event staff who prohibited him from getting to his brother despite his informing them that he was a physician and that he could assist with the emergency.

38.     At all times mentioned herein and relevant hereto, Plaintiff, Alex Bianchi, while not permitted to go to his brother during a medical emergency and assist, was forced to witness his brother undergo CPRs attempts by a spectator(s) and the ill-equipped response by stadium personnel that left his brother in dire condition, ultimately causing his demise.

- 8 -

39.     At all times mentioned herein and relevant hereto, Plaintiff, Alex Bianchi, remained in his brother's presence both at the stadium and at the hospital, up through the time that he was pronounced deceased.

40.     Following Marco Bianchi's death, public discussion boards on Reddit.com surfaced on the world wide web, including posts regarding Defendants' response time to Mr. Bianchi's medical emergency, as follows:

> "I was one of the nurses who responded to the emergency in the stands. I have been in a hundred codes probably before and have never been in a situation out of a hospital without equipment like that... I was delivering compressions to him... in response to the response of the EMTs... that was terrible honestly... I am appalled by the situation and have contacted the stadium thru email and am waiting for a response. There has to be some standards and guidelines for having emergency equipment for a stadium that holds 73,000+ fans." (public user post on reddit.com)

> ***

> "This was horrific and tragic. My condolences to the family, this was rough to watch. Jennifer is my sister. We attended the game together. Section 135 Row 1. She is being modest. She saw the guy go down and immediately knew he needed help. I yelled to security on the field. "she is a nurse get her over there" Security brought her down over the wall. ran her over to the section and raised her into the section. She tried everything she could to help the man. The life saving equipment she needed never arrived. It felt like forever before any of the EMT's arrived and when they did they did not have what was needed. My heart goes out to the family. This is a terrible loss. jenn...you did everything

- 9 -

you could and like a god damn superhero you were a first responder. I am so proud of you!" (public user post on reddit.com)

\*\*\*

"It's completely unacceptable that the right equipment wasn't there and even worse it took EMTs so long to arrive and even when they did they did not bring oxygen or an AED." (public user post on reddit.com)

\*\*\*

"Ever since the game, my wife and I have talked about this constantly and just can't get over the fact that there wasn't an AED or Oxygen over there for him within minutes." (public user post on reddit.com)

\*\*\*

"We were about 7 rows back and one section over but on the end seats that shared the same stairs as the responders. We witnessed it right from the moment he collapsed. And, YES! both my husband and I thought it took forever for EMTs to arrive... What a terrible shame at the Linc, as large and crowded a venue as it is, doesn't have MORE stations with portable defibrillators and EMTs trained to operate them." (public user post on reddit.com)

\*\*\*

"I was in section 129 and watched from above... I was wondering what the hell took so long for EMTs/appropriate equipment to arrive." (public user post on reddit.com)

- 10 -

41.     As a result of the willful, wanton, outrageous, reckless, careless and negligent conduct of the Defendants by and through their separate and respective agents, employees, servants and/or workers, acting within the course of their employment and scope of their authority, Decedent, Marco Bianchi, came to his demise on September 22, 2019.

42.     Upon information and belief, for a significant period of time prior to Decedent's medical emergency Defendants were on notice of similar circumstances wherein there was a lack of timely response to provide AED and/or other emergency care to spectators at Eagles games.

43.     Despite the aforementioned notice, Defendants failed to take proper steps for the adequate provision of emergency medical services for spectators at Eagles games.

## COUNT I
## NEGLIGENCE/RECKLESSNESS
**MAURIZIO BIANCHI, Administrator of the Estate of Marco Bianchi, Deceased, in his own right and on behalf of said Decedent's Next-of-Kin and Heirs-at-law v. ALL DEFENDANTS**

44.     Plaintiff, Maurizio Bianchi, Administrator of the Estate of Marco Bianchi, deceased, in his own right and on behalf of said Decedent's Next-of-Kin and Heirs-at-law incorporates by reference all preceding paragraphs of this complaint, the same as if fully set forth hereinafter.

45.     Defendant, Event, by and through their separate and respective agents, employees, servants and/or workers, acting within the course of their employment and scope of their authority, engaged in wanton conduct and were reckless, willful, outrageous, careless and negligent in:

a)     Failing to recognize and appreciate the immediacy of Decedent's medical emergency;

b)     Failing to arrive in adequate time as to provide life-saving emergency services;

c)     Failing to arrive in adequate time as to utilize an AED defibrillator on the Decedent;

d)     Unnecessarily delaying treatment and care to a spectator in a medical emergency;

e)     Failing to arrive in adequate time as to utilize oxygen on the Decedent

- 11 -

f)  Failing to bring an AED defibrillator to the scene of an emergency;

g)  Failing to bring oxygen, to be administered to the decedent, at the scene of a cardiac emergency;

h)  Delaying the arrival of emergency personnel to the scene;

i)  Failing to provide sufficient emergency personnel staffing at the premises as to respond to emergency situations in a timely fashion;

j)  Failing to have an AED defibrillator located in a close proximity to the emergency medical scene;

k)  Failing to have oxygen located in a close proximity to the medical emergency scene;

l)  Failing to take proper precautions for the provision of emergency medical services in ADA designated seating sections;

m)  Failing to assess the medical situation as an emergency to be in a position to render life-saving medical services on the Decedent in a timely and appropriate manner;

n)  Failing to enact proper policies and procedures in regards to appropriately and in a timely fashion responding to a medical emergency within a venue of great size;

o)  Failing to properly train their employees with regard to appropriately responding to a medical emergency in a timely fashion;

p)  Failing to employ proper staffing for Eagles games;

q)  Failing to purchase sufficient AED machines for the seating capacity at the stadium;

r)  Failing to utilize sufficient AED machines for the size of the venue;

s)  Failing to situate AED machines in proper locations so as to facilitate timely medical intervention;

t)  Failing to properly train their employees in the provision of emergency response in the context of a stadium event; and,

u)  Failing to properly train their employees with regard to bringing life-saving medical equipment to a medical emergency in a timely fashion in a venue of great size.

46.  As a direct and proximate result of the Defendant, Event's willful, wanton, outrageous, reckless, careless and negligent conduct, as described above, Plaintiff's Decedent, was caused to sustain serious, disabling and permanent injuries all of which led to his untimely death on September 22, 2019; including but not limited to: loss of oxygen; respiratory distress; conscious pain and suffering; severe trauma; cardiac failure; he suffered other medical injuries, the full extent of which have yet to be determined.

- 12 -

47.    Defendants, Eagles, Lincoln, NFL, John Doe 1 and John Doe 2, by and through their separate and respective agents, employees, servants and/or workers, acting within the course of their employment and scope of their authority, engaged in wanton conduct and were reckless, willful, outrageous, careless and negligent in:

a)    Failing to ascertain the capabilities of Defendant, Event, to adequately and timely respond to a medical emergency of a venue of great size;

b)    Hiring inadequate emergency medical services to respond to medical emergencies at their venue;

c)    Failing to properly investigate whether Defendant, Event, was properly adequate in responding to medical emergencies in venues of great size;

d)    Inadequately and negligent undertaking a duty to provide proper emergency medical care at its events in violation of the Restatement 2nd of Torts;

e)    Failing to take proper precautions for the provision of emergency medical services in their ADA designated sections;

f)    Failing to hire and/or employ competent emergency medical staffing;

g)    Failing to properly supervise the conduct of Defendant Event;

h)    Failing to ascertain whether Defendant, Event, had enacted proper policies and procedures with regard to responding to a medical emergency in a timely fashion within a venue of great size;

i)    Failing to ascertain whether Defendant, Event, had enough emergency personnel at the premises as to respond to emergency situations in a timely fashion;

j)    Failing to have an AED defibrillator located in a close proximity to the medical emergency scene;

k)    Failing to take adequate measures in response to prior medical emergencies to prevent improper responses from re-occurring;

l)    Failing to have oxygen located in a close proximity to the medical emergency scene;

m)    Failing to ascertain whether Defendant, Event, could appreciate a medical emergency and respond in a timely fashion; and

n)    Entrusting emergency medical employees of Defendant, Event, to respond to a medical emergency at their venue in a timely and appropriate manner.

48.    As a direct and proximate result of the Defendant, Eagles, Lincoln, NFL, John Doe 1 and John Doe 2's willful, wanton, outrageous, reckless, careless and/or negligent conduct, as described above,

- 13 -

Plaintiff's Decedent, was caused to sustain serious, disabling and permanent injuries all of which led to his untimely death on September 22, 2019; including but not limited to: loss of oxygen; respiratory distress; conscious pain and suffering; cardiac failure; severe trauma; he suffered other medical injuries, the full extent of which have yet to be determined.

WHEREFORE, Plaintiff, Maurizio Bianchi, Administrator of the Estate of Marco Bianchi, Deceased, demands that judgment be entered in his favor and against all Defendants jointly and severally, and/or separately, including punitive damages, in an amount in excess of Fifty Thousand Dollars ($50,000.00) each upon this Count.

## COUNT II
## WRONGFUL DEATH
**MAURIZIO BIANCHI, Administrator of the Estate of Marco Bianchi, Deceased, in his own right and on behalf of said Decedent's Next-of-Kin and Heirs-at-law v. ALL DEFENDANTS**

49.     Plaintiff, Maurizio Bianchi, hereby incorporates by reference all paragraphs above of this Complaint, the same as if set forth at length hereinafter.

50.     Plaintiff bring this action in his own right and on behalf of the Wrongful Death beneficiaries of Decedent, Marco Bianchi, pursuant to the Pennsylvania Wrongful Death Act, 42 Pa. C.S.A. § 8301, *et seq.*, and claims all damages recoverable under the Pennsylvania Wrongful Death Act.

51.     As a direct and proximate result of the foregoing, the Decedent's Wrongful Death beneficiaries have been, continue to be and will in the future be wrongfully deprived of Decedent's companionship, guidance, services, moral up-bringing and tutelage.

52.     As a direct and proximate result of the foregoing, Decedent's Wrongful Death beneficiaries have been, continue to be, and will in the future be deprived of his counsel and society.

53.     As a direct and proximate result of the Defendants' willful, wanton, outrageous, reckless, careless and/or negligent conduct, as set forth above, Decedent's Wrongful Death beneficiaries suffered,

- 14 -

are suffering, and will, for an indefinite period of time in the future, suffer damages, injuries and losses including, but not limited to, a loss of financial support, and the beneficiaries have been wrongfully deprived of the contributions they would have received from him, including monies which he would have provided for items such as clothing, food, shelter, medical care, education, and entertainment, recreation and gifts.

54.    As a direct and proximate result of the Defendants' negligence as set forth above, Decedent's beneficiaries have been caused to incur and pay various expenses for medical treatment, hospital care, custodial care, nursing care and medications, and/or funeral and other expenses related to his death, for which there is entitlement to compensation.

**WHEREFORE,** Plaintiff, Maurizio Bianchi, Administrator of the Estate of Marco Bianchi, Deceased, demands that judgment be entered in his favor and against all Defendants, jointly and severally, and/or separately, including punitive damages, in an amount in excess of Fifty Thousand Dollars ($50,000.00) each upon this Count.

## COUNT III
## SURVIVAL
**MAURIZIO BIANCHI, Administrator of the Estate of Marco Bianchi, Deceased, in his own right and on behalf of said Decedent's Next-of-Kin and Heirs-at-law v. ALL DEFENDANTS**

55.    Plaintiff, Maurizio Bianchi, hereby incorporates by reference all paragraphs above of this Complaint, the same as if set forth at length hereinafter.

56.    As a direct and proximate result of Defendants' recklessness and/or negligence as aforementioned, Decedent suffered extreme pain and suffering and death, for which Plaintiff makes claims on behalf of Decedent's heirs and/or survivors.

Case ID: 200801739

57.     As a direct and proximate result of the foregoing, Decedent suffered extreme mental anguish.

58.     As a direct and proximate result of Defendants' wanton, reckless, willful, outrageous and/or negligent conduct as aforesaid, Decedent was caused to sustain injuries, the full extent of which are yet known, and death as described herein above, which are fully incorporated herein by reference.

**WHEREFORE,** Plaintiff, Maurizio Bianchi, Administrator of the Estate of Marco Bianchi, Deceased, demands that judgment be entered in his favor and against all Defendants, jointly and severally, and/or separately, including punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00) each upon this Count.

## COUNT IV
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### ALEX BIANCHI v. ALL DEFENDANTS

59.     Plaintiff, Alex Bianchi, hereby incorporates by reference all paragraphs above of this Complaint, the same as if set forth at length hereinafter.

60.     Plaintiff, Alex Bianchi, witnessed the accident/ medical emergency ultimately causing fatal injuries of Marco Bianchi, contemporaneous with its occurrence.

61.     Alex Bianchi is a close relative of Marco Bianchi, that being his sibling.

62.     Plaintiff, Alex Bianchi, suffered shock fright, emotional trauma and emotional distress when he contemporaneously witnessed and observed the dramatic and horrific events of the accident/medical emergency.

Case ID: 200801739

63.     As a result of the Defendants, wanton, reckless, willful, outrageous and/or negligent conduct as aforesaid, Plaintiff, Alex Bianchi, suffered physical injuries, the full extent of which are not yet known.

64.     As a result of Defendants, wanton, reckless, willful, outrageous and/or negligent conduct as aforesaid, Defendants are liable to Alex Bianchi, for negligent infliction of emotion distress.

**WHEREFORE,** Plaintiff, Alex Bianchi, demands that judgment be entered in his favor and against all Defendants, jointly and severally, and/or separately, including punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00) each upon this Count.

**BARRETT DEANGELO LLC**

*/s/ Joseph G. DeAngelo*
MICHAEL F. BARRETT, ESQUIRE
JOSEPH G. DEANGELO, ESQUIRE
MICHAEL MONGELUZZI, ESQUIRE

Case ID: 200801739

DocuSign Envelope ID: ...

# VERIFICATION

The averments or denials of fact contained in the foregoing are true based upon the signer's personal knowledge or information and belief. If the foregoing contains averments which are inconsistent in fact, signer has been unable, after reasonable investigation, to ascertain which of the inconsistent averments are true, but signer has knowledge or information sufficient to form a belief that one of them is true. This Verification is made subject to the penalties of the 18 Pa. C.S. §4904, relating to unsworn falsification to authorities.

DocuSigned by:

*Maurizio Bianchi*

D7AEFE9F7E2F4B0...

Maurizio Bianchi

Date: 8/19/2020

Case ID: 200801739

DocuSign Envelope ID: 8CC2363E-0799-4B74-BA09-A6D757820684

# <u>VERIFICATION</u>

The averments or denials of fact contained in the foregoing are true based upon the signer's personal knowledge or information and belief.  If the foregoing contains averments which are inconsistent in fact, signer has been unable, after reasonable investigation, to ascertain which of the inconsistent averments are true, but signer has knowledge or information sufficient to form a belief that one of them is true.  This Verification is made subject to the penalties of the 18 Pa. C.S. §4904, relating to unsworn falsification to authorities.

DocuSigned by:

CA8BB957ECA249A...

Alex Bianchi

Date:  8/19/2020

EXHIBIT B

THIS IS NOT AN ARBITRATION
MATTER. ~~Filed and Attested by the~~ TWELVE
(12) PERSONS ~~Office of Judicial Records~~ DEMANDED
29 SEP 2020 02:58 pm
A. SILIGRINI

**BARRETT DEANGELO, LLC**
BY: MICHAEL F. BARRETT/JOSEPH G. DEANGELO/MICHAEL MONGELUZZI/
IDENTIFICATION NO. 42305/308004/318636            ATTORNEYS FOR PLAINTIFFS
1221-1223 Locust Street
Philadelphia, Pennsylvania 19107
(215) 882-3443

| | |
|---|---|
| MAURIZIO BIANCHI, Administrator of the Estate of Marco Bianchi, Deceased, in his own right and on behalf of said Decedent's Next-of-Kin and Heirs-at-Law<br>1213 Arundel Drive<br>Wilmington, DE 19808 | *PHILADELPHIA COUNTY*<br>*COURT OF COMMON PLEAS*<br>*LAW DIVISION* |
| and | |
| ALEX BIANCHI<br>424 Harrison Drive<br>Hockessin, DE 19707 | *AUGUST TERM, 2020*<br>*No. 01739* |
| *Plaintiffs* | |
| v. | |
| THE PHILADELPHIA EAGLES<br>NovaCare Complex<br>One Novacare Way<br>Philadelphia, PA 19145 | ***JURY TRIAL DEMANDED*** |
| and | |
| LINCOLN FINANCIAL FIELD<br>1 Lincoln Financial Field Way<br>Philadelphia, PA 19148 | |
| and | |
| NATIONAL EVENT SERVICES, INC.<br>501 Bailey Road<br>Yeadon, PA 19050 | |

Case ID: 200801739

and

NATIONAL FOOTBALL LEAGUE
345 Park Ave
New York, NY 10154

and

JOHN DOE 1

and

JOHN DOE 2

*Defendants*

## NOTICE TO PLEAD

| "NOTICE | "AVISO |
|---|---|
| "You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by an attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgement may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you. | "Le han demandado a usted en la corte. Si usted quiere defenderse do estas demandas expuestas en las páginas siguientes, usted tiene veinte (20) días, de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparencia escrita o en persona o con un abagado y entregar a la corte en forma escrita sus defensas o sus objecciones a las demandas en contra de su persona. Sea avisado que si usted no de defiende, la corte tomará medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted. |
| "YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP. | "LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE. SI NO TIENE ABAGADO O SI NO TIENE EL DINERO SUFICIENTE DE PARGAR TAL SERVICO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL |
| PHILADELPHIA BAR ASSOCIATION LAWYER REFERRAL and INFORMATION SERVICE One Reading Center Philadelphia, Pennsylvania 19107 (215) 238-1701" | ASSOCIACION DE LICENDIADOS DE FILADELFIA SERVICO DE REFERENCA E INFORMACION LEGAL One Reading Center Filadelfia, Pennsylvania 19107 Telefono: (215) 238-1701" |

## AMENDED COMPLAINT

Plaintiffs, Maurizio Bianchi, Administrator of the Estate of Marco Bianchi, Deceased, in his own right and on behalf of said Decedent's Next-of-Kin and Heirs-at-Law and Alex Bianchi, claims of Defendants, The Philadelphia Eagles, Lincoln Financial Field, National Event Services, Inc., National Football League, John Doe 1 and John Doe 2, jointly and severally, and each of them, respectively, separate sums in excess of $50,000 in damages upon causes of action whereof the following are true statements:

1.     Plaintiff, Maurizio Bianchi, is an adult individual and the father and Administrator of the Estate of Marco Bianchi, Deceased, residing at 1213 Arundel Drive, Wilmington, DE 19808.

2.      Plaintiff, Alex Bianchi, is an adult individual and brother of Decedent, Marco Bianchi, residing at 424 Harrison Drive, Hockessin, DE 19707.

3.      Defendant, The Philadelphia Eagles ("Eagles"), is a business entity organized and existing under the laws of the Commonwealth of Pennsylvania and which at all times relevant hereto, engaged in regular, systematic, continuous and substantial business within Philadelphia County with its principal place of business located at NovaCare Complex, One Novacare Way, Philadelphia, PA, 19145.

4.      Defendant, Lincoln Financial Field ("Lincoln") is a business entity organized and existing under the laws of the Commonwealth of Pennsylvania and which at all times relevant hereto, engaged in regular, systematic, continuous and substantial business within Philadelphia County with its principal place of business located at 1 Lincoln Financial Field Way, Philadelphia, PA 19148.

5.      Defendant, National Event Services, Inc. ("Event"), is a business entity organized and existing under the laws of the Commonwealth of Pennsylvania and which at all times relevant hereto, engaged in regular, systematic, continuous and substantial business within Philadelphia County with its principal place of business located at 501 Bailey Road, Yeadon, PA 19050.

6.      Defendant, National Football League ("NFL"), is a non-profit organization entity organized and existing under the laws of the State of New York and which at all times relevant hereto, engaged in regular, systematic, continuous and substantial business within Philadelphia County with its principal place of business located at 345 Park Ave, New York, NY 10154.

7.      Defendants, John Doe 1 and John Doe 2, is an unknown fictious individual, individuals, and/or companies responsible for the ownership, hiring and maintaining of the premises known as Lincoln Financial Field located at 1 Lincoln Financial Field Way, Philadelphia, PA 19148 at the times referenced

- 3 -

herein who Plaintiff could not identify despite a reasonable search. A reasonable and diligent search was conducted to determine the actual names/identities of Defendants, John Doe 1 and John Doe 2.

8.      Pursuant to Pennsylvania Rule of Civil Procedure 2005, Defendants, John Doe 1 and John Doe 2, are currently unidentified, fictious defendants added Doe designated to this action where their actual name/identity is unknown despite a reasonable and diligent search.

9.      Plaintiffs reserve the right to amend this Complaint and name said unknown individuals and/or entities, as defendants pursuant to Pennsylvania Rule of Civil Procedure 2005 and 1033.

10.     At all relevant times, Defendants, John Doe 1 and John Doe 2, carried on substantial business activities within Philadelphia County and the Commonwealth of Pennsylvania.

11.     At all times mentioned herein and material hereto, Defendants, Eagles, Lincoln, Event, NFL and John Doe 1 and John Doe 2, owned, managed, maintained, operated, controlled, the property known as Lincoln Financial Field located at 1 Lincoln Financial Field Way, Philadelphia, PA 19148 ("hereinafter referred to as the premises").

12.     At all times mentioned herein and material hereto, Defendants, Eagles, Lincoln, Event, NFL, John Doe 1 and John Doe 2, undertook and/or maintained certain responsibilities and obligations for providing safety and emergency medical services to the spectators/invitees of the premises during Philadelphia Eagles NFL games.

13.     At all times mentioned herein and material hereto, Defendants, Eagles, Lincoln, NFL, John Doe 1 and/or John Doe 2 contracted with Defendant, Event, for emergency medical services provided to spectators/invitees of the premises during Philadelphia Eagles NFL games.

- 4 -

14.    At all times material hereto, Defendant, Lincoln was acting as an agent, servant and/or workman of Defendants, Eagles and/or NFL, and, as such, these Defendants are liable for the acts of Defendant Lincoln under theories of vicarious liability and agency (actual, apparent, ostensible or otherwise).

15.    At all times material hereto, Defendant, Eagles, was acting as an agent, servant and/or workman of Defendant, NFL, and, as such, Defendant is liable for the acts of Defendant Eagles under theories of vicarious liability and agency (actual, apparent, ostensible or otherwise).

16.    At all times material hereto, Defendant, Event was acting as an agent, servant and/or workman of Defendants, Eagles, Lincoln, and/or NFL, and, as such, these Defendants are liable for the acts of Defendant Event under theories of vicarious liability and agency (actual, apparent, ostensible or otherwise).

17.    On or about September 22, 2019, Decedent, Marco Bianchi, was a lawful and proper business invitee and spectator at Defendants' premises for the Philadelphia Eagles NFL game.

18.    At all times mentioned herein and relevant hereto, Decedent, Marco Bianchi, was a spectator located in the first few rows of Section 131 in the north endzone stands.

Case ID: 200801739



19.     As per the above included seating diagram published on the World Wide Web at www.lincolnfinancialfield.com, Section 131 is one of the designated "ADA Seating" sections for Americans with Disabilities.

20.     At all times mentioned herein and relevant hereto, Plaintiff, Alex Bianchi, was a spectator located on the field at the 50-yard line with his wife and daughter.

21.     Lincoln Financial Field advertises that "the staff at Lincoln Financial Field has been trained in proper procedures for emergency situations."

- 6 -

22.     In about 2000, Defendant Eagles agreed on a deal to construct a new NFL football stadium, including approval of the City of Philadelphia's funding of the construction.

23.     According to Pennsylvania filing records, Defendant National Event Services was created in or about 2001.

24.     Lincoln Financial Field completed construction in about 2003, a joint effort between and among Defendants, Eagles and NFL.

25.     Lincoln Financial Field has a seating capacity of 67,594 fans and regularly hosts as many fans for its NFL games.

26.     Lincoln Financial Field includes 685 wheelchair accessible seats, compared to the former Veterans Stadium which included 256 such seats.

27.     According to Forbes, in 2019 Defendant Eagles were valued at $3.05 Billion, with an estimated net operating income of at least $150,000,000.

28.     While attending the Eagles game on September 22, 2019, Decedent, Marco Bianchi, began to suffer a sudden medical emergency.

29.     At the time Decedent began to suffer a medical emergency, proper personnel of the Defendants were immediately alerted.

30.     At all times mentioned herein and relevant hereto, Plaintiff, Alex Bianchi, was alerted to the fact that his brother was suffering a medical emergency and immediately rushed over to the section of the stadium where his brother was attending.

31.     Spectators rushed over and began attempting life-saving CPR on the decedent.

- 7 -

32.    For an unreasonably long period of time while spectators were attempting life-saving services on the Decedent, the Defendants and/or their EMS personnel failed to arrive at the scene with proper equipment.

33.    For an unreasonably long period of time Defendants failed to appropriately and timely respond to the medical emergency.

34.    Upon information and belief, Defendants were not properly equipped with an AED to timely provide medical care/intervention to Decedent.

35.    Upon information and belief, only after an unreasonably long period of time did stadium personnel arrive with medical equipment.

36.    Decedent was eventually transported to Thomas Jefferson University Hospital via ambulance.

37.    At all times mentioned herein and relevant hereto, Plaintiff. Alex Bianchi, upon being alerted of his brother's dire situation rushed over to the section, but was immediately met by Defendants' event staff who prohibited him from getting to his brother despite his informing them that he was a physician and that he could assist with the emergency.

38.    At all times mentioned herein and relevant hereto, Plaintiff, Alex Bianchi, while not permitted to go to his brother during a medical emergency and assist, was forced to witness his brother undergo CPRs attempts by a spectator(s) and the ill-equipped response by stadium personnel that left his brother in dire condition, ultimately causing his demise.

- 8 -

39.     At all times mentioned herein and relevant hereto, Plaintiff, Alex Bianchi, remained in his brother's presence both at the stadium and at the hospital, up through the time that he was pronounced deceased.

40.     Following Marco Bianchi's death, public discussion boards on Reddit.com surfaced on the world wide web, including posts regarding Defendants' response time to Mr. Bianchi's medical emergency, as follows:

> "I was one of the nurses who responded to the emergency in the stands. I have been in a hundred codes probably before and have never been in a situation out of a hospital without equipment like that... I was delivering compressions to him... in response to the response of the EMTs... that was terrible honestly... I am appalled by the situation and have contacted the stadium thru email and am waiting for a response. There has to be some standards and guidelines for having emergency equipment for a stadium that holds 73,000+ fans." (public user post on reddit.com)

> ***

> "This was horrific and tragic. My condolences to the family, this was rough to watch. Jennifer is my sister. We attended the game together. Section 135 Row 1. She is being modest. She saw the guy go down and immediately knew he needed help. I yelled to security on the field. "she is a nurse get her over there" Security brought her down over the wall. ran her over to the section and raised her into the section. She tried everything she could to help the man. The life saving equipment she needed never arrived. It felt like forever before any of the EMT's arrived and when they did they did not have what was needed. My heart goes out to the family. This is a terrible loss. jenn...you did everything

- 9 -

you could and like a god damn superhero you were a first responder. I am so proud of you!" (public user post on reddit.com)

\*\*\*

"It's completely unacceptable that the right equipment wasn't there and even worse it took EMTs so long to arrive and even when they did they did not bring oxygen or an AED." (public user post on reddit.com)

\*\*\*

"Ever since the game, my wife and I have talked about this constantly and just can't get over the fact that there wasn't an AED or Oxygen over there for him within minutes." (public user post on reddit.com)

\*\*\*

"We were about 7 rows back and one section over but on the end seats that shared the same stairs as the responders. We witnessed it right from the moment he collapsed. And, YES! both my husband and I thought it took forever for EMTs to arrive... What a terrible shame at the Linc, as large and crowded a venue as it is, doesn't have MORE stations with portable defibrillators and EMTs trained to operate them." (public user post on reddit.com)

\*\*\*

"I was in section 129 and watched from above... I was wondering what the hell took so long for EMTs/appropriate equipment to arrive." (public user post on reddit.com)

Case ID: 200801739

41.     As a result of the willful, wanton, outrageous, reckless, careless and negligent conduct of the Defendants by and through their separate and respective agents, employees, servants and/or workers, acting within the course of their employment and scope of their authority, Decedent, Marco Bianchi, came to his demise on September 22, 2019.

42.     Upon information and belief, for a significant period of time prior to Decedent's medical emergency Defendants were on notice of similar circumstances wherein there was a lack of timely response to provide AED and/or other emergency care to spectators at Eagles games.

43.     Despite the aforementioned notice, Defendants failed to take proper steps for the adequate provision of emergency medical services for spectators at Eagles games.

44.     Upon information and belief, Defendants failed to appreciate the immediacy of the medical emergency and the gravity of harm that the decedent was undergoing and once aware, egregiously failed to bring the proper medical equipment i.e. AED, despite being informed of the specific type of medical emergency.

## COUNT I
## NEGLIGENCE/RECKLESSNESS
**MAURIZIO BIANCHI, Administrator of the Estate of Marco Bianchi, Deceased, in his own right and on behalf of said Decedent's Next-of-Kin and Heirs-at-law v. ALL DEFENDANTS**

45.     Plaintiff, Maurizio Bianchi, Administrator of the Estate of Marco Bianchi, deceased, in his own right and on behalf of said Decedent's Next-of-Kin and Heirs-at-law incorporates by reference all preceding paragraphs of this complaint, the same as if fully set forth hereinafter.

46.     Defendant, Event, by and through their separate and respective agents, employees, servants and/or workers, acting within the course of their employment and scope of their authority, engaged in wanton conduct and were reckless, willful, outrageous, careless and negligent in:

- 11 -

a)   Failing to recognize and appreciate the immediacy of Decedent's medical emergency;

b)   Failing to arrive in adequate time as to provide life-saving emergency services;

c)   Failing to arrive in adequate time as to utilize an AED defibrillator on the Decedent;

d)   Unnecessarily delaying treatment and care to a spectator in a medical emergency;

e)   Failing to arrive in adequate time as to utilize oxygen on the Decedent

f)   Failing to bring an AED defibrillator to the scene of an emergency;

g)   Failing to bring oxygen, to be administered to the decedent, at the scene of a cardiac emergency;

h)   Delaying the arrival of emergency personnel to the scene;

i)   Failing to provide sufficient emergency personnel staffing at the premises as to respond to emergency situations in a timely fashion;

j)   Failing to have an AED defibrillator located in a close proximity to the emergency medical scene;

k)   Failing to have oxygen located in a close proximity to the medical emergency scene;

l)   Failing to take proper precautions for the provision of emergency medical services in ADA designated seating sections;

m)  Failing to assess the medical situation as an emergency to be in a position to render life-saving medical services on the Decedent in a timely and appropriate manner;

n)   Failing to enact proper policies and procedures in regards to appropriately and in a timely fashion responding to a medical emergency within a venue of great size;

o)   Failing to properly train their employees with regard to appropriately responding to a medical emergency in a timely fashion;

p)   Failing to employ proper staffing for Eagles games;

q)   Failing to purchase sufficient AED machines for the seating capacity at the stadium;

r)   Failing to utilize sufficient AED machines for the size of the venue;

s)   Failing to situate AED machines in proper locations so as to facilitate timely medical intervention;

t)   Failing to properly train their employees in the provision of emergency response in the context of a stadium event; and,

u)   Failing to properly train their employees with regard to bringing life-saving medical equipment to a medical emergency in a timely fashion in a venue of great size.

47.    As a direct and proximate result of the Defendant, Event's willful, wanton, outrageous, reckless, careless and negligent conduct, as described above, Plaintiff's Decedent, was caused to sustain

- 12 -

serious, disabling and permanent injuries all of which led to his untimely death on September 22, 2019; including but not limited to: loss of oxygen; respiratory distress; conscious pain and suffering; severe trauma; cardiac failure; he suffered other medical injuries, the full extent of which have yet to be determined.

48.     Defendants, Eagles, Lincoln, NFL, John Doe 1 and John Doe 2, by and through their separate and respective agents, employees, servants and/or workers, acting within the course of their employment and scope of their authority, engaged in wanton conduct and were reckless, willful, outrageous, careless and negligent in:

a)     Failing to ascertain the capabilities of Defendant, Event, to adequately and timely respond to a medical emergency of a venue of great size;

b)     Hiring inadequate emergency medical services to respond to medical emergencies at their venue;

c)     Failing to properly investigate whether Defendant, Event, was properly adequate in responding to medical emergencies in venues of great size;

d)     Inadequately and negligent undertaking a duty to provide proper emergency medical care at its events in violation of the Restatement 2nd of Torts;

e)     Failing to take proper precautions for the provision of emergency medical services in their ADA designated sections;

f)     Failing to hire and/or employ competent emergency medical staffing;

g)     Failing to properly supervise the conduct of Defendant Event;

h)     Failing to ascertain whether Defendant, Event, had enacted proper policies and procedures with regard to responding to a medical emergency in a timely fashion within a venue of great size;

i)     Failing to ascertain whether Defendant, Event, had enough emergency personnel at the premises as to respond to emergency situations in a timely fashion;

j)     Failing to have an AED defibrillator located in a close proximity to the medical emergency scene;

k)     Failing to take adequate measures in response to prior medical emergencies to prevent improper responses from re-occurring;

l)     Failing to have oxygen located in a close proximity to the medical emergency scene;

- 13 -

m)   Failing to ascertain whether Defendant, Event, could appreciate a medical emergency and respond in a timely fashion; and

n)   Entrusting emergency medical employees of Defendant, Event, to respond to a medical emergency at their venue in a timely and appropriate manner.

49.   As a direct and proximate result of the Defendant, Eagles, Lincoln, NFL, John Doe 1 and John Doe 2's willful, wanton, outrageous, reckless, careless and/or negligent conduct, as described above, Plaintiff's Decedent, was caused to sustain serious, disabling and permanent injuries all of which led to his untimely death on September 22, 2019; including but not limited to: loss of oxygen; respiratory distress; conscious pain and suffering; cardiac failure; severe trauma; he suffered other medical injuries, the full extent of which have yet to be determined.

WHEREFORE, Plaintiff, Maurizio Bianchi, Administrator of the Estate of Marco Bianchi, Deceased, demands that judgment be entered in his favor and against all Defendants jointly and severally, and/or separately, including punitive damages, in an amount in excess of Fifty Thousand Dollars ($50,000.00) each upon this Count.

## COUNT II
## WRONGFUL DEATH
**MAURIZIO BIANCHI, Administrator of the Estate of Marco Bianchi, Deceased, in his own right and on behalf of said Decedent's Next-of-Kin and Heirs-at-law v. ALL DEFENDANTS**

50.   Plaintiff, Maurizio Bianchi, hereby incorporates by reference all paragraphs above of this Complaint, the same as if set forth at length hereinafter.

51.   Plaintiff bring this action in his own right and on behalf of the Wrongful Death beneficiaries of Decedent, Marco Bianchi, pursuant to the Pennsylvania Wrongful Death Act, 42 Pa. C.S.A. § 8301, *et seq.*, and claims all damages recoverable under the Pennsylvania Wrongful Death Act.

- 14 -

52.     As a direct and proximate result of the foregoing, the Decedent's Wrongful Death beneficiaries have been, continue to be and will in the future be wrongfully deprived of Decedent's companionship, guidance, services, moral up-bringing and tutelage.

53.     As a direct and proximate result of the foregoing, Decedent's Wrongful Death beneficiaries have been, continue to be, and will in the future be deprived of his counsel and society.

54.     As a direct and proximate result of the Defendants' careless and/or negligent conduct, as set forth above, Decedent's Wrongful Death beneficiaries suffered, are suffering, and will, for an indefinite period of time in the future, suffer damages, injuries and losses including, but not limited to, a loss of financial support, and the beneficiaries have been wrongfully deprived of the contributions they would have received from him, including monies which he would have provided for items such as clothing, food, shelter, medical care, education, and entertainment, recreation and gifts.

55.     As a direct and proximate result of the Defendants' negligence as set forth above, Decedent's beneficiaries have been caused to incur and pay various expenses for medical treatment, hospital care, custodial care, nursing care and medications, and/or funeral and other expenses related to his death, for which there is entitlement to compensation.

**WHEREFORE,** Plaintiff, Maurizio Bianchi, Administrator of the Estate of Marco Bianchi, Deceased, demands that judgment be entered in his favor and against all Defendants, jointly and severally, and/or separately, in an amount in excess of Fifty Thousand Dollars ($50,000.00) each upon this Count.

Case ID: 200801739

**COUNT III**
**SURVIVAL**
**MAURIZIO BIANCHI, Administrator of the Estate of Marco Bianchi, Deceased, in his own right and on behalf of said Decedent's Next-of-Kin and Heirs-at-law v. ALL DEFENDANTS**

56.     Plaintiff, Maurizio Bianchi, hereby incorporates by reference all paragraphs above of this Complaint, the same as if set forth at length hereinafter.

57.     As a direct and proximate result of Defendants' recklessness and/or negligence as aforementioned, Decedent suffered extreme pain and suffering and death, for which Plaintiff makes claims on behalf of Decedent's heirs and/or survivors.

58.     As a direct and proximate result of the foregoing, Decedent suffered extreme mental anguish.

59.     As a direct and proximate result of Defendants' wanton, reckless, willful, outrageous and/or negligent conduct as aforesaid, Decedent was caused to sustain injuries, the full extent of which are yet known, and death as described herein above, which are fully incorporated herein by reference.

**WHEREFORE,** Plaintiff, Maurizio Bianchi, Administrator of the Estate of Marco Bianchi, Deceased, demands that judgment be entered in his favor and against all Defendants, jointly and severally, and/or separately, including punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00) each upon this Count.


**COUNT IV**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**ALEX BIANCHI v. ALL DEFENDANTS**

60.     Plaintiff, Alex Bianchi, hereby incorporates by reference all paragraphs above of this Complaint, the same as if set forth at length hereinafter.

Case ID: 200801739

61.     Plaintiff, Alex Bianchi, witnessed the accident/ medical emergency ultimately causing fatal injuries of Marco Bianchi, contemporaneous with its occurrence.

62.     Alex Bianchi is a close relative of Marco Bianchi, that being his sibling.

63.     Plaintiff, Alex Bianchi, suffered shock fright, emotional trauma and emotional distress when he contemporaneously witnessed and observed the dramatic and horrific events of the accident/medical emergency.

64.     As a result of the Defendants, wanton, reckless, willful, outrageous and/or negligent conduct as aforesaid, Plaintiff, Alex Bianchi, suffered physical injuries, including but not limited to, difficulty sleeping, difficulty concentrating, chest pain, panic attacks, anxiety, and other injuries, the full extent of which are not yet known.

65.     As a result of Defendants, wanton, reckless, willful, outrageous and/or negligent conduct as aforesaid, Defendants are liable to Alex Bianchi, for negligent infliction of emotion distress.

**WHEREFORE,** Plaintiff, Alex Bianchi, demands that judgment be entered in his favor and against all Defendants, jointly and severally, and/or separately, including punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00) each upon this Count.

**BARRETT DEANGELO LLC**

*/s/ Joseph G. DeAngelo*
MICHAEL F. BARRETT, ESQUIRE
JOSEPH G. DEANGELO, ESQUIRE
MICHAEL MONGELUZZI, ESQUIRE

Case ID: 200801739

DocuSign Envelope ID: F4F9F234-81E4-4F83-A31C-4291B514EA5B

## VERIFICATION

The averments or denials of fact contained in the foregoing are true based upon the signer's personal knowledge or information and belief.  If the foregoing contains averments which are inconsistent in fact, signer has been unable, after reasonable investigation, to ascertain which of the inconsistent averments are true, but signer has knowledge or information sufficient to form a belief that one of them is true.  This Verification is made subject to the penalties of the 18 Pa. C.S. §4904, relating to unsworn falsification to authorities.

DocuSigned by:

CA8BB957ECA249A...

Alex Bianchi

Date: _____

Case ID: 200801739

DocuSign Envelope ID: BA33D649-7205-439D-BBDC-6D35BECDA7A5

## VERIFICATION

The averments or denials of fact contained in the foregoing are true based upon the signer's personal knowledge or information and belief. If the foregoing contains averments which are inconsistent in fact, signer has been unable, after reasonable investigation, to ascertain which of the inconsistent averments are true, but signer has knowledge or information sufficient to form a belief that one of them is true. This Verification is made subject to the penalties of the 18 Pa. C.S. §4904, relating to unsworn falsification to authorities.

DocuSigned by:

*Maurizio Bianchi*

D7AEFE9F7E2F4B0...

Maurizio Bianchi

Date: _____

Case ID: 200801739

EXHIBIT C

## AGREEMENT
## PROVISION OF EMERGENCY MEDICAL SERVICES
## FOR
## LINCOLN FINANCIAL FIELD

This Agreement is between Eagles Stadium Operator, LLC, a Pennsylvania limited liability company, herein referred to as Operator, of the one part,

and

National Event Services, Inc., a New Hampshire corporation, herein referred to as Provider, of the second part.

This Agreement is made this 27th day of February, 2017.

### WITNESSETH

WHEREAS, Operator desires that Provider provide Basic and Advanced Life Support emergency medical services and ambulance transportation services to meet the needs of all persons present at events at Lincoln Financial Field in Philadelphia, Pennsylvania (the "Stadium"), including, but not limited to patrons, employees, staff, and home and visiting professional football team members; and

WHEREAS, Provider wishes to make available such services in accordance with the terms of this Agreement; and

WHEREAS, Provider agrees to strictly adhere to the obligations and requirements as set forth in this Agreement.

NOW, THEREFORE, in consideration of the terms and conditions herein contained, the parties hereto, intending to be legally bound, do hereby agree to the following:

### I. SERVICES

Provider agrees to provide all of the emergency medical services and ambulance transportation services required by this Agreement for each professional football game in the Stadium and to provide such emergency medical services and ambulance transportation services as Operator and Provider shall agree are appropriate for such other events in the Stadium for which Operator requests Provider to provide such services.

For each professional football game in the Stadium, Provider Stadium coverage personnel shall arrive at the Stadium medical office a minimum of the number of hours set forth on Exhibit "A" prior to the start of each game.

Provider's personnel shall remain at their respective assigned stations throughout the duration of all events unless they are required to leave such location to provide treatment elsewhere in the Stadium.  Provider's Stadium personnel shall remain in place until the Stadium seating area is cleared of all patrons; Provider's field personnel shall remain in place until such time as deemed appropriate by Operator.

Additionally, throughout the term of this Agreement, Provider shall provide sufficient medical supplies and equipment (including automatic defibrillators) to all First Aid Stations in Stadium so that such First Aid Stations at all time have appropriate supplies and equipment and all legally required supplies and equipment, including a minimum of one (1) defibrillator in each First Aid Station, one (1) defibrillator for each ALS Unit, and two (2) automated external defibrillators with roving staff.  Throughout the term of this Agreement, Provider shall inspect and test all medical equipment prior to each event to assure that all such equipment remains in proper working order.

Notwithstanding anything to the contrary in this Agreement, whether or not otherwise specifically required by this Agreement, throughout the term of this Agreement, Provider shall provide, for each professional football game in the Stadium and for such other events in the Stadium for which Operator requests Provider to provide services, sufficient emergency medical service personnel, services, equipment and supplies to satisfy all applicable legal requirements relating to emergency medical services for such events (including, but not limited to, certification requirements), including, but not limited to, the requirements of the Emergency Medical Services System Act, 35 Pa.C.S. §§ 8101 - 8157, as the same may be from time to time amended, and any regulations issued pursuant thereto (said Act and regulations being hereinafter collectively referred to as "Act 37").

## II.  STANDARDS OF OPERATION

**A.**     **Staff and Personnel:**  For each professional football game in the Stadium, Provider shall provide the following personnel who shall have, as listed, the minimum certifications with regard to medical training:

**1.**     Fifteen (15) Pennsylvania State or Nationally Registered Emergency Medical Technicians, seven (7) EMT-Paramedics, two (2) EMS Supervisors, one (1) Triage Clerk, one (1) dispatcher, one (1) manager and one (1) emergency physician who specializes in and is experienced in emergency medicine at various Stadium medical offices.

**2.**     Four (4) Pennsylvania State or Nationally Registered Emergency Medical Technicians and two (2) Pennsylvania EMT-Paramedics for field operations.

**3.**     Five (5) Ambulance Units comprised of five (5) ALS Units.  All ambulance units provided shall be in good working order and shall meet or exceed all applicable legal standards and requirements including all standards for Pennsylvania licensure and certification under Act 37. Provider shall ensure that all staff operating ambulance units possess a valid driver's license, have completed the emergency Vehicle Operators Course and meet any and all additional requirements in order to lawfully operate an ambulance unit.

2

Provider shall ensure that all of its personnel will be neatly groomed and will be neatly dressed in a recognizable uniform and that all of its personnel perform their duties and responsibilities in a professional, courteous and caring manner. Upon Operator's request, all of Provider's personnel shall wear identification badges or other identification provided by Operator.

Provider hereby agrees that it will conduct appropriate background checks, testing and training for all of its employees prior to their employment at the Stadium and will throughout the term of this Agreement carry out appropriate training programs for all of its employees. Provider's employees will also attend, at Provider's cost, all Stadium orientation sessions as requested by Operator throughout the term of this Agreement.

**B.**   **Operational Safety:**  Provider shall ensure that all of its personnel operate all equipment and provide all care in accordance with the applicable standards of care and in a professional, courteous and caring manner.

**C.**   **Operational Plan; Event EMS Plan:**  Provider and Operator shall develop an operational plan to address how Provider's personnel will respond for treatment or transport of patients. Such plan will be approved by both parties including stand-by and redeployment locations for all of Provider's personnel and ambulance units and protocols for response.

Provider shall, on an annual basis, prepare and submit to Operator the Event EMS Plan described in 29 Pa. Code § 1013.1, and shall, at Operator's request, submit such Plan to the Pennsylvania Department of Health Division of Emergency Medical Services.

## III.  INFECTIOUS CONTROL MANAGEMENT

Provider shall be responsible to comply with all standards, practices and regulations governing the management, treatment and environmental control of patients, personnel and equipment to prevent the exposure or transmission of infectious diseases.

Provider shall maintain an Infectious Control Policy, which will be made available for inspection and approval by Operator or its designee, at Operator's request.

## IV.  NON-DISCRIMINATION

Provider agrees not to differentiate or discriminate in the delivery of services to individuals because of race, color, national origin, ancestry, religion, sex, marital status, sexual preference, age, financial ability, or medical condition; and agrees to render treatment and care to all persons in the same manner and in accordance with the same standards as offered to other persons. Provider shall also abide by the provisions of Exhibit "B" attached hereto.

## V.  COMPLAINTS

Provider shall within twenty-four hours of the receipt of any complaint promptly advise Operator of any complaint against Provider in connection with Provider's services pursuant to this

Agreement.  Provider shall respond to any complaints logged against the Provider in the same manner as the complaint is delivered.  Such complaints shall be responded to within a time frame that is acceptable to both parties, never exceeding seven (7) days for general issues and forty-eight (48) hours following any incident that involves medical services.

## VI.  INSURANCE

Provider shall at all time throughout the term of this Agreement maintain Professional and Commercial General Liability with minimum limits of Five Million Dollars ($5,000,000) per occurrence and in the aggregate, Motor Vehicle Insurance coverage (applying to owned, hired and non-owned vehicles) with Combined Single Limits of Five Million Dollars ($5,000,000), Workers Compensation with statutory limits, and Employers Liability in the amount of One-Hundred Thousand Dollars ($100,000) each accident for bodily injury by accident, One-Hundred Thousand Dollars ($100,000) each employee for bodily injury by disease, and One-Hundred Thousand Dollars ($100,000) policy limit for bodily injury by disease.  Such limits may be provided by a combination of primary and excess or umbrella policies.

Such professional and Commercial General liability insurance shall include Errors and Omissions, medical malpractice, bodily injury, property damage, false arrest, wrongful entry and eviction, detention, imprisonment, violation of property rights, discrimination, humiliation, libel, slander and violation of an individual's right of privacy.

Should any of the foregoing required insurance coverage be written on a "claims made" not an "occurrence" basis, Provider agrees to maintain coverage for a period of three (3) years following termination of this Agreement.

All such insurance shall be provided by recognized companies qualified to conduct business in Pennsylvania, with A. M. Best's Ratings of A VI or higher.

All property of the Provider or its employees, agents, or contractors brought, kept, used or left at the Stadium shall be kept at the sole risk of the Provider its employees, agents or contractors.  No insurer of Provider shall have any right of subrogation against Operator or its affiliates.

Concurrently with the execution of this Agreement, Provider shall deliver to Operator certificates of insurance evidencing that such coverage is in effect and providing for at least sixty (60) days notice to Operator if any of such insurance expires or is terminated or cancelled.

Provider agrees that the following entities and persons shall be listed as additional insureds on all of the policies (other than Workers Compensation and Employers Liability) required under this Agreement:  Eagles Stadium Operator, LLC; Philadelphia Eagles, LLC; Philadelphia Eagles Limited Partnership; Eagles Stadium Inc.; Philadelphia Authority for Industrial Development; the City of Philadelphia; and the Commonwealth of Pennsylvania.

## VII.  INDEMNIFICATION

Provider shall indemnify, defend and hold harmless Operator, Operator's affiliates, and their respective partners, members, shareholders, directors, officers and employees (collectively the

"Indemnified Parties") from and against any liability, cost or expense, including reasonable attorney's fees, for damages and/or personal injury, including death therefrom, to any person, or property damage or loss (collectively "Claims") arising out of or in connection with Provider's performance or non-performance of its obligations pursuant to this Agreement.

Operator shall indemnify, defend and hold harmless Provider, its officers and employees from and against any liability, cost or expense, including reasonable attorney's fees, for damages and/or personal injury, including death therefrom, to any person, or property damage or loss, to the extent arising out of the negligent conduct or willful misconduct of Operator or its officers or employees. Operator shall not indemnify, defend or hold harmless Provider, its officers or employees from and against any liability, cost or expense to the extent arising out of the negligence or willful misconduct of Provider, its agents, officers or employees.

All property of Provider or its employees or agents that is brought, kept, used or left at the Stadium shall be brought, kept, used or left at the sole risk of the Provider and/or such employee or agent. In the event Operator permits Provider to store and use its personal property at the Stadium, such storage and use will be at its own risk. Provider is not obligated to insure this property, but shall have no recourse to any insurance or loss payment arrangements maintained by Operator. No insurer of such property of Provider shall have any right of subrogation against any Indemnified Party or their respective insurers.

The requirements of this Article VII shall survive termination of this Agreement.

Nothing in this Article is intended to limit Provider's liability to the minimum amounts of insurance that Provider is required to maintain by Article VI of this Agreement.

## VIII. COMPENSATION

Operator will pay Provider for Provider's services on the basis specified in Exhibit "A".

Provider will retain the right to bill any third party insurance carrier for any patient other than personnel of Operator, Operator's affiliates or of any visiting professional football teams.

## IX. TERM

Unless sooner terminated in accordance with the provisions hereof, this Agreement shall be effective as of March 1, 2017 and remain in full force and effect until the 28th day of February, 2019.

## X.  TERMINATION BY OPERATOR

Notwithstanding anything to the contrary, Operator may terminate this Agreement at any time with or without cause upon ten (10) days prior written notice to Provider.

## XI.  TERMINATION FOR CAUSE

**A.**      Provider may terminate this Agreement in the event of any of the following:

(1)      Non-payment of fees due from the Operator provided said non-payment continues after receipt of sixty (60) days written notice of said delinquency from Provider to Operator; or

(2)      The filing of a bankruptcy petition by Operator.

**B.**      Operator may terminate this Agreement in the event of any of the following:

(1)      The failure of Provider to perform its duties as set forth in this Agreement. In the event that Operator has any complaint as to the manner in which Provider is performing its duties, Operator shall provide written notice to Provider setting forth the nature of Operator's complaint ("Notice of Complaint"). Provider shall have seven (7) days from the receipt of such Notice of Complaint in which to correct the problem to the satisfaction of Operator.  If the situation is corrected within said seven (7) day period, Provider shall not be in default.  If, however, Provider is unable or unwilling to correct this deficiency within said seven (7) day period, then Operator, at its option, may terminate this Agreement; or

(2)      The filing of a bankruptcy petition by Provider.

## XII.  ACCESS TO RECORDS

Provider shall maintain complete and accurate records of all medical care provided in connection with this Agreement. The parties hereto understand that this Agreement may be subject to and if applicable all parties will abide by, the provisions of Section 952 of the Omnibus Reconciliation Act of 1980, and any amendments thereto which pertain to the disclosure of records, books, and documents relative to the cost of and charges for services furnished by a care provider.

Within twelve (12) hours of each professional football game or other event for which Provider performs services under this Agreement, Provider shall submit to the Operator documentation summarizing all incidents of medical care performed by Provider at such game or event.  An incident report form shall be provided for each medical event in which an Authorization To Use and/or Disclose Protected Health Information form ("Disclosure Authorization Form") has been signed by the person or persons receiving medical care.  In all other instances (those in which a Disclosure Authorization Form has not been signed), Provider shall submit a summary of the basic facts of such medical event to the full extent permitted by law.

6

## XIII. REPORTING REQUIREMENTS

Provider shall submit to the Operator Commonwealth of Pennsylvania personal income tax withholding information concerning all of Provider's employees (past or present) who are working or who have worked at the Stadium (without any reference to the identity of such personnel). All such information shall be submitted to Operator on or before January 25 of each year during the term of this Agreement.

## XIV.  HEADINGS

The headings used to identify a paragraph have been included only for convenience of the parties and are not intended to constrain or completely identify the content of said paragraph.

## XV.  GOVERNING LAW

The validity, enforceability, and interpretation of any of the clauses of this Agreement shall be governed by the laws of the Commonwealth of Pennsylvania.

## XVI.  ENTIRE AGREEMENT

This Agreement contains the entire understanding of the parties and there are no representations, warranties, covenants or undertakings other than those expressly set forth herein.

## XVII.  MODIFICATION OR WAIVER

A modification or waiver of any of the provisions of this Agreement shall be effective only if made in writing and executed by both parties with the same formality as this Agreement.

The failure of either party to insist upon strict performance of any of the provisions of this Agreement shall not be construed as a waiver of any subsequent default of the same or similar nature.

## XVIII.  SEVERABILITY

If any term, condition, clause or provision of this Agreement shall be determined or declared to be void in law, or otherwise, then only that term, condition, clause or provision shall be stricken from this Agreement and in all other respects, this Agreement shall continue in force, effect and operation.

## XIX.  NOTICE

Any notice required to be given pursuant to the terms and conditions hereof, shall be in writing and shall be sent by Certified or Registered Mail, addressed as follows:

> Eagles Stadium Operator, LLC
> Nova Care Complex
> One Nova Care Way
> Philadelphia, PA  19145
> Attn:  Director of Event Operations

> Eagles Stadium Operator, LLC
> Nova Care Complex
> One Nova Care Way
> Philadelphia, PA  19145
> Attn:  Legal

> National Event Services, Inc.
> 501 Baily Road
> Yeadon, PA  19050
> Attn:  Carl Monzo, President

## XX.  INDEPENDENT CONTRACTOR RELATIONSHIP

It is mutually understood and agreed that in the performance in the duties and obligations of the parties of this Agreement, each party hereto is a separate and independent contractor.  Neither party is the principal, agent or representative of the other; nor will any employee of the Provider or Operator be considered employees of the other party.

## XXI.  ATTACHMENTS

Exhibit "A" and Exhibit "B" attached hereto are incorporated by reference herein and shall be considered to be an integral part of this Agreement.

[THE BALANCE OF THIS PAGE LEFT INTENTIONALLY BLANK]

IN WITNESS HEREOF, the parties have set their hands and seals.

NATIONAL EVENT SERVICES, INC.

By: _____

Print Name:  Carl A. Monzo

Title: President

EAGLES STADIUM OPERATOR, LLC

By: _____

Print Name: Jason Miller

Title: Senior Vice President of Operations

EXHIBIT "A"
## RATES, BILLING AND PAYMENT

This Exhibit sets forth the compensation to which Provider will be entitled for all of its services provided pursuant to this Agreement, and the personnel that Provider shall provide, for each professional football game in the Stadium.  If Provider by agreement with Operator provides different personnel levels for other events in the Stadium, Provider shall be entitled to compensation at the individual rates set forth on this Exhibit for the personnel actually provided.

## I.  PAYMENT RESPONSIBILITY

**A.**      **Stadium Coverage for Professional Football Games**



**Primary First Aid** (a minimum of 5.5 hours prior to the start of each game)

> EMT's – 2 assigned to room at all times

> Medic – 1 assigned to room at all times

> Clerk   – 1 assigned to room at all times

> Physician – 1 assigned to room at all times

> Supervisors - 2 assigned to stadium

> 1 ALS Unit

**First Aid (LL 100NW)** (a minimum of 2 hours prior to the start of each game)

> EMT's – 2 available for retrieval or transport

> Medics – 1 assigned to room at all times

> 1 ALS Unit

**First Aid (LL 100SE)** (a minimum of 2 hours prior to the start of each game)

> EMT's – 2 available for retrieval or transport

> Medics – 1 assigned to room at all times

> 1 ALS Unit

**First Aid (UL 200NW)** (a minimum of 2 hours prior to the start of each game)

> EMT's – 2 available for retrieval or transport

Medic -  1 assigned to room at all times

**First Aid (UL 200SE)** (a minimum of 2 hours prior to the start of each game)

EMT's – 2 available for retrieval or transport

Medic – 1 assigned to room at all times

**Lower Suite Level** (a minimum of 2 hours prior to the start of each game)

EMT – 1 available for retrieval or transport

Medic – 1 for response

**HeadHouse** (a minimum of 3.5 hours prior to the start of each game)

EMTs  – 2 for response

Medic – 1 for response

**Roving Response Team** (a minimum of 5.5 hours prior to the start of each game)

EMT's  –  2 for response

**Command Center** (a minimum of 5.5 hours prior to the start of each game)

Dispatcher – Overall EMS Supervisor functioning as liaison with Eagles, Police, other department reps.

**Miscellaneous** (a minimum of 2 hours prior to the start of each game)

Manager

B.      **Field Coverage for Professional Football Games**



**Eagles Sideline** (a minimum of 2 hours prior to the start of each game)

1 EMT

1 Medic

1 ALS Unit

**Visiting Sideline** (a minimum of 2 hours prior to the start of each game)

1 EMT

11

1 Medic

1 ALS Unit

**Eagles Bench** (a minimum of 2 hours prior to the start of each game)

1 EMT for oxygen administration as requested

**Visiting Bench** (a minimum of 2 hours prior to the start of each game)

1 EMT for oxygen administration as requested

Provider will directly submit a billing statement to Operator indicating a summary of all services rendered. Such statement will indicate the total fee per event charge as specified hereinabove which includes the following direct expenses and all other expenses of Provider:

Wages/Benefits
Fuel
Equipment
Total hours of coverage

Provider shall submit to Operator a Summary Report of services provided within one (1) business day from the date of service.

## II.  DESCRIPTION OF SERVICE IN KIND

So long as this Agreement remains in effect, Operator agrees to allow Provider to use in its printed marketing materials the fact that it provides such services to Operator. However notwithstanding the previous sentence, nothing in this Agreement shall constitute a right or license to, or otherwise permit Provider to, use any of the trademarks, service marks, copyrights, logos, symbols, emblems, designs, colors, identifications and designations of or related to the Eagles, Lincoln Financial Field, or the Philadelphia Eagles for any purpose whatsoever.

## III.  ADDITIONAL SERVICES BY PROVIDER

Provider agrees to offer other appropriate levels of coverage for charity activities of Operator and its affiliates, on an as needed basis to Operator as a courtesy.

12

EXHIBIT "B"

## 1.1    City Non-Discrimination Requirements.

1.1.1    In its performance of this Agreement, Provider shall not discriminate or permit discrimination against any person because of race, color, religion, national origin, age, sexual preference/orientation or sex. Any such discrimination shall constitute a default by Provider under the Agreement and Operator shall have the right to exercise any of its rights and remedies under the Agreement.

1.1.2    In accordance with Chapter 17-400 of The Philadelphia Code, Provider agrees that its payment or reimbursement of membership fees or other expenses associated with participation by its employees in an exclusionary private organization, insofar as participation confers an employment advantage or constitutes or results in discrimination with regard to hiring, tenure of employment, promotions, terms, privileges or conditions of employment on the basis of race, color, sex, sexual orientation, religion, national origin or ancestry, constitutes a substantial breach of the Agreement entitling Operator to all rights and remedies provided in the Agreement or otherwise available in law or equity.

1.1.3    Provider agrees to include and require to be included the provisions of Section 1.1.2, with appropriate adjustment for the identity of the parties, in all contracts and subcontracts which are entered into for work to be performed on behalf of Provider pursuant to the Agreement.

1.1.4    Provider further agrees to cooperate with the Commission on Human Relations of the City of Philadelphia in any manner which the Commission deems reasonable and necessary for the Commission to carry out its responsibilities under Chapter 17-400 of The Philadelphia Code. Failure to so cooperate shall constitute a substantial breach of the Agreement entitling Operator to all rights and remedies provided in the Agreement.

## 1.2    Commonwealth Non-Discrimination Requirements.

During the term of this Agreement, Provider agrees, as to itself and as to each of its subcontractors, as follows:

(a)    Provider and its subcontractors shall not discriminate against any employee, applicant for employment, independent Provider or any other person because of race, color, religious creed, handicap, ancestry, national origin, age or sex. Provider and its subcontractors shall take affirmative action to insure that applicants are employed, and that employees or agents are treated during employment, without regard to their race, color, religious creed, handicap, ancestry, national origin, age or sex. Such affirmative action shall include, but is not limited to: employment, upgrading, demotion or transfer, recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training. Provider and its subcontractors shall post in conspicuous places, available to employees, agents, applicants for employment and other persons, a notice to be provided by the contracting agency setting forth the provisions of this non-discrimination clause.

13

(b)      Provider and its subcontractors shall in advertisements or requests for employment placed by them or on their behalf, state that all qualified applicants will receive consideration for employment without regard to race, color, religious creed, handicap, ancestry, national origin, age or sex.

(c)      Provider and its subcontractors shall send each labor union or workers' representative with which it has a collective bargaining agreement or other contract or understanding, a notice advising said labor union or workers' representative of its commitment to this non-discrimination clause. Similar notice shall be sent to every other source of recruitment regularly utilized by Provider and its subcontractors.

(d)      It shall be no defense to a finding of non-compliance with this non-discrimination clause that Provider or its subcontractors had delegated some of its employment practices to any union, training program or other source of recruitment which prevents it from meeting its obligations. However, if the evidence indicates that Provider or its subcontractors was not on notice of the third-party discrimination or made a good faith effort to correct it, such factor shall be considered in mitigation in determining appropriate sanctions.

(e)      Where the practices of a union or of any training program or other source of recruitment will result in the exclusion of minority group persons, so that Provider or its subcontractors will be unable to meet its obligations under this non-discrimination clause, Provider or its subcontractors shall then employ and fill vacancies through other non-discriminatory employment procedures.

(f)      Provider and its subcontractors shall comply with all state and federal laws prohibiting discrimination in hiring or employment opportunities. In the event of Provider's or its subcontractors' non-compliance with the non-discrimination clause of this Agreement or with any such laws, this Agreement may be terminated or suspended, in whole or in part, and Provider or its subcontractors may be declared temporarily ineligible for further Commonwealth of Pennsylvania contracts, and other sanctions may be imposed and remedies invoked.

(g)      Provider and its subcontractors shall furnish all necessary employment documents and records to, and permit access to its books, records and accounts by, the contracting agency for purposes of investigation to ascertain compliance with the provisions of this clause. If Provider or its subcontractors does not possess documents or records reflecting the necessary information requested, they shall furnish such information on reporting forms supplied by the contracting agency.

(h)      Provider and its subcontractors shall actively recruit minority subcontractors and women subcontractors or subcontractors with substantial minority or women representation among their employees.

(i)      Provider and its subcontractors shall include the provisions of this non-discrimination clause in every subcontract, so that such provisions will be binding upon each subcontractor.

14

(j)     Provider's obligations under this Section 1.2 are limited to Provider's facilities within Pennsylvania or, where the contract is for purchase of goods manufactured outside of Pennsylvania, the facilities at which such goods are actually produced.

## 1.3     Economic Opportunity Plan

1.3.1   Provider acknowledges that it has received and reviewed Operator's Economic Opportunity Plan which is attached as Schedule 1 hereto and hereby made a part hereof (the "Economic Opportunity Plan").  Provider further acknowledges that the Economic Opportunity Plan represents Operator's commitment to provide meaningful employment opportunities in the operation of the Stadium for minority and female workers and meaningful contracting opportunities in the operation of the Stadium for disadvantaged minority, women and disabled-owned business enterprises certified by the City of Philadelphia's Minority Business Enterprise Council.  With respect to its work and to work of its subcontractors and sub-subcontractors, Provider shall have the same obligations to use its good faith efforts to comply with the Economic Opportunity Plan as Operator has undertaken pursuant to said Plan.  In accordance with such good faith standard, Provider shall comply with, and shall cause its subcontractors and sub-subcontractors to use their good faith efforts to comply with, all employment opportunity requirements of the Economic Opportunity Plan applicable to their respective portions of the work and all contracting opportunity requirements of the Economic Opportunity Plan applicable to their respective portions of the work. Throughout the term of the Agreement, Provider shall, upon the request of Operator, prepare and submit to Operator, by the fifteenth (15th) day of each calendar month, reports, in a format acceptable to Operator, which summarize through the end of the previous calendar month: (i) any and all subcontracts or supply orders awarded by Provider and its subcontractors to minority, women and disabled-owned businesses; (ii) the hiring and employment by Provider and subcontractors of minority, women and disabled persons for the work pursuant to the Agreement; (iii) such other information relating to the Economic Opportunity Plan as Operator may reasonably require.

## 1.4     MacBride Principles.

The following provisions shall remain in force and effect for so long as Section 17-104 of the Philadelphia Code in effect on the date of execution of this Sublease remains in force and effect.

1.4.1   Provider by execution of this Agreement certifies and represents that (i) Provider does not have, and will not have at any time during the term of this Agreement (including any extensions thereof), any investments, licenses, franchises, management agreements or operations in Northern Ireland and (ii) no product to be delivered to the Operator under this Agreement will originate in Northern Ireland, unless Provider has implemented the fair employment principles embodied in the MacBride Principles.

1.4.2    Provider agrees to cooperate with Operator and the City of Philadelphia's Director of Finance in any manner that is reasonable and necessary for the Director to carry out the Director's responsibilities under Section 17-104 of the Philadelphia Code.   Provider expressly understands and agrees that any false certification or representation by Provider in connection with this Section 1.4 or any failure to comply with the provisions of Section 1.4 shall constitute a material breach of the Agreement entitling Operator to all rights and remedies provided in this Agreement or under Section 17-104 of the Philadelphia Code.   In addition, it is understood that false certification or representation is subject to prosecution under Title 18 Pa.C.S.A. Section 4904.

EXHIBIT D



Medical Protective
Princeton Insurance Company
PLICO
MedPro RRG

02/12/2018

National Event Services, Inc
501 Baily Rd
Yeadon, PA 19050-3103

**Re:     Policy Number**  HN021513
**Policy Effective Date** 02/01/2018 to 02/01/2019

Thank you for trusting us to defend and protect your reputation and assets. Enclosed please find a copy of your policy issued by National Fire & Marine Insurance Company.

In the event you have questions about the claims process, please call us at 800-4MEDPRO (800-463-3776) to speak with a claims representative who will be able to answer your questions and discuss solutions for claim-related issues. Additionally, if you need to report a claim as required by the reporting requirements of this policy, please send your notice of claims as follows:

Via Email:       reportaclaim@medpro.com

Via Mail:        MedPro Group
                 Attn: First Claim Reports
                 5814 Reed Road
                 Fort Wayne, IN 46835

I also encourage you to visit www.medpro.com to access our Prevention & Education Center for up-to-date risk information and recommended strategies to help promote patient safety and satisfaction.

In closing, thank you for joining more than 200,000 clients who entrust MedPro Group to provide the peace of mind, expertise and choice they expect from their healthcare liability insurer.

Sincerely,

Tim Kenesey
President and CEO

MedPro Group is the marketing name used to refer to the insurance operations of The Medical Protective Company, Princeton Insurance Company, PLICO, Inc. and MedPro RRG Risk Retention Group. All insurance products are administered by MedPro Group and underwritten by these and other Berkshire Hathaway affiliates, including National Fire & Marine Insurance Company. Product availability is based upon business and regulatory approval and may differ among companies. Visit medpro.com/affiliates for more information.

PLCYCVLTR-00-1215

# Pennsylvania Surplus Lines Warning Statement

The insurer which has issued this insurance is not licensed by the Pennsylvania Insurance Department and is subject to limited regulation. This insurance is NOT covered by the Pennsylvania Insurance Guaranty Association.

SERVICE OF PROCESS CLAUSE

It is agreed that in the event of the failure of the Insurer(s) or Underwriter(s) herein to pay any amount claimed to be due hereunder, the Insurer(s) or Underwriter(s) herein, at the request of the Insured (or reinsured), will submit to the jurisdiction of any court of competent jurisdiction within the United States of America and will comply with all requirements necessary to give such court jurisdiction, and all matters arising hereunder shall be determined in accordance with the law and practice of such court. It is further agreed that in any such action instituted against any one of them upon this contract, Insurer(s) or Underwriter(s) will abide by the final decision of such court or of any appellate court in the event of an appeal.

Service of process shall be made pursuant to the procedures provided by 42 Pa.C.S. Ch. 53 Subch. B (relating to interstate and international procedure). When making service of process by mail, such process shall be mailed to General Counsel, National Fire & Marine Insurance Company, 1314 Douglas Street, Omaha, Nebraska 68102-1944.  The above-named is authorized and directed to accept service of process on behalf of the Insured(s) or Underwriter(s) in any such action or upon the request of the insured (or reinsured) to give a written undertaking to the insured (or reinsured) that it or they will enter a general appearance for the Insurer(s) or Underwriter(s) in the event such an action shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States of America, which makes provisions therefor, the Insured(s) or Underwriter(s) hereby designates the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute or his successor or successors in office, as the true and lawful attorney upon whom any lawful process may be served in any action, suit or proceeding instituted by or on behalf of the insured (or reinsured) or any beneficiary hereunder arising out of his contract of insurance (or reinsurance), and hereby designates the above-named as the person on whom such process or a true copy thereof shall be served.

Name of Surplus Lines Agent/Broker_____



## HEALTHCARE LIABILITY POLICY
## DECLARATIONS

### NOTICE:
**This policy may contain claims-made and reported coverage. Please read this policy carefully.**

**ISSUING COMPANY:** National Fire & Marine Insurance Company, as administered by a MedPro Group company
Omaha, Nebraska

**POLICY NUMBER:** HN021513

| ITEM 1 | FIRST NAMED INSURED: | National Event Services, Inc |
|---|---|---|
| | ADDRESS: | 501 Baily Rd |
| | | Yeadon, PA 19050-3103 |
| | | ☐ Administrative First Named Insured |

| ITEM 2 | POLICY PERIOD: | From 02/01/2018 to 02/01/2019 both days at 12:01 a.m. at the address of the First Named Insured stated herein. |
|---|---|---|

**ITEM 3**  **COVERAGE PARTS SELECTED:**

(please refer to the applicable Schedule of Named Insureds for detailed Retroactive Dates, Limits of Liability, Retentions, etc.)

| | |
|---|---|
| **Professional Liability:** | Claims-Made and Reported |
| **General Liability:** | Occurrence |
| **Cyber Liability and Breach Response:** | Claims-Made and Reported |

**ITEM 4**  **RETROACTIVE DATE:**

| | |
|---|---|
| **Professional Liability:** | 05/01/2015 |
| **General Liability:** | n/a |
| **Cyber Liability and Breach Response:** | 02/01/2017 |

All days at 12:01 a.m. at the address of the First Named Insured stated herein.

**ITEM 5**  **LIMITS OF LIABILITY:**

**Professional Liability:**

| | |
|---|---|
| Per Event Limit | $ 1,000,000 |
| Aggregate Limit | $10,000,000 |
| Claims Expenses | Defense Outside Limits |

**General Liability:**

| | |
|---|---|
| Per Event Limit | $ 1,000,000 |
| General Aggregate Limit | $ 3,000,000 |
| Products Completed Operations Hazard Aggregate Limit | $ 3,000,000 |

© 2015 MedPro Group. All rights reserved.

| | |
|---|---|
| Personal and Advertising Injury Limit | $ 1,000,000 Each Person |
| Damage to Premises Rented to an Insured | $      50,000 Any One Premises |
| Claims Expenses | Defense Outside Limits |

**Cyber Liability and Breach Response:**

| | |
|---|---|
| Coverage A - Multimedia Liability | $      50,000 each claim/aggregate |
| Coverage B - Security and Privacy Liability | $      50,000 each claim/aggregate |
| Coverage C - Privacy Regulatory Defense and Penalties | $      50,000 each claim/aggregate |
| Coverage D - Privacy Breach Response Costs, Customer Notification Expenses, and Customer Support and Credit Monitoring Expenses | $      50,000 each claim/aggregate |
| Coverage E - Network Asset Protection | $      50,000 each claim/aggregate |
| Coverage F - Cyber Extortion | $      50,000 each claim/aggregate |
| Coverage G - Cyber Terrorism | $      50,000 each claim/aggregate |
| Coverage H - Regulatory Proceeding | n/a each claim/aggregate |
| Coverage I - Evacuation Expense Reimbursement | $      50,000 each claim/aggregate |
| Coverage J - Disinfection Expense Reimbursement | $      50,000 each claim/aggregate |
| Coverage K - Public Relations Expense Reimbursement | $      50,000 each claim/aggregate |
| Coverage L - E-Discovery Claim Expenses and E-Discovery Regulatory Investigation Expenses | $      50,000 each claim/aggregate |
| Coverage M - Data Protection Reputational Harm | $      50,000 each claim/aggregate |
| Aggregate Limit | $  50,000 |
| Claims Expenses | Defense Within Limits |

| | | |
|---|---|---|
| **ITEM 6** | **RETENTION:** | |
| | **Professional Liability:** | $Nil Per Event / $Nil Aggregate |
| | **General Liability:** | $Nil Per Event / $Nil Aggregate |
| | **Cyber Liability and Breach Response:** | $Nil Each Claim Self-Insured Retention<br>8 hours Time Retention (Coverages E.2. and G)<br>180 consecutive days Period of Indemnity (Coverage M) |
| **ITEM 7** | **PREMIUM:** | |
| | Policy Premium | $      48,895 |
| | Terrorism Premium (TRIA) | $         200 |
| | Total Premium | $      49,095 |
| | **(Does not include any applicable surplus lines taxes, which must be collected by the producer.)** | |
| **ITEM 8** | **FORMS & ENDORSEMENTS:** Refer to attached Schedule of Forms and Endorsements | |
| **ITEM 9** | **PRODUCER:**          CRC Insurance Services Inc<br>**ADDRESS:**          987 Old Eagle School Rd, Ste 715<br>                              Wayne, PA 19087 | |
| **ITEM 10** | **SERVICE OF SUIT:** Service of process in any lawsuit or mandated alternative dispute resolution (ADR) proceeding instituted against the company shall be made upon: General Counsel, National Fire & Marine Insurance Company, 1314 Douglas Street, Omaha, Nebraska 68102-1944.  The General Counsel is authorized and directed to accept service of process on behalf of the company in any suit or ADR proceeding. Further, | |

 © 2015 MedPro Group. All rights reserved.

| | pursuant to any law which makes provision therefore, the company hereby designates the Superintendent, Commissioner, Director of Insurance, deputy, or department employee specified as attorney or agent for receipt of lawful service of process or ADR proceeding instituted by or on behalf of the insured or any beneficiary within this contract. Additionally, the General Counsel is hereby authorized as the company's designee upon whom the service of process may be served. |
|---|---|

IN WITNESS WHEREOF, National Fire & Marine Insurance Company has caused this policy to be signed by its President (and countersigned by its duly Authorized Representative, where necessary).


_Donald F. Wurster_
President


Countersigned By: _____     Date: _____



**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

| | |
|---|---|
| **Forming Part of Policy No.:** | HN021513 |
| **Issued to:** | National Event Services, Inc |
| **Policy Period:** | From 02/01/2018 to 02/01/2019 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## SCHEDULE OF FORMS AND ENDORSEMENTS

Forms and Endorsements attached to this Policy:

| FORM NAME | FORM NUMBER | ENDORSEMENT NUMBER |
|---|---|---|
| Declarations | 0001-PXX-00-0717 | |
| Schedule of Forms and Endorsements | 0002-PXX-00-1215 | |
| Schedule of Named Insureds - Professional Liability | 0006-PPX-00-1215 | |
| Common Policy Provisions and Conditions | 0010-PXX-00-1215 | |
| Professional Liability Coverage Part - Facilities | 0011-PPF-00-1215 | |
| General Liability Coverage Part - Facilities | 0012-PGF-00-1215 | |
| Cyber Liability Coverage Part | 0013-PCX-00-1215 | |
| PL Disciplinary, Licensing Credentialing Actions Endorsement | 1303-PPX-00-1215 | 1 |
| GL Blanket AI Endorsement | 1506-PGX-00-1215 | 2 |
| GL Blanket Waiver of Subrogation Endorsement | 1512-PGX-00-1215 | 3 |
| GL Cap on Losses from Certified Acts of Terrorism Endorsement | 1536-PGX-00-1215 | 4 |
| Pennsylvania Amendatory Endorsement | 1800-PXX-PA-1215 | 5 |



**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

| | |
|---|---|
| **Forming Part of Policy No.:** | HN021513 |
| **Issued to:** | National Event Services, Inc |
| **Policy Period:** | From 02/01/2018 to 02/01/2019 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## SCHEDULE OF NAMED INSUREDS — PROFESSIONAL LIABILITY

Only with respect to coverage provided under the Professional Liability Coverage Part, and in consideration of the premium due, and in reliance upon the representations of all **insureds**, the **company** and the **insureds** agree the organizations and persons listed below are designated as **named insureds** and the Retroactive Dates, Limits of Liability and Retentions shown on the Declarations are amended as follows, but only with respect to the designated **named insureds**.

| SCHEDULE OF NAMED INSUREDS | | | | | | |
|---|---|---|---|---|---|---|
| NAMED INSURED | ID NUMBER | RETRO-ACTIVE DATE | TERMIN-ATION DATE | LIMITS OF LIABILITY (PER EVENT LIMIT/ AGGREGATE LIMIT) | RETENTION (PER EVENT/ AGGREGATE) | PREMIUM |
| National Event Services, Inc | 933053 | 05/01/2015 | | $1,000,000 / $10,000,000 | $Nil / $Nil | $18,098 |
| CrowdRx | 906016 | 02/01/2015 | 12/01/2016 | $1,000,000 / $10,000,000 | $Nil / $Nil | Included |

Physician FTEs :

| NAMED INSURED | ID NUMBER | RETRO-ACTIVE DATE | TERMIN-ATION DATE | LIMITS OF LIABILITY | RETENTION | PREMIUM |
|---|---|---|---|---|---|---|
| Physician FTE 1 | | 02/01/2015 | | FNI | $Nil / $Nil | $26,567 |
| Arash Albekord MD | 944236 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Ann Marie Barnet MD | 944173 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Andrew Nicholas Bazos MD | 917869 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Jeremy Berman MD | 1180337 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Oliver Michael Berrett MD | 944227 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Graham Michael Brant-Zawadzki MD | 1307653 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Brandan Eric Crum MD | 594148 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Edward Daniel Davila MD | 1196260 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Sean Thomas Devlin DO | 373549 | | | Physician FTE 1 | $Nil / $Nil | Included |
| David Christopher Fiore MD | 944164 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Terry Vincent Fotre DO | 1203179 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Matt Samuel Friedman MD | 917870 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Wayne Clay Hardwick MD | 946262 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Jackson Olen Henley MD | 1204012 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Ryan Hodnick DO | 944882 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Stephen Howard Hoffman MD | 944235 | | | Physician FTE 1 | $Nil / $Nil | Included |

| NAMED INSURED | ID NUMBER | RETRO-ACTIVE DATE | TERMIN-ATION DATE | LIMITS OF LIABILITY (PER EVENT LIMIT/ AGGREGATE LIMIT) | RETENTION (PER EVENT/ AGGREGATE) | PREMIUM |
|---|---|---|---|---|---|---|
| **SCHEDULE OF NAMED INSUREDS** | | | | | | |
| Carlos Patrick Holden MD | 933324 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Gary Edward Johnson MD | 944165 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Nicholas Charbel Kanaan MD | 643237 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Abie Li MD | 933328 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Thomas Liu DO | 933323 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Kirsten Kari Mackey DO | 944221 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Andrew Michael McCoy MD | 1218940 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Marc Daniel Moisi MD | 943759 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Ariel Ann Palanca MD | 937520 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Douglas W Patton MD | 944223 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Ernst Paul Jr MD | 779960 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Omeed Saghafi MD | 944168 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Eric Daniel Salk MD | 917871 | | | Physician FTE 1 | $Nil / $Nil | Included |
| David Nathan Selander MD | 933327 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Jessica Jihad Slim MD | 946677 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Benjamin Allen Smith MD | 1310896 | | 08/24/2017 | Physician FTE 1 | $Nil / $Nil | Included |
| Jeremy Ryan Smith MD | 937519 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Aaron Michael Stutz MD | 1315594 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Andrew James Swanson DO | 944222 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Jenarah Leigh Tekippe MD | 933325 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Gregory F Truax DO | 944886 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Richard Diego Tucker MD | 1203181 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Rex Romulo Villanueva DO | 1204992 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Jeffrey Joseph Westin MD | 946260 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Bailey Zhao MD | 1315592 | | | Physician FTE 1 | $Nil / $Nil | Included |

Providers FTEs :

| | | | | | | |
|---|---|---|---|---|---|---|
| Provider FTE 1 | | 02/01/2015 | | FNI | $Nil / $Nil | $141 |
| All Nurse Practitioners Employed or Contracted by National Event Services, Inc | 917872 | | | Provider FTE 1 | $Nil / $Nil | Included |
| Provider FTE 2 | | 02/01/2015 | | FNI | $Nil / $Nil | $1,061 |
| All Physician Assistants Employed or Contracted by National Event Services, Inc | 917873 | | | Provider FTE 2 | $Nil / $Nil | Included |

\* Indicates any applicable surcharges, taxes or fees.

As used in this Schedule, "FNI" means the **first named insured**.

## All other terms and conditions of the policy remain unchanged.

© 2015 MedPro Group. All rights reserved.



**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

### *HEALTHCARE LIABILITY POLICY*
### *COMMON POLICY PROVISIONS AND CONDITIONS*

**NOTICE:**

**This policy may contain claims-made and reported coverage. Please read this policy carefully.**

In consideration of the payment of the premium due, and in reliance upon the representations of all **insureds**, the **company** and all **insureds** agree as follows, subject to the terms and conditions of this policy, including the applicable Limits of Liability:

## I.  DEFINITIONS

These definitions apply to all Coverage Parts:

A.  **Additional insured** means any person or organization listed on a Schedule of Additional Insureds.

B.  **Advertisement** means a notice that is broadcast or published to the general public or specific market segments about any **named insured's** goods, products, or services for the purpose of attracting customers or supporters. For the purposes of this definition:

   1.  notices that are published include material placed on the internet or on similar electronic means of communication; and

   2.  regarding websites, only that part of a website that is about any **named insured's** goods, products, or services for the purposes of attracting customers or supporters is considered an **advertisement**.

C.  **Authorized insured** means any **insured** authorized by the **first named insured** to give notice of a **claim** or **potential claim** to the **company**.

D.  **Automobile** or **auto** means:

   1.  any land motor vehicle, trailer or semi-trailer, including any attached machinery and equipment, designed for use on public roads; or

   2.  any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

   However, **automobile** or **auto** does not include **mobile equipment**.

E.  **Bodily injury** means any damage to the human body, including sickness or disease and any mental injury, shock, emotional distress, or death arising therefrom. In addition, it includes damages claimed for the cost of any care, loss of services, or loss of consortium arising therefrom.

F.  **Case management** means identifying patients with specific health care needs and developing a plan to ensure an efficient use of resources to achieve the best outcome.

G.  **Claim** means an express, written demand upon an **insured** for money or services as compensation for damages, including a suit. As used in this definition, "suit" means a civil proceeding in which damages to which this insurance applies are alleged. Suit also includes an arbitration or other alternative dispute resolution proceeding in which such damages are claimed and to which an **insured** must submit or does submit with the **company's** consent. However, this definition does not apply to coverage provided under the Cyber Liability and Breach Response Coverage Part.

H.  **Claims expense** means all costs and expenses incurred in connection with the investigation, adjustment, and defense of any **claim** or **potential claim**. Such costs and expenses:

   1.  shall only include:

     © 2015 MedPro Group. All rights reserved.

    a.  attorneys' fees paid to the law firm selected to defend an **insured**;

    b.  court costs;

    c.  expert fees;

    d.  reporter fees;

    e.  the cost of any alternative dispute resolution ordered by a court, otherwise required by law, or pre-approved by the **company**;

    f.  post-judgment interest on that portion of the judgment that does not exceed the Limit of Liability available under the particular coverage provided; and

    g.  such other costs and expenses that the **company** determines to be reasonably related to the defense of a **claim** or **potential claim**.

  2.  shall not include:

    a.  **loss**;

    b.  attorneys' fees awarded to a claimant;

    c.  the salary of any **employee** of an **insured**; or

    d.  the forgiveness of any amounts owed for the cost of care or services rendered by an **insured**.

However, this definition does not apply to coverage provided under the Cyber Liability and Breach Response Coverage Part.

I.  **Company** means the Issuing Company shown on the Declarations.

J.  **Employee** means any person who receives a W-2 or 1099 IRS tax form from any **named insured** that is an organization, and who was acting within the scope of his or her duties on behalf of that **named insured** at the time of the **event**, offense, **health care event** or any other act or omission that results in a **claim** or **potential claim** that is otherwise covered under this policy. **Employee** also includes any leased worker, temporary worker or volunteer so long as such person is or was acting within the scope of his or her duties on behalf of a **named insured** that is an organization.

As used in this definition:

1.  "leased worker" means a person leased to, or used by, a **named insured** that is an organization through a labor leasing firm or a locum tenens or staffing organization under an agreement between a **named insured** and the labor leasing firm, or locum tenens or staffing organization, to perform duties related to the conduct of that **named insured's** business. Leased worker does not include a temporary worker;

2.  "temporary worker" means a person who is furnished to a **named insured** that is an organization to substitute for a permanent **employee** on leave or to meet seasonal or short-term workload conditions. A temporary worker does not include a leased worker; and

3.  "volunteer" means a person who provides his or her services or labor to a **named insured** that is an organization, without being paid by that **named insured**, under the supervision or direction of the **named insured**. Volunteer does not include any independent contractor or staff physician.

However, only with respect to the coverage provided under the Professional Liability Coverage Part, **employee** does not mean any physician, surgeon, podiatrist, chiropractor, dentist, certified registered nurse anesthetist, midwife, resident or intern.

Additionally, this definition does not apply to coverage provided under the Cyber Liability and Breach Response Coverage Part.

K.  **Event** means an accident. All injuries arising out of, or in connection with:

1.  the same or related acts or omissions; or

2.  the continuous or repeated exposure to substantially the same harmful conditions;

will be considered one **event**. For the purposes of this definition, all injuries to a mother and fetus (or fetuses) from conception through delivery shall constitute one **event**.

 © 2015 MedPro Group. All rights reserved.

L.   **Extended reporting period** means the period of time after the cancellation or nonrenewal of any Coverage Part shown on the Declarations or any endorsement as "Claims-Made and Reported" during which an **insured** may report a **claim** or **potential claim**.

M.   **First named insured** means the person or organization shown as the First Named Insured on the Declarations.

N.   **Health care event** means any **event** in the rendering of, or failure to render, **professional services** that results in injury. All injuries arising out of, or in connection with, the same or related acts or omissions in furnishing **professional services** shall be considered one **health care event**.

O.   **Impaired property** means tangible property, other than the **insured's product** or the **insured's work**, which cannot be used or becomes less useful because:

1.   it incorporates the **insured's product** or **insured's work** that is known or thought to be defective, deficient, inadequate, or dangerous; or

2.   an **insured** has failed to fulfill the terms of a contract or agreement if such property can be restored to use by:

a.   the repair, replacement, adjustment, or removal of the **insured's product** or **insured's work**; or

b.   an **insured's** fulfillment of the terms of the contract.

P.   **Insured** means:

1.   the **first named insured**;

2.   any **named insured**;

3.   any **employee**;

4.   any administrator, partner, superintendent, director, officer, member, trustee, stockholder, medical director, department head or head of the medical staff, student, board or committee member or staff member, but only to the extent that he or she is acting within the scope of his or her duties on behalf of any **named insured**. As used to define **insured**, student means an unlicensed person, other than a resident, enrolled in a licensed or accredited training program operated by any **named insured** that is an organization relative to the delivery of **professional services**;

5.   any spouse or domestic partner of any individual **insured**, but only with respect to the conduct of the business of a **named insured** that is an organization. As used in this definition, "domestic partner" means any person qualifying as such under any federal, state or local laws or under a **named insured's** employee benefit plans or employee benefits program;

6.   any organization formed or acquired by a **named insured** that is an organization during the **policy period**, over which that **named insured** maintains at least majority ownership; however, coverage under this subparagraph is afforded only:

a.   until the 90th day after the **named insured** acquires or forms the organization or the end of the **policy period**, whichever is earlier;

b.   for a **loss**, **event**, offense, **health care event**, **bodily injury**, **property damage** or **personal and advertising injury** or other **claim** or **potential claim** otherwise covered by this policy that occurred after the organization was formed or acquired by the **named insured**; and

c.   unless otherwise stated on a Schedule of Named Insureds, the newly formed or acquired organization will share Limits of Liability with the **named insured** that formed or acquired that newly formed or acquired organization;

7.   the estate, heirs, executors, administrators, assigns and legal representatives of an **insured** in the event of such **insured's** death, incapacity, insolvency or bankruptcy, but only to the extent that such **insured** would have been provided coverage under this policy; or

8.   any organization, or any person other than an **employee**, while acting as a **named insured's** real estate manager.

Q.   **Insured contract** means:

1.   a contract for a lease of premises, except for that portion of the contract for a lease of premises that indemnifies

         © 2015 MedPro Group. All rights reserved.

any person or organization for damage by fire to premises while rented to an **insured** or temporarily occupied by an **insured** with permission of the owner;

2. an agreement between a railroad and an **insured** under which the **insured** will hold the railroad harmless for certain liability arising out of the use of a sidetrack;

3. any easement or license agreement, except in connection with construction or demolition operations on, or within 50 feet of, a railroad;

4. an obligation, as required by ordinance, law or regulation, to indemnify a municipality, except in connection with work for a municipality; or

5. any agreement to maintain an elevator;

6. any provision in any other contract or agreement pertaining to an **insured's** business (including an indemnification of a municipality in connection with work performed for a municipality) under which an **insured** assumes the tort liability of another party to pay for **bodily injury** or **property damage** to a third person or organization. As used in this definition, "tort liability" means a liability that would be imposed by law in the absence of any contract or agreement. This does not include any provision:

   a. that indemnifies a railroad for **bodily injury** or **property damage** arising out of construction or demolition operations within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

   b. that indemnifies an architect, engineer or surveyor for injury or damage arising out of:

      (1) preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

      (2) giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

   c. under which the **insured**, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the **insured's** rendering or failure to render professional services, including those listed in b. above and supervisory, inspection, architectural or engineering activities.

R. **Insured's product**

1. means:

   a. any goods or products, other than real property, manufactured, sold, handled, distributed, or disposed of by:

      (1) a **named insured**;

      (2) others trading under a **named insured's** name; or

      (3) a person or organization whose business or assets a **named insured** has acquired.

   b. containers (other than vehicles), materials, parts, or equipment furnished in connection with such goods or products.

2. includes:

   a. warranties or representations made at any time with regard to the fitness, quality, durability, performance, or use of the goods or the **insured's products**; or

   b. the providing of, or the failure to provide, warnings or instructions.

3. does not include:

   a. vending machines; or

   b. other property rented to, or located for, the use of others, but not sold to others by a **named insured**.

S. **Insured's work**

1. means:

   a. work or operations performed by, or on behalf of, a **named insured**; or

      b.   materials, parts, or equipment furnished in connection with such work or operations.

  2.  includes:

      a.   warranties or representations made at any time with regard to the fitness, quality, durability, performance, or use of the work or operations; or

      b.   the providing of, or the failure to provide, warnings or instructions.

T.  **Loading or unloading** means the handling of property:

  1.  after it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft, or **auto**;

  2.  while it is in or on an aircraft, watercraft, or **auto**; or

  3.  while it is being moved from an aircraft, watercraft, or **auto** to the place where it is finally delivered.

It does not include the movement of property by means of a mechanical device, other than a hand truck, which is not attached to the aircraft, watercraft, or **auto**.

U.  **Location** means premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad.

V.  **Loss**

  1.  Means civil damages, including prejudgment interest, which an **insured** becomes legally obligated to pay through adjudication or settlement.

  2.  Does not include:

      a.   any damages that are greater than any applicable Limit of Liability;

      b.   any injunctive or other equitable relief;

      c.   **claims expense**;

      d.   attorneys' fees awarded to a claimant as a fine, penalty, or sanction based upon any **insured's** misconduct; however, attorneys' fees awarded as a part of the claimant's damages in a covered **claim** for any other purpose will be included as **loss**;

      e.   the salary of any **employee**; or

      f.   the forgiveness of any amounts owed for the cost of care or services rendered by an **insured**.

W.  **Managed care services** means services provided to manage and/or administer a health care plan. As used in this definition "health care plan" means a medical benefits plan administered by a health maintenance organization, preferred provider organization, or other similar organization which provides, or arranges to provide, healthcare services to members under a written contract or agreement. These services can include any of the following acts provided on behalf of the health care plan:

  1.  the creation, sale, and marketing of a health care plan;

  2.  the selection, credentialing, and contracting of health care providers;

  3.  the evaluation of the cost, quality and proper utilization of treatment options available or being provided to participants;

  4.  the adjustment, investigation, and processing of claims for benefits; or

  5.  **case management**.

However, **managed care services** do not include **treatment** rendered, or which should have been rendered, to a patient.

X.  **Medical expenses** means the reasonable cost of necessary:

  1.  first aid administered at the time of the accident;

  2.  medical, surgical, diagnostic, and dental services;

  3.  prosthetic devices; and

4.  ambulance, hospital, professional nursing, and funeral services.

Y.  **Mobile equipment**

1.  Means any of the following types of land vehicles, including any attached machinery or equipment:

    a.  bulldozers, farm machinery, forklifts, and other vehicles designed for use principally off public roads;

    b.  vehicles maintained for use only on, or next to, premises owned or rented by a **named insured**;

    c.  vehicles that travel on crawler treads;

    d.  vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

        (1) power cranes, shovels, loaders, diggers, or drills; or

        (2) road construction or resurfacing equipment, such as graders, scrapers, or rollers;

    e.  vehicles not described in subparagraphs 1.a, b, c, or d above, that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

        (1) air compressors, pumps, and generators, including spraying welding, building cleaning, geophysical exploration, lighting, and well-servicing equipment; or

        (2) cherry pickers and similar devices used to raise or lower workers; or

    f.  vehicles not described in subparagraphs 1.a, b, c, or d above, maintained primarily for purposes other than the transportation of persons or cargo.

2.  Does not include self-propelled vehicles with the following types of permanently attached equipment, but will be considered **autos**:

    a.  equipment designed primarily for:

        (1) snow removal,

        (2) road maintenance (but not construction or resurfacing); or

        (3) street cleaning;

    b.  cherry pickers and similar devices mounted on car or truck chassis and used to raise or lower workers; and

    c.  air compressors, pumps, and generators, including spraying, welding, building cleaning, geophysical exploration, lighting, and well-servicing equipment.

3.  Does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered **autos**.

Z.  **Named insured** means any of the following, but only if listed by name on a Schedule of Named Insureds:

1.  any organization, including any corporations, partnerships or joint ventures;

2.  any individual person, but only to the extent that such person was acting in the course and scope of his or her duties of employment with the **first named insured** or another **named insured**; or

3.  a **location**.

AA. **Personal and advertising injury** means injury, including consequential **bodily injury**, arising from one or more of the following offenses:

1.  false arrest, detention, or imprisonment;

2.  malicious prosecution;

3.  the wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies, committed by or on behalf of its owner, landlord, or lessor;

4.  oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services;

5.  oral or written publication, in any manner, of material that violates a person's right of privacy; or the use of

another's advertising idea in the **insured's advertisement**.

BB. **Pollutants** means any solid, liquid, gaseous, fuel, lubricant, thermal, acoustic, electrical, or magnetic irritant or contaminant, including but not limited to smoke, vapor, soot, fumes, fibers, radiation, acid, alkalis, petroleum, chemicals or waste. As used in this definition, "waste" means medical waste, biological infectants, and all other materials to be disposed of, recycled, stored, reconditioned or reclaimed.

CC. **Policy period** means the period of time shown on the Declarations as the Policy Period. However, if the policy is terminated before the later of the dates shown on the Declarations, **policy period** means the period between the first date shown on the Declarations and the date the policy was terminated.

DD. **Potential claim** means an **event**, including an incident arising from, or in connection with, that **event**, which an **insured** knows or reasonably should know is likely to result in a **claim**.

EE. **Products completed operations hazard**

1. Means all **bodily injury** and **property damage** occurring away from any premises an **insured** owns or rents, and arising out of the **insured's product** or **insured's work** except:

   a. products that are still in the physical possession of an **insured**; or

   b. work that has not yet been completed or has been abandoned. However, the **insured's work** will be deemed completed at the earliest of the following times:

      (1) when all of the work called for in the **insured's** contract has been completed;

      (2) when all of the work to be done at the job site has been completed if the contract calls for work at more than one job site; or

      (3) when that part of the work at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

      Work that may need service, maintenance, correction, repair, or replacement, but which is otherwise complete, will be deemed completed.

2. Does not include **bodily injury** or **property damage** arising out of, or in connection with:

   a. the transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by an **insured** and that condition was created by the **loading or unloading** of the vehicle by an **insured**;

   b. the existence of tools, uninstalled equipment, or abandoned or unused materials; or

   c. products or operations for which the classification, shown on the Declarations or in a policy schedule, states that **products completed operations hazard** is subject to the General Aggregate Limit.

FF. **Professional services** means **treatment**, peer review and utilization management not involving **managed care services**. As used in this definition:

1. "peer review" means the evaluation of a health care provider's fitness and qualification to provide **treatment** by a professional review board or committee through formally adopted, written procedures for the purposes of granting, determining or revoking clinical staff privileges at a hospital, clinic or other medical facility that is a **named insured**, and which results in a patient alleging damages arising from a **health care event**; and

2. "utilization management" means the process of evaluating **treatment** to a patient for its appropriateness or necessity which results in a patient alleging damages arising from a **health care event**. In clarification and not in limitation of the foregoing, utilization management will include prospective review of proposed **treatment**, concurrent review of **treatment**, retrospective review of already rendered **treatment**, disease management, **case management**, and the use of predictive modeling to identify individuals or populations for disease management or **case management**.

GG. **Property damage** means:

1. physical injury to tangible property, including any resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

2. loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the **event** that caused it.

However, this definition does not apply to coverage provided under the Cyber Liability and Breach Response Coverage Part.

HH. **Treatment** means:

1. medical, surgical, dental, mental health, or nursing services, including those rendered in connection with a clinical trial. This shall also include first aid rendered at the scene of an accident without expectation of monetary compensation, unless such accident occurred on the premises;

2. the provision of medical examinations, opinions, or consultations regarding a person's medical condition within an **insured's** practice as a licensed health care provider;

3. postmortem handling of bodies, including autopsies, organ donation or harvesting or other procedures; or

4. the furnishing of any of the following, but only as it relates to the rendering of medical, surgical, dental, or nursing services:

   a. food and beverages;

   b. blood, blood products, medications, supplies, equipment, or appliances; or

   c. counseling or other social services.

As used in this definition, "clinical trial" means a structured study with predetermined protocols approved by an institutional review board, an independent ethics committee, an ethical review board or a research ethics board which has been formally designated to approve, monitor, and review research involving humans in order to develop effectiveness or safety data or treatment plans, pharmaceutical products or medical devices.

## II. DEFENSE AND SUPPLEMENTAL PAYMENTS

These provisions apply to all Coverage Parts:

A. DEFENSE

The **company** will have the exclusive right and duty to defend any **claim** or **potential claim** against an **insured** to which this policy applies, subject to the timely payment of any applicable Deductible or Self-Insured Retention. However, the **company** has no duty to:

1. defend an **insured** until any applicable Self-Insured Retention has been exhausted by the payment of **loss** or **claims expense**;

2. defend an **insured** after the applicable Limits of Liability have been exhausted by the payment of **loss** or **claims expense**;

3. appeal any judgment; however, the **company** may appeal any judgment as it deems expedient; or

4. pay any **claims expense** incurred by an attorney not retained or approved by the **company**, in writing, to represent the **insured**.

Upon the exhaustion of the applicable Limit of Liability provided under this policy, the **insured** shall become responsible for all further **claims expense** arising from any **claim** or **potential claim** and the **company** has the right to withdraw from the further defense of such **claim** or **potential claim** by tendering such defense to the **insured**. If the **insured** cannot come to an agreement with the attorney assigned by the **company** regarding the payment of future fees and costs, the **insured** shall take all steps necessary to allow the attorney to withdraw from the matter. .

B. SUPPLEMENTAL PAYMENTS

The **company** shall also pay, in addition to the Limits of Liability:

1. the premium on any bond required to proceed with an appeal approved by the **company** or to release attachments to an **insured's** property; however, the face value of the bond may not exceed the applicable Limit of Liability or the total **loss** payable under the policy, whichever is less; in addition, the **company** has no duty to apply for or furnish any such bond; and

2. reimbursement of reasonable expenses incurred by an **insured** at the **company's** request to assist in the investigation and defense of a **claim** or **potential claim**; payment for actual loss of earnings shall not exceed

$500 for each day an individual **insured** is required to attend hearings, trials, or an **insured's** own deposition.

C. **DEFENSE OUTSIDE THE LIMITS/WITHIN THE LIMITS SHOWN ON DECLARATIONS**

The **company's** duty to defend shall also include a duty to pay **claims expenses** either:

1. in addition to the applicable Limits of Liability such that payment of **claims expenses** and other supplemental payments will not reduce or exhaust the applicable Limits of Liability, if shown on the Declarations as "Defense Outside Limits;" or

2. as part of the applicable Limits of Liability such that payment of **claims expenses** and other supplemental payments reduce and can exhaust the applicable Limits of Liability, if shown on the Declarations as "Defense Within Limits."

## III. EXCLUSIONS

The coverage provided under any Coverage Part of this policy does not apply to:

A. ADA

Any **claim** or **potential claim** arising out of, or in connection with, an **insured's** duty to comply with the Americans with Disabilities Act of 1990 (ADA). This also includes any amendment or regulation that applies thereto or any comparable federal, state, or local law. This exclusion does not apply to any such **claim** or **potential claim** that is based on an **insured's** alleged negligence in the rendering of or failure to render **professional services**.

B. ANTITRUST

Any **claim** or **potential claim** arising out of, or in connection with, an **insured's** antitrust activity, except to the extent such **claim** or **potential claim** arises out of any **insured's** alleged rendering of, or failure to render, **professional services**. As used in this exclusion, "antitrust activity" means any actual or alleged price fixing, restraint of trade, price discrimination, predatory pricing, monopolization, unfair business practices, or violation of common law or the Federal Trade Commission Act of 1914, the Sherman Antitrust Act of 1890, the Clayton Act of 1914, any similar federal, state, or local antitrust statute or law, or any rule or regulation promulgated under the Act, statute, or law.

C. BUSINESS PRACTICES

Any **claim** or **potential claim** arising out of, or in connection with, an **insured's** billing practices or advertising activities. However, this exclusion does not apply to the coverage provided under the Personal and Advertising Injury Liability Insuring Clause.

D. CLAIM OR POTENTIAL CLAIM REPORTED OR DISCOVERED PRIOR TO THE POLICY PERIOD

Only with respect to any Coverage Part shown on the Declarations as "Claims-Made and Reported":

1. any **claim** or **potential claim** which has or which should have been reported to any insurer, including through any self-insured or captive program, prior to the **policy period**; and

2. any **potential claim** that was first known about or discovered, or should reasonably have been known about or discovered by, an **authorized insured** prior to the **policy period**.

E. CRIMINAL ACTS

Any **claim** or **potential claim** arising out of, or in connection with, any criminal act committed by, or at the direction of, the **insured**.

F. DEFAULT JUDGMENT AND FAILURE TO COOPERATE

Any **claim** or **potential claim** that the **company** was unable to timely investigate or defend due to the acts or omissions of any **insured**, including any resulting damages from a default judgment.

G. DISCRIMINATION

Any **claim** or **potential claim** arising out of, or in connection with, the violation of any statute, law, ordinance or regulation prohibiting discrimination or humiliation because of race, creed, color, national origin, religion, age, gender or any other protected class as defined by statute, law, ordinance or regulation.

H.  ECONOMIC SANCTIONS EXCLUSION

Whenever coverage provided by this policy would be in violation of any U.S. economic trade sanctions such as, but not limited to, those sanctions administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control, such coverage shall be null and void. Similarly, any coverage relating to or referred to in any certificates or other evidences of insurance or any **claim** or **potential claim** that would be in violation of U.S. economic or trade sanctions as described above shall also be null and void.

I.  EMPLOYEE BENEFITS LIABILITY

Any **claim** or **potential claim** arising out of, or in connection with, any group benefits administered on behalf of a **named insured's employees**, including:

1.  group insurance plans or programs, such as life, health, accident, dental, or legal advice;

2.  individual retirement accounts, salary reduction plans under I.R.S. Code 401(k), or any amendment thereto, savings plans, or employee stock subscription plans;

3.  travel or vacation plans; or

4.  workers' compensation, occupational disease, unemployment, Social Security, or disability benefits insurance.

J.  EMPLOYER'S LIABILITY

Any **claim** or **potential claim** arising out of, or in connection with, **bodily injury** to:

1.  an **employee** of a **named insured** arising out of, or in connection with, and in the course of:

    a.  employment by that **named insured**; or

    b.  performing duties related to the conduct of that **named insured's** business; or

2.  the spouse, child, parent, brother, or sister of that **employee** as a consequence of subparagraph 1 above.

This exclusion shall apply whether a **named insured** may be held liable as an employer, or in any other capacity, and to any obligation to share damages with, or repay someone else who must pay damages, because of the injury. This exclusion does not apply to liability assumed by an **insured** under an **insured contract**.

K.  EMPLOYMENT PRACTICES

Any **claim** or **potential claim** brought by an **employee**, or applicant for employment, which alleges an **insured**:

1.  breached an actual or implied contract of employment;

2.  violated an anti-discrimination statute;

3.  engaged in any form of harassment;

4.  engaged in libel or slander related to an employment relationship;

5.  retaliated for the exercise of a public right or duty;

6.  engaged in intentional or negligent infliction of emotional distress arising out of, or in connection with, an employment relationship;

7.  wrongfully failed to hire, promote, or grant tenure;

8.  wrongfully demoted; or

9.  wrongfully terminated employment.

L.  ERISA

Any **claim** or **potential claim** seeking to impose liability under the Employee Retirement Income Security Act of 1974 (ERISA), or any amendment or regulation that applies thereto.

M.  FRAUDULENT CLAIMS

Any **claim** or **potential claim** made by an **insured** who knows that the **claim** or **potential claim** is false or fraudulent, as regards to amount or otherwise; additionally, this policy shall become void and all **claims** and **potential claims** hereunder shall be forfeited.

N.  GOVERNMENTAL IMMUNITY AND OTHER PROTECTIONS

Any **claim** or **potential claim** for which an **insured** has:

1.  immunity as a volunteer or as an employee or contractor of a federal, state, or local government; or

2.  immunity, insurance, indemnity, or any other protection pursuant to any federal, state, or local laws, including but not limited to the Federal Tort Claims Act.

O.  INJUNCTIVE RELIEF, TAXES, FINES AND PENALTIES

Any **claim** or **potential claim** or other matter seeking:

1.  injunctive relief;

2.  any relief other than **loss**; or

3.  the award of taxes, fines, penalties, or sanctions.

P.  INSURED VERSUS INSURED

Any **claim** or **potential claim** initiated, alleged, or caused to be brought about, by any **insured** covered by this policy against any other **insured** covered by this policy. This exclusion does not apply if the **claim** or **potential claim** arises out of an **insured** providing **professional services** to another **insured**.

Q.  MANAGED CARE SERVICES

Any **claim** or **potential claim** arising out of, or in connection with, any **managed care services**.

R.  MEDICARE OR MEDICAID

Any **claim** or **potential claim** arising out of, or in connection with, any Medicare/Medicaid Claim. As used in this exclusion, a "Medicare/Medicaid Claim" means a claim based on or arising out of, or in connection with, any actual or alleged violation of law, regulation or rule with respect to Medicare, Medicaid, Tricare or any similar federal, state or local governmental program.

S.  MULTI-POLICY AND ANTI-STACKING

If more than one policy, Coverage Part or Insuring Clause applies, the following multi-policy and anti-stacking exclusions apply:

1.  if more than one policy issued by the **company** or by a past, present or future parent, subsidiary or affiliate applies to the liability of an **insured**, the **company's** duty to pay for a **loss** will be confined to the policy containing the largest applicable Limit of Liability; or

2.  if more than one Coverage Part or Insuring Clause under this policy applies to the liability of an **insured**, the **company's** duty to pay **loss** will be confined to the Coverage Part or Insuring Clause containing the largest applicable Limit of Liability.

T.  NUCLEAR ENERGY LIABILITY

Any **claim** or **potential claim**:

1.  for which an **insured** has coverage under a nuclear energy liability policy issued by the:

    a.  Nuclear Energy Liability Insurance Association;

    b.  Mutual Atomic Energy Liability Underwriters;

    c.  Nuclear Insurance Association of Canada; or

    d.  any successor or assign of the entities set forth in the subparagraphs above.

    This policy also does not apply if such coverage did exist, but was terminated by the exhaustion of the **insured's** limit of liability.

2.  resulting from the hazardous properties of nuclear material for which an **insured**:

    a.  was required to maintain financial protection under the Atomic Energy Act of 1954 or any amendment or regulation that applies thereto; or

    b.  was entitled to indemnity by the United States government or any agency thereof or would have been

© 2015 MedPro Group. All rights reserved.

entitled to had this policy not been issued.

U.  OWNERSHIP OR MANAGEMENT OF NON-INSURED ENTITIES

Any **claim** or **potential claim** arising out of, or in connection with, the acts or omissions of any organization, partnership, joint venture, or other business enterprise that is not a **named insured**, but which is owned, managed or supervised by an **insured**. However, this exclusion does not apply to an organization defined as an **insured**.

V.  RICO

Any **claim** or **potential claim** arising out of, or in connection with, an **insured's** violation of the Racketeer Influenced Corrupt Organizations Act (RICO), or any comparable federal, state or local laws or any amendment or regulation that applies thereto.

W.  WAR

Any **claim** or **potential claim** arising out of, or in connection with:

1.  war, including undeclared or civil war;

2.  warlike action by a military force, including action in hindering or defending against an actual or expected attack by any governmental, sovereign, or other authority using military personnel or other agents; or

3.  insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

X.  WORKERS' COMPENSATION AND OTHER SIMILAR LAWS

Any **claim** or **potential claim** arising out of, or in connection with, any obligation or damages arising under any law related to:

1.  workers' compensation;

2.  occupational disease;

3.  unemployment compensation;

4.  disability benefits; or

5.  other similar law that provides for scheduled benefits as a result of an injury or disease.

The exclusions for "EMPLOYMENT PRACTICES," "EMPLOYER'S LIABILITY," "WAR" and "WORKER'S COMPENSATION AND OTHER SIMILAR LAWS" do not apply to damage by fire to premises while rented to an **insured** or temporarily occupied by an **insured** with the permission of its owner. Only with respect to the coverage provided under the General Liability Coverage Part, a separate limit of liability applies to Damage to Premises Rented to an Insured as described in the Limits of Liability.

## IV. <u>DEDUCTIBLES AND RETENTIONS</u>

These provisions apply to all Coverage Parts:

A.  LOSS AND CLAIMS EXPENSE

If a Deductible or Self-Insured Retention is shown on the Declarations, and is designated as "Loss and Claims Expense," it is agreed and understood that the **company's** duty to pay **loss** and **claims expense** for any **claim** or **potential claim** thereunder will be limited in the following manner:

1.  the **company** shall have a duty to pay **loss** and **claims expense** only in excess of the Deductible or Self-Insured Retention. The Deductible or Self-Insured Retention shall be applied to **claims expense** first, then to **loss**;

2.  the **first named insured** shall have a duty to pay all **loss** and **claims expense** up to the amount of the Deductible or Self-Insured Retention, payment of which shall not be unreasonably withheld;

3.  unless prohibited by law, the **company** has complete discretion to pay the entire **loss** and **claims expense** and seek reimbursement from the **first named insured** for the Deductible or Self-Insured Retention. If this occurs, the **first named insured** shall reimburse the **company** within 30 days of the **company's** payment of the Deductible or Self-Insured Retention amount;

© 2015 MedPro Group. All rights reserved.

4. the applicable Limits of Liability shall be reduced by the amount of the Deductible payable as **loss** and **claims expense** for such **claims** or **potential claims**. The applicable Limits of Liability shall not be reduced by the amount of the Self-Insured Retention;

5. if a Deductible or Self-Insured Retention is shown on the Declarations, the Deductible or Self-Insured Retention shall apply to all **loss** and **claims expense** arising from a single **event**, **health care event**, offense or other covered incident, regardless of the number of **insureds** found liable for the **loss** and/or **claims expense**; and

6. if a Retention Aggregate is shown on the Declarations, the **first named insured's** duty to pay **loss**, regardless of the number of **claims** or **potential claims** made, shall not exceed the Retention Aggregate.

B. LOSS ONLY

If a Deductible is shown on the Declarations, and is designated as "Loss Only," it is agreed and understood that the **company's** duty to pay **loss** for any **claim** or **potential claim** thereunder will be limited in the following manner:

1. the **company** shall have a duty to pay only **loss** in excess of the Deductible;

2. the **first named insured** shall have a duty to pay all **loss** up to the amount of the applicable Deductible, payment of which shall not be unreasonably withheld;

3. unless prohibited by law, the **company** has complete discretion to pay the entire **loss** and seek reimbursement from the **first named insured** for the Deductible. If this occurs, the **first named insured** shall reimburse the **company** within 30 days of the **company's** payment of the Deductible amount;

4. the applicable Limits of Liability shall be reduced by the amount of the Deductible payable as **loss** for such **claims** or **potential claims**;

5. if a Deductible is shown on the Declarations, the Deductible shall apply to all **loss** arising from a single **event**, **health care event**, offense or other covered incident, regardless of the number of **insureds** found liable for the **loss**; and

6. if a Retention Aggregate is shown on the Declarations, the **first named insured's** duty to pay **loss**, regardless of the number of **claims** or **potential claims** made, shall not exceed the Retention Aggregate.

If more than one Deductible or Self-Insured Retention applies to a **claim** or **potential claim**, the **first named insured's** duty to pay all applicable **loss** and/or **claims expense** will be limited to the largest such Deductible or Self-Insured Retention.


## V. CONDITIONS

These conditions apply to all Coverage Parts:

A. ACTION AGAINST THE COMPANY

1. No action shall lie against the **company** unless each **insured** is in full compliance with all of the terms of this policy.

2. No person shall have the right to join the **company** as a party to a **claim** to determine an **insured's** liability under this policy. Further, an **insured** shall not interplead the **company** into a **claim**.

3. No action shall lie against the **company** until the amount of **loss** has been finally determined by entry of judgment or written agreement between the **insured**, the claimant, and the **company**. Once the amount of **loss** has been finally determined, the claimant shall be entitled to recover under the terms of this policy.

B. ARBITRATION

1. The **company** and the **insureds** agree that in any dispute, **claim**, **potential claim** or controversy arising out of, relating to, or in connection with this policy, whether brought by or on behalf of an **insured**, the **company**, or any other party, the **company** may elect to submit any such dispute, **claim**, **potential claim** or controversy to binding arbitration, in accordance with Title 9 USC Sec. 1 et seq. (the Federal Arbitration Act) and shall be governed by the Commercial Arbitration Rules of the American Arbitration Association.

2. The arbitration shall be presided over by three arbitrators chosen from the Commercial Insurance Panel of the American Arbitration Association. The arbitrators shall be governed by the law of the state of the address of

the **first named insured**, as shown on the Declarations. The arbitration shall take place in the county that the capital of that state is located.

3. The arbitrators shall have the discretion to order pre-arbitration discovery, including an exchange of documents and deposition of potential witnesses. Each party shall bear its own arbitration costs and expenses including attorneys' fees, unless otherwise provided by law.

4. Any arbitration award shall be in writing and shall specify the factual and legal bases of the award. Judgment on the award rendered by the arbitrator shall be final and may be entered in any court having jurisdiction thereof. Furthermore, this arbitration provision shall be a complete defense to any suit, action or proceeding in any federal, state or local court or before any administrative tribunal with respect to any dispute, **claim, potential claim** or controversy arising out of, relating to or in connection with this policy.

C. ASSISTANCE AND COOPERATION

1. After any **claim** is made, or any **potential claim** is first discovered, the **insured** shall not contract any expense, voluntarily assume any liability in any situation, nor make or contract any settlement of the **claim** or **potential claim**, except at the **insured's** own cost and responsibility, without the written authorization of the **company**.

2. The **company's** duty to defend and pay **loss** for any **claim** or **potential claim** otherwise covered under this policy is strictly conditioned upon all **insureds'** cooperation with the **company** in the investigation, defense, and/or settlement of any matter to which this policy applies. Such cooperation shall include, but is not limited to:

    a. attendance at any deposition, hearing, or trial, as requested by the **company**;

    b. assistance in securing and giving evidence;

    c. obtaining the attendance of witnesses;

    d. doing nothing to prejudice the **company's** ability to investigate, defend, and/or manage any matter to which this policy applies;

    e. submitting to recorded and/or sworn statements and to examinations under oath as requested by the **company**; and

    f. promptly producing, at the **company's** request, any records, documents and other information in an **insured's** possession, custody or control.

3. If a **claim** or **potential claim** is, or might be, covered under any other policy of insurance, the **insured** shall promptly give notice to such other insurers. The **insured** shall also provide the **company** with copies of the applicable policies. The **insured** shall further act in good faith to enforce any rights held under such policies, including the right to a defense.

D. BANKRUPTCY OR INSOLVENCY

The bankruptcy or insolvency of an **insured** or an **insured's** estate, or the non-payment by an **insured** or by any other organization responsible for a Deductible or Self-Insured Retention, shall not act to modify any duty owed by an **insured** or the **company** under the policy. Under no circumstances will such bankruptcy, insolvency or non-payment require the **company** to assume or in any way be responsible for any Deductible or Self-Insured Retention, or otherwise assume any obligation owed by any **insured** under this policy. The **company** will have no duty to pay **loss** or **claims expense** for any **claim** or **potential claim** unless the **insured** or any other organization responsible for the Self-Insured Retention timely pays the Self-Insured Retention in full.

E. CANCELLATION, NONRENEWAL AND/OR TERMINATION OF COVERAGE

1. This policy may be canceled by the **first named insured**. The **first named insured** shall provide written notice to the **company** requesting cancellation. The cancellation shall be effective on the date requested by the **first named insured** or the date the notice is received by the **company**, whichever is later.

2. Any coverage contained within this policy may be terminated by the **first named insured**. The **first named insured** shall provide written notice to the **company** requesting the coverage termination. The termination shall be effective on the date requested by the **first named insured** or the date the notice is received by the **company**, whichever is later.

3.  This policy, or any coverage contained therein, may also be canceled, terminated or nonrenewed by the **company**. The **company** will send notice to the **first named insured** at the last address on record with the **company**.

4.  If the **first named insured** cancels this policy, or terminates any coverage contained therein, earned premium shall be computed in accordance with the standard short rate tables and procedure. If the **company** cancels this policy, or terminates any coverage contained therein, earned premium shall be computed pro rata. Premium adjustments shall be made within a reasonable period of time after cancellation. However, payment or tender of unearned premium shall not be a condition of cancellation.

5.  If the **company** cancels or nonrenews this policy for any reason other than non-payment of premium, the **company** shall provide written notice to the **first named insured** not less than 30 days prior to the effective date of such cancellation or nonrenewal. If the **company** cancels this policy for nonpayment of premium, the **company** shall provide written notice to the **first named insured** not less than 10 days prior to the effective date of such cancellation or nonrenewal.

6.  If the **company** cancels or nonrenews this policy, coverage under the policy shall terminate on the earlier of:

    a.  the date stated on the cancellation or nonrenewal notice; or

    b.  the date an **insured** procures replacement coverage.

## F. COVERAGE TERRITORY

This policy applies to **claims** or **potential claims** arising from acts, omissions, occurrences or offenses (including offenses that take place through the Internet or similar electronic means of communication) occurring anywhere in the world, with the exception of any country or jurisdiction which is subject to trade or other economic sanction or embargo by the United States of America, provided that the **claim** or **potential claim** is made and any legal proceedings are pursued within the United States, its territories and possessions, including Puerto Rico.

## G. EXTENDED REPORTING PERIOD

Only with respect to any Coverage Part shown on the Declarations as "Claims-Made and Reported," the following provisions apply:

1.  Automatic Limited Extended Reporting Period

    a.  In the event that coverage under this policy is terminated for any reason, the **company** will provide an automatic limited **extended reporting period** of 30 days, starting with the end of the **policy period**, during which **claims** and **potential claims** arising out of any specific coverage(s) may be reported to the **company** in writing. However, the **claim** must have been first made against an **insured** during the **policy period**, or the **potential claim** must have been first discovered by an **insured** during the **policy period**.

    b.  This automatic limited **extended reporting period** shall not extend the **policy period** or change the scope of the coverage provided. Any **claim** or **potential claim** first reported to the **company** during the automatic limited **extended reporting period** will be deemed to have been made on the last date on which this policy is in effect. The Limits of Liability that apply at the end of the **policy period** are not renewed or increased for **claims** or **potential claims** first reported during the automatic limited **extended reporting period**.

2.  Optional Extended Reporting Period

    a.  The **company** shall, upon written request by or on behalf of the **first named insured,** make an offer for an **extended reporting period** to the **first named insured** if coverage is or will be canceled or nonrenewed, subject to the following:

        (1)  any such written request by or on behalf of the **first named insured** must be received by the **company** no later than 30 days after the cancellation or nonrenewal of the coverage;

        (2)  the **company** shall be required to send the offer for an **extended reporting period** only to the **first named insured** or its authorized representative; and

        (3)  the coverage has been or will be canceled or nonrenewed with respect to:

            a)  the entire policy;

            b)  a Coverage Part; or

© 2015 MedPro Group. All rights reserved.

     c)  a **named insured** who:

        i)  has Limits of Liability listed in the Limits of Liability column of a Schedule of Named Insureds – Professional Liability;

        ii)  does not share Limits of Liability with another **named insured** with respect to the General Liability Coverage Part or the Cyber Liability and Breach Response Coverage Part; or

        iii)  shares Limits of Liability with another **named insured**, but only when all coverage available under that shared limit is terminated.

b.  The **first named insured** may accept the **company's** offer of an **extended reporting period** by paying the premium due within 30 days from either the date on which the policy expires or the date on which the **company** receives the request for an **extended reporting period**, whichever is later. Failure to pay the full premium within this 30-day period will be deemed a rejection of the offer.

c.  In the event of the purchase of an **extended reporting period**, the entire premium for such **extended reporting period** shall be deemed earned at its commencement.

d.  If an **extended reporting period** is purchased, a **claim** or **potential claim** otherwise covered by this policy may be reported for the period of time set forth in the applicable **extended reporting period** endorsement issued after termination of the **policy period**. The **extended reporting period** will begin at the end of the **policy period**. However, the **extended reporting period** shall not:

    (1)  extend the **policy period**;

    (2)  apply to any **claim** or **potential claim** arising from a **health care event**, **event**, offense, **bodily injury**, **property damage**, or **personal and advertising injury** that took place after the **policy period**; or

    (3)  otherwise expand the coverage provided under this policy.

## H.  FIRST NAMED INSURED

1.  The **first named insured** shall be authorized to act on behalf of all **insureds** with respect to this policy, with full authority to bind all **insureds**. The **first named insured's** authority shall include, but is not limited to, the following actions:

    a.  receipt of notices of cancellation or nonrenewal;

    b.  requesting or receiving endorsements issued to form a part of this policy;

    c.  payment of premiums due;

    d.  receiving return premium; and

    e.  receiving and/or responding to an offer for an **extended reporting period** for any **insured**.

2.  The **first named insured** shall notify the **company** in writing of any changes that might affect the insurance provided under this policy, including cancellation and nonrenewal.

## I.  FRAUD WARNING

Any person, who knowingly and with intent to defraud any insurance company or other person, files an application for insurance or statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties, which may include voiding of the policy if allowed by law.

## J.  GOVERNMENTAL ACCESS TO RECORDS

If required by section 952 of the Omnibus Reconciliation Act of 1980, and after receipt of written request from the **first named insured**, the **company** will allow the U.S. Secretary of Health and Human Services or the U.S. Comptroller General access to this policy as well as all books, documents and records necessary to verify the cost of this policy. The **company** will also allow access to subcontracts between the **company** and any of its related organizations, and to such organization's books, documents and other records to the extent required by law, and to the extent that the **company** has possession, custody or control of such books, documents and records. Access will be provided for up to 4 years after the services provided pursuant to this policy cease.

          © 2015 MedPro Group. All rights reserved.

K.   INSPECTION AND AUDIT

The **company** shall be permitted, at its own discretion and for its own benefit, to audit an **insured's** property, operations, and any business records. The **company** shall also have the right to obtain a copy of any current or prior insurance records. Any findings or recommendations made by the **company** as a result of an audit shall inure only to the **company's** benefit. As a result, they may not be used as evidence of the **insured's** compliance with any safety regulations or other industry standards.

L.   MODIFICATIONS

Except as provided herein, this policy may not be modified except by written endorsement attached to and made a part of this policy by the **company**. The **company's** decision not to insist on an **insured's** compliance with any provision of this policy shall not operate to waive, modify, or void that provision, or any other provision, condition or term of this policy.

M.   NON-ASSIGNABILITY

No interest of an **insured** under this policy shall be assignable without the prior written consent of the **company**. However, if the **insured** is a person and dies, the coverage afforded by this policy shall inure to the benefit of that **insured's** estate.


N.   OTHER INSURANCE

Unless otherwise noted in a Coverage Part:

1.   if any other valid and collectible insurance is available to any **insured** with respect to a liability covered by this policy, and such insurance is afforded under a policy issued by a past, present or future parent, subsidiary or affiliate of the **company**, then the maximum limits of liability under all policies shall not exceed the highest remaining applicable limit of liability under any one policy;

2.   if any other valid and collectible insurance is available to any **insured** for a **claim** or **potential claim** under a policy not issued by a past, present or future parent, subsidiary or affiliate of the **company**, then this insurance will be excess over such other insurance even if such other insurance is stated to be primary, excess, contingent or otherwise. The **company** will pay only the **company's** share of the **loss**, if any, that exceeds the sum of:

     a.   the total amount that all such other insurance would pay for the **loss** in the absence of this insurance; and

     b.   the total of all deductible and self-insured amounts under all such other insurance; and

3.   this condition shall not apply if such other valid insurance is written to be specifically excess of this policy.

O.   PREMIUMS

1.   The **company's** obligation to perform any duty under the policy is strictly conditioned upon the payment of the premium when due. Therefore, this policy shall not be deemed to have been issued, delivered, or renewed and shall not be applicable to any matter which would otherwise be covered herein, until:

     a.   the premium has been paid in full; or

     b.   if the **company** has agreed to finance the policy, the first installment has been paid in full.

     If payment is made by check, electronic transfer or money order, it shall not be considered "paid in full" until honored by the payor's bank.

2.   Premiums for this policy shall be computed in accordance with the **company's** rules, rates, and rating plans.

3.   Any premium designated as deposit premium is merely a deposit on the actual amount owed. At the close of the **policy period**, the **company** will compute the earned premium for that period. The deposit premium will then be credited to that amount. If the deposit premium exceeds the earned premium, the **company** will refund the difference to the **first named insured**. If the earned premium exceeds the deposit premium, the **company** will bill the **first named insured** for the difference.

4.   The **first named insured** shall maintain records of the information necessary for premium computation. The **first named insured** shall send copies of these records to the **company** at the end of the **policy period** as directed by the **company**. Such information shall be subject to audit and verification by the **company**.

P.  REPORTING REQUIREMENTS

1. The **company's** duty to defend and pay **loss** for any **claim** or **potential claim** otherwise covered under this policy is strictly conditioned upon an **authorized insured's** forwarding, as soon as practicable and expressly subject to the reporting requirements of the applicable Insuring Clause, notice of every **claim**, **potential claim**, demand, suit, summons, or legal paper the **insured** receives.

2. If the Retention shown on the Declarations is a:

   a. Deductible, an **authorized insured** shall, as soon as practicable, report any **claim** or **potential claim**;

   b. Self-Insured Retention, an **authorized insured** shall, as soon as practicable, report any **claim** or **potential claim** that:

      (1) an **authorized insured** believes will results in damages that exceed the applicable Self-Insured Retention;

      (2) has a loss reserve exceeding 50% of the applicable Self-Insured Retention;

      (3) involves a claimant's demand which exceeds the applicable Self-Insured Retention;

      (4) contains allegations of unfair claim practices or bad faith;

      (5) involves a suit naming the **company** or its affiliates as defendants; or

      (6) that caused:

         a) neurological injury, such as brain injury, spinal cord injury or nerve injury resulting in paralysis;

         b) injury during pregnancy or delivery;

         c) significant limitation of daily activities, such as feeding, continence or sexual function;

         d) loss of sight or hearing;

         e) severe disfigurement, such as burns, amputation or scarring;

         f) loss of any organ; or

         g) death.

3. All such reports and documents shall be:

   a. directed to the **company** using the contact information listed on the contact sheet attached to this policy;

   b. in writing; and

   c. include the following information:

      (1) the identity of all **insureds** implicated;

      (2) all reasonably obtainable information with respect to the time, place and circumstances of the **health care event**, **event**, offense or other matter for which coverage is sought under this policy;

      (3) the nature and extent of the injury;

      (4) the names and addresses of any injured persons;

      (5) the names and addresses of available witnesses; and

      (6) the basis for the **insured's** belief that a **claim** is reasonably likely to be made, as well as the date the **insured** first came to this belief.

4. A **health care event**, **event**, offense, accident or other matter reported to the **company** as part of risk management or loss control services shall not constitute the report of a **claim** or **potential claim** for purposes of coverage under this policy.

Q. REPRESENTATIONS

1. By acceptance of this policy, each **insured** agrees, represents, and warrants that the statements and particulars made in all applications, including any statements and particulars made in any and all documents, supplemental pages or other attachments for the purposes of any application, are true and correct. It is further understood

Page 18 of 19                © 2015 MedPro Group. All rights reserved.

and agreed that any application and attachments are incorporated into, and shall form a part of, this policy. Therefore, this policy and any endorsements hereto, and all applications and attachments, embody all agreements between the **company** and any of its authorized representatives, and all **insureds** relating to this insurance.

2.  In the event any application was executed or endorsed by an **insured's** insurance producer, the **insured** acknowledges that the insurance producer has acted under the **insured's** express authority and that the **insured** has thoroughly reviewed the information contained on any application.

3.  The representations made by an **insured** in the applications and attachments are the basis for the coverage provided, as well as the **company's** calculation of the applicable premium. Therefore, it is understood and agreed that, to the extent permitted by law, the **company** reserves all rights, including the right to rescind this policy, or deny any coverage provided for a **claim** or **potential claim**, based upon any material misrepresentation made by any **insured**. As used in this condition, "material misrepresentation" means concealment, misrepresentation, omission or fraud which, if known by the **company**, would have led to refusal by the **company** to make this contract or provide coverage, or to make this contract or provide coverage on different terms or conditions.

4.  No knowledge or information possessed by any **insured** shall be imputed to any other **insured**, except for material facts or information known to the person or persons who signed the application. In the event of any material misrepresentation in connection with any of the particulars or statements in the application, this policy shall be void with respect to any **insured** who knew of such material misrepresentation or to whom such knowledge is imputed.

R.  SEPARATION OF INSUREDS

Except for any duties specifically assigned to the **first named insured** and Limits of Liability applicable to any **insured**, this policy applies:

1.  separately to each **insured** against whom a **claim** or **potential claim** is made; and

2.  as if each **insured** were the only **insured** under this policy.

S.  SETTLEMENT

The **company** may only settle a **claim**, **potential claim** or other matter brought against an **insured** with the consent of the **first named insured**.

T.  SUBROGATION

The **company** shall be subrogated to the rights of any **insured** to the extent of any payments made, or as allowed by law. **Insureds** shall do nothing to prejudice those rights. At the **company's** request, an **insured** shall bring suit or transfer those rights to the **company**. **Insureds** shall also help the **company** enforce its rights.

U.  TERMS CONFORM TO STATUTE OR REGULATION

If any term of this policy, or any duty arising therefrom, would cause the **company** to violate any federal, state or local law or regulation, the policy is amended to bring the **company** into compliance with such statute or regulation.

                                                     © 2015 MedPro Group. All rights reserved.



**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

*HEALTHCARE LIABILITY POLICY*

*PROFESSIONAL LIABILITY COVERAGE PART*

**NOTICE:**

**This Coverage Part may contain claims-made and reported coverage. Please read this Coverage Part carefully.**

## I.  INSURING CLAUSES

A.  PROFESSIONAL LIABILITY

1.  Claims-Made and Reported:

If "Claims-Made and Reported" is shown on the Declarations with respect to this Coverage Part, the following provisions apply:

a.  The **company** will pay on behalf of any **insured** all **loss** and **claims expense**, subject to any applicable Deductible or Self-Insured Retention, and up to the Limits of Liability shown on the Declarations with respect to this Coverage Part, arising from a **health care event** that took place on or after the applicable Retroactive Date shown on the Declarations. Moreover, to be covered under this policy, the **loss** or **claims expense** must arise from:

(1)  a **claim** that was first made against, and received by, an **insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period** or within any applicable **extended reporting period**; or

(2)  a **potential claim** that was first known about or discovered by an **insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period** or within the automatic limited **extended reporting period**.

b.  All **claims** and **potential claims** for damages arising out of, or in connection with the same **health care event** will be deemed to have been first made on the date that the first of those **claims** is made against any **insured**, or the date the first of such **potential claims** is discovered by an **authorized insured**, whichever date is earlier. Only the policy in effect when the first such **claim** is made and reported to the **company**, or the first such **potential claim** is discovered and reported to the **company**, whichever is earlier, will apply to all related **claims** and **potential claims**, no matter when those related **claims** are made or reported, or **potential claims** are discovered and reported. If, prior to the effective date of this policy, the first such **claim** is made, or the first such **potential claim** is discovered, this policy will not apply to that **claim** or **potential claim**, nor to any related **claim** or **potential claim** made during this **policy period** or any **extended reporting period**.

2.  Occurrence:

If "Occurrence" is shown on the Declarations with respect to this Coverage Part, the following provisions apply:

a.  The **company** will pay on behalf of an **insured** all **loss** and **claims expense**, subject to any applicable Deductible or Self-Insured Retention, and up to the Limits of Liability shown on the Declarations with respect to this Coverage Part, arising from a **health care event** that occurred during the **policy period**.

b.  A **health care event** will be deemed to have occurred on the earliest date of any related acts or omissions that gave rise to or contributed to the **health care event**.

© 2015 MedPro Group. All rights reserved.

## II. **EXCLUSIONS**

The coverage provided under this Coverage Part does not apply to:

A. CONTRACTUAL LIABILITY

Liability for the acts of another assumed by an **insured** under any contract or agreement, whether written, oral or implied. This exclusion does not apply to liability for damages that the **insured** would have in the absence of the contract or agreement.

B. ELECTRONIC DATA

Any **claim** or **potential claim** arising out of, or in connection with, the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data. As used in this exclusion, "electronic data" means information, facts, or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices, or any other media that are used with electronically controlled equipment or by means of the internet.

C. INTENTIONAL ACTS

Any **loss** for any **claim** or **potential claim** arising out of, or in connection with, any act listed below:

1. any criminal, intentional, dishonest or fraudulent act;

2. any romantic relationship, or any actual or threatened sexual conduct, with a current, former or prospective patient;

3. any willful violation of any law, statute, or regulation;

4. any breach of contract or guaranty regarding the efficacy of **treatment**;

5. **professional services** by the **insured** while under the influence of alcohol, drugs or intoxicants of any kind; or

6. any creation, alteration, modification or destruction, with deceptive intent, of any medical record.

However, the **company** will pay **claims expense** to defend any **insured** against any **claim** or **potential claim** involving any excluded act listed above when intertwined with any other act triggering any insuring agreement.

D. LICENSURE

Any **claim** or **potential claim** arising from, or in connection with, any **treatment** rendered by any individual who was not authorized to provide such **treatment** due to the suspension, revocation, surrender, or restriction of, or failure to obtain, the proper professional license, certification or authorization.

E. PRIVACY

Any **claim** or **potential claim** arising out of, or in connection with, any disclosure of or access to any person's or organization's confidential, proprietary or personal information, including personally identifiable information, financial information, patents, trade secrets, processing methods, customer lists, credit card information, health information, or any other type of nonpublic information. This exclusion applies even if the **claim** or **potential claim** is for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other **loss**, **claims expense**, cost or expense incurred by an **insured** or others resulting from the excluded **claims** or **potential claims**.

F. TREATMENT BY AN ADMINISTRATOR OR COMMITTEE MEMBER

Any **claim** or **potential claim** arising out of, or in connection with, the rendering of, or failure to render, **treatment** by an administrator or committee member, unless it was provided in an emergency without an expectation of compensation.  As used in this exclusion:

1. "administrator" means an owner, partner, stockholder, director, trustee, executive officer, medical director, department head, or faculty member of a **named insured**; and

2. "committee member" means a person serving as a member of a committee or board formed or controlled by a **named insured**. It also includes any person executing the directives of such a committee or board.

## III. **ADDITIONAL CONDITIONS**

In addition to the conditions in the Common Policy Provisions and Conditions, the following conditions apply to this Coverage Part:

A. RETROACTIVE DATES

1. A **named insured** that has a date listed under the Retroactive Date column in a Schedule of Named Insureds will be considered as having "Claims-Made and Reported" coverage as shown on the Declarations with respect to the applicable Coverage Part.

2. A **named insured** that has "n/a" listed under the Retroactive Date column in a Schedule of Named Insureds will be considered as having "Occurrence" coverage as shown on the Declarations with respect to the applicable Coverage Part.

B. TERMINATION DATES

If a **named insured** has a date listed under the Termination Date column in a Schedule of Named Insureds, any **health care event** must have taken place before that date, and after any applicable Retroactive Date, to be covered under the applicable Coverage Part. However, coverage for such **named insured** shall automatically terminate in the event that the policy is canceled or nonrenewed, unless an **extended reporting period** is purchased for that **named insured** under the applicable Coverage Part.

C. LIMITS OF LIABILITY

1. A **named insured** that has "FNI" or the name of any other **named insured** listed under the Limits of Liability column in a Schedule of Named Insureds will share the Limits of Liability provided to that **first named insured** or **named insured**.

2. If any **named insured** has an amount listed under the Limits of Liability column in a Schedule of Named Insureds, and any other **named insured** lists that same **named insured** in its Limits of Liability column, all such **named insureds** will share Limits of Liability.

3. A **named insured** that has an amount listed under the Limits of Liability column in a Schedule of Named Insureds does not share the **first named insured's** or any other **named insured's** Limits of Liability as long as no other **named insured** lists that same **named insured** in its Limits of Liability column.

D. RETENTIONS

1. A **named insured** that has "FNI" or the name of any other **named insured** listed under the Retention column in a Schedule of Named Insureds is subject to any Deductible or Self-Insured Retention applicable to that **first named insured** or **named insured**.

2. If any **named insured** has an amount listed under the Retention column in a Schedule of Named Insureds, and any other **named insured** lists that same **named insured** in its Retention column, all such **named insureds** will share the Deductible or Self-Insured Retention.

3. A **named insured** that has an amount listed under the Retention column in a Schedule of Named Insureds does not share the **first named insured's** or any other **named insured's** Deductible or Self-Insured Retention as long as no other **named insured** lists that same **named insured** in its Retention column.

E. FULL-TIME EQUIVALENT POSITIONS

1. A **named insured** who is listed as an FTE Physician or FTE Provider in a Schedule of Named Insureds is a **named insured** who, along with other **named insureds**, performs **professional services** and shares in a full-time equivalent position that is filled by any number of **named insureds** during the **policy period**.

2. A **named insured** may have multiple full-time equivalent positions during the policy period. Each such full-time equivalent position shall be identified numerically (e.g., FTE #1; FTE #2; etc.) on the applicable Schedule of Named Insureds.

F. SLOT POSITIONS

1. A **named insured** who is listed as a Slot Physician or Slot Provider in a Schedule of Named Insureds is a **named insured** who, along with other **named insureds**, performs **professional services** and shares in a full-time slot position that is filled by any number of **insureds** during the **policy period**.

2. A **named insured** may have multiple full-time slot positions during the **policy period**. Each such full-time slot position shall be identified numerically (e.g., Slot #1; Slot #2; etc.) on the applicable Schedule of Named Insureds.

3. Only one **insured** may occupy a full-time slot position at a time.

## IV. <u>LIMITS OF LIABILITY</u>

A. PER EVENT LIMIT

The Per Event Limit shown on the Declarations is the most the **company** will pay under this Coverage Part for **loss** and **claims expense**, if shown on the Declarations as "Defense Within Limits," for any **health care event** regardless of the number of:

1. **insureds** who share a Per Event Limit;

2. **claims** made or **potential claims** first discovered; or

3. persons or organizations making **claims** or **potential claims**

B. AGGREGATE LIMIT

The Aggregate Limit shown on the Declarations is the most the **company** will pay under this Coverage Part for **loss** and **claims expense**, if shown on the Declarations as "Defense Within Limits," for all **health care events** regardless of the number of:

1. **health care events**;

2. **insureds** who share an Aggregate Limit;

3. **claims** made or **potential claims** first discovered; or

4. persons or organizations making **claims** or **potential claims**.



<div align="right">

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

</div>

## *HEALTHCARE LIABILITY POLICY*
## *GENERAL LIABILITY COVERAGE PART*

### NOTICE:

**This Coverage Part may contain claims-made and reported coverage. Please read this Coverage Part carefully.**

## I. <u>INSURING CLAUSES</u>

### A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. <u>Claims-Made and Reported</u>

   If "Claims-Made and Reported" is shown on the Declarations with respect to this Coverage Part, the following provisions apply:

   a. The **company** will pay on behalf of any **insured** all **loss** and **claims expense**, subject to any applicable Deductible or Self-Insured Retention, and up to the Limits of Liability shown on the Declarations with respect to this Insuring Clause, arising from an **event** resulting in **bodily injury** or **property damage** that took place on or after the applicable retroactive date shown on the Declarations. Moreover, to be covered under this policy, the **loss** or **claims expense** must arise from:

      (1) a **claim** that was first made against, and received by, an **insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period** or within any applicable **extended reporting period**; or

      (2) a **potential claim** that was first known about or discovered by an **insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period** or within the automatic limited **extended reporting period**.

   b. All **claims** and **potential claims** for damages arising out of, or in connection with, **bodily injury** to the same person, including damages claimed by any person or organization for care, loss of services, or death resulting at any time from **bodily injury**, will be deemed to have been first made on the date that the first of those **claims** is made against any **insured**, or the date the first of such **potential claims** is discovered by an **authorized insured**, whichever date is earlier. Additionally, all **claims** and **potential claims** for damages because of **property damage** causing **loss** to the same person or organization will be deemed to have been first made on the date that the first of those **claims** is made against any **insured**, or the date the first of the **potential claims** is discovered by an **authorized insured**, whichever date is earlier. Only the policy in effect when the first such **claim** is made and reported to the **company**, or the first such **potential claim** is discovered and reported to the **company**, whichever is earlier, will apply to all related **claims** and **potential claims**, no matter when those related **claims** are made or reported, or **potential claims** are discovered and reported. If, prior to the effective date of this policy, the first such **claim** is made, or the first such **potential claim** is discovered, this policy will not apply to that **claim** or **potential claim**, nor to any related **claim** or **potential claim** made during this **policy period** or any **extended reporting period**.

2. <u>Occurrence</u>

   If "Occurrence" is shown on the Declarations with respect to this Coverage Part, the following provisions apply:

   a. The **company** will pay on behalf of an **insured** all **loss** and **claims expense**, subject to any applicable Deductible or Self-Insured Retention, and up to the Limits of Liability shown on the Declarations with respect to this Insuring Clause, arising from an **event** resulting in **bodily injury** or **property damage** that occurred during the **policy period**.

   b. An **event** will be deemed to have occurred on the earliest date of any related acts or omissions that gave

© 2015 MedPro Group. All rights reserved.

rise to or contributed to the **event**.

B.  PERSONAL AND ADVERTISING INJURY LIABILITY

1.  <u>Claims-Made and Reported</u>

If "Claims-Made and Reported" is shown on the Declarations with respect to this Coverage Part, the following provisions apply:

a.  The **company** will pay on behalf of any **insured** all **loss** and **claims expense**, subject to any applicable Deductible or Self-Insured Retention, and up to the Limits of Liability shown on the Declarations with respect to this Insuring Clause, arising from an offense resulting in **personal and advertising injury** that took place on or after the applicable retroactive date shown on the Declarations. Moreover, to be covered under this policy, the **loss** or **claims expense** must arise from:

(1)  a **claim** that was first made against, and received by, an **insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period** or within any applicable **extended reporting period**; or

(2)  a **potential claim** that was first known about or discovered by an **insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period** or within the automatic limited **extended reporting period**.

b.  All **claims** and **potential claims** for damages arising out of, or in connection with the same **personal and advertising injury** will be deemed to have been first made on the date that the first of those **claims** is made against any **insured**, or the date the first of such **potential claims** is discovered by an **authorized insured**, whichever date is earlier. Only the policy in effect when the first such **claim** is made and reported to the **company**, or the first such **potential claim** is discovered and reported to the **company**, whichever is earlier, will apply to all related **claims** and **potential claims**, no matter when those related **claims** are made or reported, or **potential claims** are discovered and reported. If, prior to the effective date of this policy, the first such **claim** is made, or the first such **potential claim** is discovered, this policy will not apply to that **claim** or **potential claim**, nor to any related **claim** or **potential claim** made during this **policy period** or any **extended reporting period**.

2.  <u>Occurrence</u>

If "Occurrence" is shown on the Declarations with respect to this Coverage Part, the following provisions apply:

a.  The **company** will pay on behalf of an **insured** all **loss** and **claims expense**, subject to any applicable Deductible or Self-Insured Retention, and up to the Limits of Liability shown on the Declarations with respect to this Insuring Clause, arising from an offense resulting in **personal and advertising injury** that occurred during the **policy period**.

b.  An offense will be deemed to have occurred on the earliest date of any related acts or omissions that gave rise to or contributed to the offense.

C.  MEDICAL PAYMENTS

1.  <u>Claims-Made and Reported</u>

If "Claims-Made and Reported" is shown on the Declarations with respect to this Coverage Part, the following provisions apply:

a.  The **company** will pay on behalf of any **named insured**, **medical expenses** for **bodily injury** caused by an accident, regardless of fault, and up to the Limits of Liability shown on the Declarations with respect to this Insuring Clause. However, the **medical expenses** must have been caused by an accident that took place on or after the applicable Retroactive Date shown on the Declarations. Moreover, to be covered under this policy, the **medical expenses** must:

(1)  arise from a **claim** that was first made against, and received by, a **named insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period**;

(2)  arise from an accident that occurred on a premises owned or occupied by, or on the ways next to premises owned or occupied by, a **named insured**; and

(3)  result from the operations of a **named insured**.

b.  for damages arising out of, or in connection with the same accident will be deemed to have been first made

on the date that the first of those **claims** is made against any **insured**, or the date the first of such **potential claims** is discovered by an **authorized insured**, whichever date is earlier. Only the policy in effect when the first such **claim** is made and reported to the **company**, or the first such **potential claim** is discovered and reported to the **company**, whichever is earlier, will apply to all related **claims** and **potential claims**, no matter when those related **claims** are made or reported, or **potential claims** are discovered and reported. If, prior to the effective date of this policy, the first such **claim** is made, or the first such **potential claim** is discovered, this policy will not apply to that **claim** or **potential claim**, nor to any related **claim** or **potential claim** made during this **policy period** or any **extended reporting period**.

2. Occurrence

If "Occurrence" is shown on the Declarations with respect to this Coverage Part, the following provisions apply:

a. the **company** will pay on behalf of a **named insured**, **medical expenses** for **bodily injury** caused by an accident, regardless of fault, and up to the Limits of Liability shown on the Declarations with respect to this Insuring Clause. However, the **medical expenses** must be caused by an accident that occurred during the **policy period**. Moreover, to be covered under this policy, the **medical expenses** must:

(1) be submitted to the **company**, in writing, within one year of the accident;

(2) arise from an accident that occurred on a premises owned or occupied by, or on the ways next to premises owned or occupied by, a **named insured**; and

(3) result from the operations of a **named insured**.

b. An accident will be deemed to have occurred on the earliest date of any related acts or omissions that gave rise to or contributed to the accident.

However, payments for **medical expenses** shall not be subject to any Deductible or Self-Insured Retention.

## II. **EXCLUSIONS**

A. EXCLUSIONS APPLICABLE TO THIS COVERAGE PART

The coverage provided under this Coverage Part does not apply to:

1. Contractual Liability

Any **claim** or **potential claim** arising out of, or in connection with, an **insured's** obligation to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

a. that the **insured** would have in the absence of the contract or agreement; or

b. assumed in a contract or agreement that is an **insured contract**, provided the **bodily injury, property damage, personal and advertising injury** or **medical expenses** occurred subsequent to the execution of the contract or agreement. Only for the purposes of liability assumed in an **insured contract**, reasonable attorneys' fees and necessary litigation expenses incurred by or for a party, other than an **insured**, are deemed to be damages because of **bodily injury, property damage, personal and advertising injury** or **medical expenses**, provided:

(1) liability to or for that party's defense has also been assumed in the same **insured contract**; and

(2) attorneys' fees and litigation expenses are for the defense against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

2. Electronic Data

Any **claim** or **potential claim** arising out of, or in connection with, the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data. As used in this exclusion, "electronic data" means information, facts, or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices, or any other media that are used with electronically controlled equipment or by means of the internet.

2. Employees

Any **claim** or **potential claim** arising out of, or in connection with, the acts or omissions of an **employee**, involving:

a. **bodily injury**, **personal and advertising injury** or **medical expenses**:

    (1) to another **employee** or agent of a **named insured**;

    (2) to the spouse, relative or dependent as a consequence of subparagraph a.(1), above; or

    (3) for which there is any duty to share damages or loss with, or repay, another party liable for the loss as a consequence of subparagraphs a.(1) and a.(2), above.

b. **property damage** to property:

    (1) owned, occupied, or used by an **insured**;

    (2) rented to an **insured**; or

    (3) in the care, custody, or control of an **insured**.

3. Privacy

Any **claim** or **potential claim** arising out of, or in connection with, any disclosure of or access to any person's or organization's confidential, proprietary or personal information, including personally identifiable information, financial information, patents, trade secrets, processing methods, customer lists, credit card information, health information, or any other type of nonpublic information. This exclusion applies even if the **claim** or **potential claim** is for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other **loss**, **claims expense**, cost or expense incurred by an **insured** or others resulting from the excluded **claims** or **potential claims**.

4. Professional Liability

Any **claim** or **potential claim** arising out of, or in connection with, a **health care event**.

5. Recording And Distribution Of Material Or Information In Violation Of Law

Any **claim** or **potential claim** arising out of, or in connection with, any act or omission that violates or is alleged to violate:

a. the Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

b. the CAN-SPAM Act of 2003, including any amendment of or addition to such law;

c. the Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act; or

d. any federal, state or local statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

6. Sexual Acts

Any **claim** or **potential claim** arising out of, or in connection with, any actual or threatened sexual conduct by any person of another person while in the care, custody, or control of any **insured**.

Under this exclusion, the **company's** duty to defend the **insured** for such **claim** or **potential claim** will cease when it is established by trial or arbitration verdict, court ruling, regulatory ruling or legal admission that the **insured** engaged in any act excluded in this exclusion.

B. EXCLUSIONS APPLICABLE TO THE BODILY INJURY AND PROPERTY DAMAGE LIABILITY INSURING CLAUSE AND THE MEDICAL PAYMENTS INSURING CLAUSE

The coverage provided under the Bodily Injury and Property Damage Liability Insuring Clause and the Medical Payments Insuring Clause does not apply to:

1. Aircraft, Auto Or Watercraft

**Bodily injury**, **property damage** or **medical expenses** arising out of, or in connection with, the ownership, maintenance, use, or entrustment to others of any aircraft, **auto**, or watercraft owned or operated by or rented to or loaned to any **insured**. Use includes operation and **loading or unloading**.

a. This exclusion applies even if the **claims** or **potential claims** against any **insured** allege negligence or other wrongdoing in the supervision, hiring, employment, training, or monitoring of others by that **insured** if the **event** or accident which caused the **bodily injury**, **property damage** or **medical expenses** involved the ownership, maintenance, use, or entrustment to others of any aircraft, **auto**, or watercraft that is owned or operated by or rented or loaned to any **insured**.

b. This exclusion does not apply to:

(1) the loading or unloading of a patient;

(2) a watercraft while on shore on premises owned or rented by the **insured**;

(3) a watercraft that is:

    a) not owned by an **insured**;

    b) less than 26 feet long; and

    c) not being used to carry persons or property for a charge.

(4) parking an **auto** on or next to a site owned or occupied by an **insured**, but only if the **auto** is not owned, rented, or being used by an **insured**;

(5) liability assumed under an **insured contract** for the ownership, maintenance, or use of an aircraft or watercraft; or

(6) **bodily injury**, **property damage** or **medical expenses** arising out of, or in connection with:

    a) the operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of **mobile equipment** if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

    b) the operation of any of the machinery or equipment listed in subparagraph 2.a or 2.b of the definition of **mobile equipment**.

2. <u>Asbestos</u>

Any **claim** or **potential claim** arising out of, or in connection with, asbestos, or any materials containing asbestos in whatever form or quantity.

3. <u>Damage To Impaired Property Or Property Not Physically Injured</u>

**Property damage** to **impaired property** or property that has not been physically injured arising out of, or in connection with:

a. a defect, deficiency, inadequacy, or dangerous condition in the **insured's product** or **insured's work**; or

b. a delay or failure by an **insured** to perform under the terms of a contract or agreement.

This exclusion does not apply to the loss of use of other property arising out of, or in connection with, sudden and accidental physical injury to the **insured's product** or the **insured's work** after it has been put to its intended use.

4. <u>Damage To The Insured's Product</u>

**Property damage** to the **insured's product** arising out of, or in connection with, it or any part of it.

5. <u>Damage To The Insured's Work</u>

**Property damage** to the **insured's work** arising out of, or in connection with, the **insured's work** or any part of it, and included in the **products completed operations hazard**. This exclusion does not apply if the damaged work, or the work out of which the damage arises, was performed by a subcontractor on behalf of the **insured**.

6. <u>Damage To Property</u>

**Property damage** to:

a. property an **insured** owns, rents, or occupies, including any costs or expenses incurred by an **insured**, or

any other person or organization for repair, replacement, enhancement, restoration, or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

b. premises an **insured** sells, gives away, or abandons if the **property damage** arises out of, or in connection with, any part of those premises;

c. property loaned to an **insured**;

d. personal property in the care, custody, or control of an **insured**;

e. that particular part of real property on which an **insured** or any contractors or subcontractors, working directly or indirectly on behalf of an **insured**, are performing operations if the **property damage** arises out of those operations; or

f. that particular part of any property that must be restored, repaired, or replaced because the **insured's work** was incorrectly performed on it.

Subparagraphs a, c, and d of this exclusion do not apply to **property damage** (other than damage by fire) to a premises, including the contents of such premises, rented to an **insured** for a period of 7 or fewer consecutive days. A separate limit of liability applies to the Damage to Premises Rented to an Insured as described in the Limits of Liability provision.

Subparagraph b of this exclusion does not apply if the premises are the **insured's work** and were never occupied, rented, or held for rental by an **insured**.

Subparagraph f of this exclusion does not apply to **property damage** included in the **products completed operations hazard**.

7. <u>Expected Or Intended Injury</u>

**Bodily injury**, **property damage** or **medical expenses** arising out of, or in connection with, any act expected or intended by an **insured** to cause **bodily injury**, **property damage** or **medical expenses**. This exclusion applies even if an **insured's** act causes **bodily injury**, **property damage** or **medical expenses**:

a. of a different type or degree than expected or intended; or

b. to a different person or organization than expected or intended.

However, this exclusion does not apply to **bodily injury** or **medical expenses** arising out of, or in connection with, an **insured's** use of reasonable force to protect persons or property.

8. <u>Fungi And Bacteria</u>

a. **Bodily injury**, **property damage** or **medical expenses** arising out of, or in connection with, the actual, alleged or threatened inhalation of, injection of, contact with, exposure to, existence of, or presence of any fungi or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

b. Any **loss**, cost or expense arising out of, or in connection with, the abating, testing, monitoring, cleaning, removing, containing, treating, detoxifying, neutralizing, remediating, or disposing of, or in any way responding to, or assessing the effects of, fungi or bacteria, by any **insured** or by any other person or organization.

This exclusion shall not apply to any fungi or bacteria contained in a good or product intended for bodily consumption. For the purposes of this exclusion, the term fungi includes any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents, or byproducts produced or released by fungi.

9. <u>Liquor Liability</u>

**Bodily injury**, **property damage** or **medical expenses** arising out of, or in connection with, any **insured's** liability by reason of:

a. causing or contributing to the intoxication of any person;

b. the furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

c. any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if the **insured** is in the business of manufacturing, distributing, selling, serving or

 © 2015 MedPro Group. All rights reserved.

furnishing alcoholic beverages.

10. Mobile Equipment

**Bodily injury**, **property damage** or **medical expenses** arising out of, or in connection with:

a. the transportation of **mobile equipment** by an **auto** owned or operated by or rented or loaned to an **insured**; or

b. the use of **mobile equipment** in, while in practice for, or while being prepared for any prearranged racing, speed, demolition, or stunting activity.

11. Personal And Advertising Injury

**Bodily injury** arising out of, or in connection with, **personal and advertising injury**.

12. Pollution

a. Any **bodily injury**, **property damage** or **medical expenses** arising out of, or in connection with, the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of **pollutants**:

(1) at or from any premises, site, or location that is or was at any time owned or occupied by or rented or loaned to any **insured**. However, this does not apply to:

a) **bodily injury** if sustained within a building and caused by smoke, fumes, vapor, or soot produced by or originated from equipment that is used to heat, cool, or dehumidify the building or equipment that is used to heat water for personal use by the building's occupants or guests;

b) **bodily injury**, **property damage** or **medical expenses** for which an **insured** may be held liable, if it is a contractor, and the owner or lessee of such premises, site, or location has been added to the policy as an **additional insured** with respect to an **insured's** ongoing operations performed for that **additional insured** at that premises, site, or location, and such premises, site, or location is not or never was owned or occupied by or rented or loaned to any **insured**, other than that **additional insured**; or

c) **bodily injury**, **property damage** or **medical expenses** arising out of, or in connection with, heat, smoke, or fumes from a fire that becomes uncontrollable or breaks out from where it was intended to be.

(2) at or from any premises, site, or location that is or was at any time used by or for any **insured** or others for the handling, storage, disposal, processing, or treatment of waste.

(3) which are or were at any time transported, handled, stored, treated, disposed of or processed as waste by or for any **insured** or any other person or organization for whom an **insured** may be legally responsible.

(4) at or from any premises, site, or location on which any **insured** or any contractors or subcontractors, working directly or indirectly on any **insured's** behalf, are performing operations if the **pollutants** were brought on or to the premises, site, or location in connection with such operations by such **insured**, contractor, or subcontractor. However, this subparagraph does not apply to:

a) **bodily injury**, **property damage** or **medical expenses** arising out of, or in connection with, the escape of fuels, lubricants, or other operating fluids, which are needed to perform the normal electrical, hydraulic, or mechanical functions necessary for the operation of **mobile equipment** or its parts, if such fuels, lubricants, or other operating fluids escape from a vehicle part designed to hold, store, or receive them. This exception does not apply if the **bodily injury, property damage** or **medical expenses** arises out of the intentional discharge, dispersal, or release of fuels, lubricants, or other operating fluids or if such fuels, lubricants, or other operating fluids are brought on or to the premises, site, or location with the intent that they be discharged, dispersed, or released as part of the operations being performed by such **insured**, contractor, or subcontractor;

b) **bodily injury**, **property damage** and **medical expenses** sustained within a building and caused by the release of gases, fumes, or vapors from materials brought into the building in connection with operations being performed by an **insured**, or on its behalf by a contractor or subcontractor;

or

c) **bodily injury**, **property damage** or **medical expenses** arising out of, or in connection with, heat, smoke, or fumes from a fire that becomes uncontrollable or breaks out from where it was intended to be.

(5) arising out of, or in connection with, any premises, site, or location on which any **insured** or any contractors or subcontractors, working directly or indirectly on any **insured's** behalf, are performing operations if such operations are to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any other way respond to or assess the effects of, **pollutants**.

b. Any damages, **loss**, cost, or expense arising out of, or in connection with, any:

(1) request, demand, order, or statutory or regulatory requirement that any **insured** or others test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize , or in any way respond to or assess the effects of, **pollutants**; or

(2) **claim** or **potential claim** by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, or neutralizing, or in any way responding to or assessing the effects of **pollutants**.

However, this subparagraph does not apply to liability for damages because of **property damage** that an **insured** would have in the absence of such request, demand, order, or statutory or regulatory requirement, or such **claim** or **potential claim** by or on behalf of a governmental authority.

13. Recall Of Products, Work, Or Impaired Property

Any **claim** or **potential claim** arising out of, or in connection with, any **loss**, cost, or expense incurred by an **insured** or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal, or disposal of:

a. the **insured's product**;

b. the **insured's work**; or

c. **impaired property**

if such product, work, or property is withdrawn or recalled from the market or from use due to a known or suspected defect, deficiency, inadequacy, or dangerous condition to it.

14. Silica

Any **claim** or **potential claim** arising out of, or in connection with, silica, including, but not limited to:

a. inhaling, ingesting or physical exposure to silica directly or through any goods, products, structures, real estate or land containing silica;

b. the use or presence of silica in any process or operation of any type, including but not limited to construction, manufacturing, sandblasting, cleaning, drilling, farming or mining;

c. the use or presence of silica in any good, product, structure, real estate or land, or any component part of any good, product, structure, real estate or land; or

d. the manufacture, sale, transportation, handling, storage or disposal of silica or any goods, products, structures, real estate or land containing silica;

e. any disease actually or allegedly caused by, contributed to or aggravated by silica, including but not limited to silicosis, chronic silicosis, accelerated silicosis, acute silicosis, conglomerate silicosis, any auto-immune disorder, tuberculosis, silicoproteinosis, cancer, scleroderma, emphysema, pneumoconiosis, pulmonary fibrosis, progressive massive fibrosis, any lung disease or any other ailment actually or allegedly caused by, contributed to or aggravated by silica;

f. any costs of medical or other testing, monitoring or diagnosis arising out of, or in connection with, any actual, alleged, threatened or feared **bodily injury** arising in whole or in part, directly or indirectly, out of silica; or

g. any costs of investigations, feasibility studies, cleaning, removal or remediation of the actual or alleged presence of silica in or on any goods, products structures, real estate or land.

As used in this exclusion, "silica" means silica in any form and any of its derivatives, including but not limited to silica dust, silicon dioxide ($SiO_2$), crystalline silica, quartz, or non-crystalline (amorphous) silica.

The exclusions for "AIRCRAFT, AUTO OR WATERCRAFT," "DAMAGE TO IMPAIRED PROPERTY OR PROPERTY NOT PHYSICALLY INJURED," "DAMAGE TO THE INSURED'S PRODUCT," "DAMAGE TO THE INSURED'S WORK," "DAMAGE TO PROPERTY," "LIQUOR LIABILITY," "MOBILE EQUIPMENT," "POLLUTION," and "RECALL OF PRODUCTS, WORK, OR IMPAIRED PROPERTY" do not apply to damage by fire to premises while rented to an **insured** or temporarily occupied by an **insured** with the permission of its owner. A separate limit of liability applies to Damage to Premises Rented to an Insured as described in the Limits of Liability.

C.   EXCLUSIONS APPLICABLE TO PERSONAL AND ADVERTISING INJURY LIABILITY INSURING CLAUSE

The coverage provided under the Personal and Advertising Injury Liability Insuring Clause does not apply to:

1.   Breach Of Contract

**Personal and advertising injury** arising out of, or in connection with, a breach of contract, except an implied contract to use another's advertising idea in an **insured's advertisement**.

2.   Electronic Chatrooms Or Bulletin Boards

**Personal and advertising injury** arising out of, or in connection with, an electronic chatroom or bulletin board an **insured** hosts, owns, or over which an **insured** exercises control.

3.   Infringement Of Copyright, Patent, Trademark, Or Trade Secret

**Personal and advertising injury** arising out of, or in connection with, the infringement of copyright, patent, trademark, trade secret, or other intellectual property rights. However, this exclusion shall not apply to the infringement of copyright, trade, dress, or slogan in an **insured's advertisement**.

4.   Insureds In Media And Internet Type Businesses

**Personal and advertising injury** committed by an **insured** whose business is:

a.   advertising, broadcasting, publishing, or telecasting;

b.   designing or determining content for the websites of others; or

c.   an internet search, access, content, or service provider.

However, this exclusion does not apply to **claims** arising from false arrest, detention or imprisonment, malicious prosecution, or the wrongful eviction from, or wrongful entry into, or invasion of the private occupancy of a room dwelling or premises occupied by, or on behalf of, its owner, landlord, or lessor.

For the purposes of this exclusion, the placing of frames, borders, or links, or advertising for an **insured** or others is not considered, by itself, to be the business of advertising, broadcasting, publishing, or telecasting.

5.   Knowing Violation Of Rights Of Others

**Personal and advertising injury** caused by, or at the direction of, an **insured** with the knowledge that the act would violate the rights of another and would inflict **personal and advertising injury**.

6.   Material Published Prior To Policy – Claims-Made and Reported Only

Only with respect to any Coverage Part shown on the Declarations as "Claims-Made and Reported," **personal and advertising injury** arising out of, or in connection with, oral or written publication of material whose first publication took place before the applicable retroactive date shown on the Declarations.

7.   Material Published Prior To Policy – Occurrence Only

Only with respect to any Coverage Part shown on the Declarations as "Occurrence," **personal and advertising injury** arising out of, or in connection with, oral or written publication of material whose first publication took prior to the **policy period**.

8.   Material Published With Knowledge Of Falsity

**Personal and advertising injury** arising out of, or in connection with, oral or written publication of material if done by, or at the direction of, an **insured** with knowledge of its falsity.

9.   Quality Or Performance Of Goods – Failure To Conform To Statements

**Personal and advertising injury** arising out of, or in connection with, the failure of goods, products, or services to conform to any statement of quality or performance in an **insured's advertisement**.

10. <u>Unauthorized Use Of Another's Name Or Product</u>

**Personal and advertising injury** arising out of, or in connection with, the unauthorized use of another's name or product in an **insured's** email address, domain name, or metatag, or other similar tactics to mislead another's potential customers.

11. <u>Wrong Description Of Prices</u>

**Personal and advertising injury** arising out of, or in connection with, the wrong description of the price of the goods, products, or services in an **insured's advertisement**.

D.  EXCLUSIONS APPLICABLE TO MEDICAL PAYMENTS INSURING CLAUSE

1. <u>Medical Expenses</u>

The coverage provided under Medical Payments Insuring Clause does not apply to **medical expenses** arising out of, or in connection with, **bodily injury**:

a.  to an **insured**, except volunteers;

b.  to a person hired to do work for, or on behalf of, an **insured** or tenant of an **insured**;

c.  to a person injured on that part of a premises owned or rented by an **insured** that the injured person normally occupies;

d.  to any person, whether or not an **employee**, who is eligible for benefits under a workers' compensation, occupational disease, disability benefits, or similar law;

e.  to a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests;

f.  covered as a **products completed operations hazard**; or

g.  to any inmate, patient, or prisoner, who is being treated, cared for, detained, or imprisoned by any **insured** or in any premises of any **insured**.


## III. LIMITS OF LIABILITY

A.  GENERAL RESTRICTIONS

The Limits of Liability shown on the Declarations is the most the **company** will pay regardless of the number of:

1.  **insureds**;

2.  **claims** made or **potential claims** first discovered; or

3.  persons or organizations making **claims** or **potential claims**.

B.  GENERAL AGGREGATE LIMIT

The General Aggregate Limit shown on the Declarations is the most the **company** will pay for **loss, claims expense**, if shown on the Declarations as "Defense Within Limits," and **medical expenses** under this Coverage Part except for **loss** and **claims expense** included in the **products completed operations hazard**.

C.  PRODUCTS COMPLETED OPERATIONS HAZARD AGGREGATE LIMIT

The Products Completed Operations Hazard Aggregate Limit shown on the Declarations is the most the **company** will pay under the Bodily Injury and Property Damage Liability Insuring Clause for **loss** and **claims expense**, if shown on the Declarations as "Defense Within Limits," because of **bodily injury** and **property damage** included in the **products completed operations hazard**.

D.  PERSONAL AND ADVERTISING INJURY LIABILITY LIMIT

Subject to subparagraph B. above, the Personal and Advertising Injury Liability Limit shown on the Declarations is the most the **company** will pay for **loss** and **claims expense**, if shown on the Declarations as "Defense Within Limits," under the Personal and Advertising Injury Insuring Clause because of **personal and advertising injury** sustained by any one person or organization.

E.   PER EVENT LIMIT

Subject to subparagraphs B. or C. above, whichever applies, the Per Event Limit shown on the Declarations is the most the **company** will pay for:

1.   **loss** and **claims expense**, if shown on the Declarations as "Defense Within Limits," under the Bodily Injury and Property Damage Liability Insuring Clause; and

2.   **medical expenses** under the Medical Payments Insuring Clause;

because of all **bodily injury** and **property damage** arising out of any one **event**.

F.   DAMAGE TO PREMISES RENTED TO AN INSURED LIMIT

Subject to subparagraph E. above, the Damage to Premises Rented to an Insured Limit shown on the Declarations is the most the **company** will pay under the Bodily Injury and Property Damage Liability Insuring Clause for **loss** or **claims expense**, if shown on the Declarations as "Defense Within Limits," because of **property damage** to any one premises, while rented to a **named insured** or temporarily occupied by a **named insured** with permission of the owner.

G.   MEDICAL EXPENSE LIMIT

Subject to subparagraph E. above, the Medical Expense Limit shown on the Declarations is the most the **company** will pay under the Medical Payments Insuring Clause for **medical expenses** because of **bodily injury** sustained by any one person.

© 2015 MedPro Group. All rights reserved.



<div align="right">

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

</div>

### *HEALTHCARE LIABILITY POLICY*
### *CYBER LIABILITY AND BREACH RESPONSE COVERAGE PART*

### NOTICE:

**This Coverage Part contains Claims-Made and Reported coverage. If designated as "Claims-Made" in the title of the particular Insuring Clause, the coverages provided by that Insuring Clause will only cover claims first made against an insured during the policy period, and reported to the company during the policy period or during any applicable extended reporting period. All claims are subject to the applicable Limits of Liability and the applicable Retention(s) as shown on the Declarations. Note that the Limits of Liability for Coverages A, B, C and H include claim expenses. Please read this Coverage Part carefully.**

**I.   INSURING CLAUSES**

   A.   COVERAGE A - MULTIMEDIA LIABILITY - CLAIMS-MADE

   The **company** will pay on behalf of an **insured** all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured** becomes legally obligated to pay as **damages**, including liability **assumed under contract**, and related **claim expenses**, resulting from a **claim** for a **multimedia peril** committed by an **insured**, provided that:

   1.   the **multimedia peril** is committed on or after the **retroactive date**;

   2.   the **claim** is first made against an **insured** during the **policy period**; and

   3.   the **claim** is reported to the **company**, in writing, during the **policy period**, or within 30 days thereafter.

   B.   COVERAGE B - SECURITY AND PRIVACY LIABILITY - CLAIMS-MADE

   The **company** will pay on behalf of an **insured** all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured** becomes legally obligated to pay as **damages** and related **claim expenses**, resulting from a **claim** for a **security and privacy wrongful act** committed by an **insured** resulting from a **security breach**, **privacy breach** or **breach of privacy regulations**, provided that:

   1.   the **security breach**, **privacy breach** or **breach of privacy regulations** and the resulting **security and privacy wrongful act** takes place on or after the **retroactive date**;

   2.   the **claim** is first made against an **insured** during the **policy period**; and

   3.   the **claim** is reported to the **company**, in writing, during the **policy period**, or within 30 days thereafter.

   C.   COVERAGE C - PRIVACY REGULATORY DEFENSE AND PENALTIES - CLAIMS-MADE

   The **company** will pay on behalf of an **insured** all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured** becomes legally obligated to pay as a **regulatory compensatory award** or **regulatory fines and penalties** (to the extent insurable by law), and related **claim expenses**, resulting from a **privacy regulatory proceeding** instituted against an **insured** resulting from a **security breach**, **privacy breach** or **breach of privacy regulations**, provided that:

   1.   the **security breach**, **privacy breach** or **breach of privacy regulations** takes place on or after the **retroactive date**;

   2.   the **privacy regulatory proceeding** is first instituted against an **insured** during the **policy period**; and

   3.   the **privacy regulatory proceeding** is reported to the **company**, in writing, during the **policy period**, or within 30 days thereafter.

D. COVERAGE D - PRIVACY BREACH RESPONSE COSTS, CUSTOMER NOTIFICATION EXPENSES, AND CUSTOMER SUPPORT AND CREDIT MONITORING EXPENSES

The **company** will indemnify an **insured** for all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured** incurs during the **policy period** as **privacy breach response costs**, **customer notification expenses** and/or **customer support and credit monitoring expenses** resulting from a **security breach**, a **privacy breach** or **breach of privacy regulations**, provided that:

1. the **security breach**, **privacy breach** or **breach of privacy regulations** takes place during the **policy period**;

2. the **security breach**, **privacy breach** or **breach of privacy regulations** is reported to the **company**, in writing, no later than 60 days after the date the **security breach**, **privacy breach** or **breach of privacy regulations** is discovered; and

3. the **privacy breach response costs**, **customer notification expenses** and/or **customer support and credit monitoring expenses** are incurred with the **company's** consent.

E. COVERAGE E - NETWORK ASSET PROTECTION

1. Loss of Digital Assets

   The **company** will reimburse an **insured business** for all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured business** incurs as **digital assets loss** and **special expenses** due to damage, alteration, corruption, distortion, theft, misuse or destruction of an **insured business's digital assets** directly caused by a **covered cause of loss**, provided that:

   a. the **covered cause of loss** first occurs and is discovered by the Chief Information Officer, Chief Technology Officer, Chief Security Officer, Risk Manager or General Counsel of the **insured business** during the **policy period**; and

   b. the **covered cause of loss** is reported to the **company**, in writing, no later than 60 days after the date the **covered cause of loss** is discovered.

   **Digital assets loss** and **special expenses** will be reimbursed for a period of up to 12 months following the discovery of the damage, alteration, corruption, distortion, theft, misuse or destruction of **digital assets**, unless specified otherwise by endorsement. **Digital assets loss** and **special expenses** will only be paid where there is clear evidence provided by an **insured business** that such **digital assets loss** and **special expenses** resulted from a **covered cause of loss**.

2. Non-Physical Business Interruption and Extra Expense

   The **company** will reimburse an **insured business** for all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured business** incurs as **income loss**, **interruption expenses**, and **special expenses** resulting from the total or partial interruption, degradation in service or failure of the **insured business's computer system** directly caused by a **covered cause of loss**, provided that:

   a. the **covered cause of loss** first occurs and is discovered by the Chief Information Officer, Chief Technology Officer, Chief Security Officer, Risk Manager or General Counsel of the **insured business** during the **policy period**;

   b. the **covered cause of loss** is reported to the **company**, in writing, no later than 60 days after the date the **covered cause of loss** is discovered;

   c. the **income loss**, **interruption expenses** and/or **special expenses** are incurred during the **period of restoration**; and

   d. the total or partial interruption, degradation in service or failure of the **insured business's computer system** exceeds the **time retention**.

F. COVERAGE F - CYBER EXTORTION

The **company** will indemnify an **insured business** for all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured business** pays as **cyber extortion expenses** and/or **cyber extortion monies** directly caused by a **cyber extortion threat** or series of **cyber extortion threats**, including

a demand for **cyber extortion monies**, provided that:

1. the **cyber extortion threat** is first made against an **insured business** during the **policy period**; and

2. the **cyber extortion threat** is reported to the **company**, in writing, no later than 60 days after the date the **cyber extortion threat** is received by an **insured**.

**Cyber extortion expenses** and **cyber extortion monies** shall not be paid without prior consultation with the **company** and the **company's** express agreement. An **insured business** must make every reasonable effort to notify the local law enforcement authorities and the Federal Bureau of Investigation or similar equivalent foreign agency before surrendering any **cyber extortion monies** in response to a **cyber extortion threat**.

G. COVERAGE G - CYBER TERRORISM

The **company** will reimburse an **insured business** for all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured business** incurs as **income loss, interruption expenses** and **special expenses** resulting from the total or partial interruption, degradation in service or failure of an **insured business's computer system** directly caused by an **act of terrorism**, provided that:

1. the **act of terrorism** takes place during the **policy period**;

2. the **act of terrorism** is reported to the **company**, in writing, no later than 60 days after the date **act of terrorism** is discovered;

3. the **income loss, interruption expenses** and/or **special expenses** are incurred during the **period of restoration**; and

4. the total or partial interruption, degradation in service or failure of an **insured business's computer system** exceeds the **time retention**.

H. COVERAGE H - REGULATORY PROCEEDING - CLAIMS-MADE

The **company** will reimburse an **insured** for all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured** becomes legally obligated to pay as **regulatory fines and penalties** (to the extent insurable by law) and **claims expenses** and/or **shadow audit expenses** (where applicable) resulting from a **regulatory proceeding**, provided that:

1. the wrongful act, error or omission giving rise to the **regulatory proceeding** is committed on or after the **retroactive date**;

2. the **regulatory proceeding** is first instituted against an **insured** during the **policy period**; and

3. the **regulatory proceeding** is reported to the **company**, in writing, during the **policy period**, or within 30 days thereafter.

The **company** shall have no duty to defend an **insured** under Coverage H, but only to reimburse an **insured** for covered **claim expenses, shadow audit expenses**, and/or **regulatory fines and penalties**. An **insured** shall have complete freedom of choice with respect to the selection of the licensed attorney who provides legal services in connection with any **regulatory proceeding** triggering coverage under Coverage H. Upon receiving notice from an **insured** of a **regulatory proceeding**, the **company** or its authorized agent will provide the **insured** with the name(s) of panel counsel. If an **insured** retains panel counsel, the **company** will, subject to all other provisions of this Coverage Part, pay 100% of covered **claim expenses, shadow audit expenses**, and/or **regulatory fines and penalties** in excess of the **retention**, up to the applicable Limits of Liability under Coverage H. If an **insured** retains non-panel counsel, the **insured** must pay a co-payment of 25%, and the **company** will pay the remaining 75% of covered **claim expenses, shadow audit expenses**, and/or **regulatory fines and penalties** in excess of the **retention**, up to the applicable Limits of Liability under Coverage H.

I. COVERAGE I - EVACUATION EXPENSE REIMBURSEMENT

The **company** will reimburse an **insured business** for all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured business** incurs as **evacuation expense** directly caused by an **evacuation**, provided that:

1. the **evacuation** occurs during the **policy period**;

2. the **evacuation** is reported to the **company**, in writing, during the **policy period**, or within 30 days

thereafter;

3. written notice to the **company** includes details regarding the time, date and place of the **evacuation**; description of the **evacuation expense** incurred by an **insured business**; and documented proof of such **evacuation expense**; and

4. no other valid and collectible insurance providing **evacuation expense** coverage is available to any **insured business**, whether that other insurance is provided on a primary, excess, contingent or any other basis.

J.   COVERAGE J - DISINFECTION EXPENSE REIMBURSEMENT

The **company** will reimburse an **insured business** for all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured business** incurs as **disinfection expense** directly caused by a **disinfection event**, provided that:

1. the **disinfection event** occurs during the **policy period**;

2. the **disinfection event** is reported to the **company**, in writing, during the **policy period**, or within 30 days thereafter;

3. written notice to the **company** includes details regarding the time, date and place of the **disinfection event**; description of the **disinfection expense** incurred by an **insured business**; and documented proof of such **disinfection expense**; and

4. no other valid and collectible insurance providing **disinfection expense** coverage is available to any **insured business**, whether that other insurance is provided on a primary, excess, contingent or any other basis.

K.   COVERAGE K - PUBLIC RELATIONS EXPENSE REIMBURSEMENT

The **company** will reimburse an **insured business** for all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured business** incurs as **public relations expenses** directly caused by a **public relations event**, provided that:

1. the **public relations event** occurs during the **policy period**;

2. the **public relations event** is reported to the **company**, in writing, during the **policy period**, or within 30 days thereafter;

3. the **public relations expenses** are incurred with the **company's** consent;

4. written notice to the **company** includes details regarding the time, date and place of the **public relations event**; description of the **public relations expenses** incurred by an **insured business**; and documented proof of such **public relations expenses**; and

5. no other valid and collectible insurance providing **public relations expenses** coverage is available to any **insured business**, whether that other insurance is provided on a primary, excess, contingent or any other basis.

L.   COVERAGE L - E-DISCOVERY CLAIM EXPENSES AND E-DISCOVERY REGULATORY INVESTIGATION EXPENSES - CLAIMS-MADE

The **company** will:

1. indemnify an **insured** for all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured** incurs as **e-discovery claim expenses** and/or **e-discovery regulatory investigation expenses** resulting from a **regulatory proceeding**; and

2. provide **e-discovery consulting services** to an **insured** during the **policy period**, provided that:

   a. the wrongful act, error or omission giving rise to the **regulatory proceeding** is committed on or after the **retroactive date**;

   b. the **regulatory proceeding** is first instituted against an **insured** during the **policy period**; and

   c. the **regulatory proceeding** is reported to the **company**, in writing, during the **policy period**, or within 30 days thereafter.

M.   COVERAGE M - DATA PROTECTION REPUTATIONAL HARM

The **company** will reimburse an **insured business**, in excess of the **retention** and within the applicable Limits of Liability, for the net ascertained loss of value to such **insured business's reputation**, being the loss of **net profit** suffered by the **insured business** during the **period of indemnity** and/or any **recoverable costs** and/or any **increase in cost of working** incurred by the **insured business** during the **period of indemnity**, solely and directly caused by a **data protection breach**, provided, that:

1. the **data protection breach** first occurs and is discovered by the Chief Information Officer, Chief Technology Officer, Chief Security Officer, Risk Manager or General Counsel of the **insured business** during the **policy period**; and

2. the Chief Information Officer, Chief Technology Officer, Chief Security Officer, Risk Manager or General Counsel of the **insured business** reports the **data protection breach** to the **company**, in writing, within 60 days of any **adverse media report**.

## II. ADDITIONAL EXCLUSIONS

This insurance does not apply to:

A. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to:

1. any **multimedia peril** under Coverage A;

2. any **security and privacy wrongful act** under Coverage B;

3. any **security breach**, **privacy breach** or **breach of privacy regulations** under Coverage C;

4. any **covered cause of loss** under Coverage E;

5. any **cyber extortion threat** under Coverage F;

6. any **act of terrorism** under Coverage G;

7. any acts, errors or omissions under Coverages H and L;

8. any **evacuation** under Coverage I;

9. any **disinfection event** under Coverage J;

10. any **public relations event** under Coverage K; or

11. any **data protection breach** under Coverage M;

committed, allegedly committed or that occurred, in whole or in part, prior to the applicable **retroactive date**.

B. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to:

1. any **multimedia peril** under Coverage A;

2. any **security and privacy wrongful act** under Coverage B;

3. any **security breach**, **privacy breach** or **breach of privacy regulations** under Coverages C or D;

4. any **covered cause of loss** under Coverage E;

5. any **cyber extortion threat** under Coverage F;

6. any **act of terrorism** under Coverage G;

7. any acts, errors or omissions under Coverages H and L;

8. any **evacuation** under Coverage I;

9. any **disinfection event** under Coverage J;

10. any **public relations event** under Coverage K; or

11. any **data protection breach** under Coverage M;

that any **insured** knew, or could have reasonably foreseen, prior to the effective date of this Coverage Part, could be the basis of a **claim**.

C.   any **claim** or circumstance involving the Coverages available under this Coverage Part notified to a previous insurer prior to the effective date of this Coverage Part.

D.   any **claim** made by or on behalf of an **insured** against another **insured**; however, this exclusion shall not apply to:

1.   an otherwise covered **claim** under Coverage B made by any past, present or future **employee** for a **security and privacy wrongful act**, but only if such **employee** did not commit, participate in or contribute to such **security and privacy wrongful act** or a **security breach**, **privacy breach**, or **breach of privacy regulations**; or

2.   any **billing errors proceeding** instituted by an **insured** against an **insured** as a **qui tam plaintiff** or brought by an **insured** under the United States False Claims Act.

E.   any **claim** alleging or arising out of any willful, deliberate, malicious, fraudulent, dishonest or criminal act, error or omission, or any intentional violation of the law or of an **insured business's** privacy policy, or the gaining of any profit or advantage to which any **insured** is not legally entitled, if any of the aforementioned is committed by an **insured**, whether acting alone or in collusion with other persons. However, the insurance afforded by this Coverage Part shall apply to **claims expenses** incurred in defending any such **claim**, but shall not apply to any **damages, regulatory fines and penalties** or other **loss** that an **insured** might become legally obligated to pay. The **company** will have the right to recover those **claims expenses** incurred from those parties found to have committed criminal, dishonest, fraudulent or malicious acts, errors or omissions by a court, jury or arbitrator. This exclusion shall not apply to a **claim** under Coverage E for **employee** sabotage.

F.   any **claim** arising out of any **insured's** activities as a trustee, partner, officer, director, or **employee** of any employee trust, charitable organization, corporation, company, or business other than that of an **insured business**.

G.   any **claim** arising out of an **insured's** insolvency or bankruptcy or the insolvency or bankruptcy of any other entity including, but not limited to, the failure, inability, or unwillingness to make payments because of the insolvency, liquidation, or bankruptcy of any individual or entity.

H.   **bodily injury**, except that this exclusion shall not apply to negligent infliction of emotional distress or mental anguish arising out of any actual or alleged **multimedia peril, security and privacy wrongful act**, **privacy breach, security breach** or **breach of privacy regulations**.

I.   any **claim** for **property damage**.

J.   any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to:

1.   satellite failures;

2.   electrical or mechanical failures and/or interruption, including, but not limited to, electrical disturbance, spike, brownout, or blackout; or

3.   outages to gas, water, telephone, cable, telecommunications or other infrastructure, unless such infrastructure is under an **insured business's** operational control and unless such **claim** otherwise triggers coverage under Coverage E or G.

K.   any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the wear and tear, drop in performance, progressive deterioration or aging of electronic equipment and other property or **computer hardware** used by an **insured**.

L.   any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to failure of overhead transmission and distribution lines.

M.   any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to gradual deterioration of subterranean insulation.

N.   any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to fire, smoke, explosion, lightning, wind, water, flood, earthquake, volcanic eruption, tidal wave, landslide, hail, force majeure, or any other physical event however caused, unless such **claim** otherwise triggers coverage under Coverages E or G.

O.  any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to coupons, prize discounts, prizes, awards or any other valuable consideration given in excess of the total contracted or expected amount.

P.  any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the actual or alleged inaccurate, inadequate, or incomplete description of the price of goods, products, or services.

Q.  any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to an **insured's** cost guarantees, cost representations, contract price or cost estimates being exceeded.

R.  any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the violation of any economic or trade sanctions by the United States government including, but not limited to, sanctions administered and enforced by the United States Treasury Department's Office of Foreign Assets Control ('OFAC').

S.  any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to any breach of any express, implied, actual or constructive contract, warranty, guarantee or promise. This exclusion shall not apply to:

   1.  any liability or obligation that any **insured** would have in the absence of such contract or agreement;

   2.  unintentional breach of contract; or

   3.  a breach of an **insured business's** privacy policy.

T.  any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the liability of others assumed by an **insured** under any contract or agreement, either oral or written. This exclusion shall not apply:

   1.  to the extent such **insured** would have been liable in the absence of such contract or agreement; or

   2.  with respect to any **multimedia peril, security and privacy wrongful act, security breach, privacy breach** or **breach of privacy regulations**, to the extent an **insured business** has assumed such liability in the form of a written hold harmless or indemnity agreement that predates the first **multimedia peril, security and privacy wrongful act, security breach, privacy breach** or **breach of privacy regulations**.

U.  any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to:

   1.  any presence of **pollutants** or contamination of any kind;

   2.  any actual, alleged, or threatened discharge, dispersal, release, or escape of **pollutants** or contamination of any kind including, but not limited to, solid, liquid, gaseous, or thermal irritants or contaminants including asbestos, smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste (waste includes materials to be recycled, reconditioned, or reclaimed), wherever such occurs, whether or not such results from an **insured's** activities or the activities of others, is sudden or gradual, and is accidental, intended, foreseeable, expected, fortuitous, or inevitable;

   3.  any governmental or regulatory directive or request that an **insured business** or anyone acting under an **insured business's** direction or control test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize said **pollutants**; or

   4.  any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize **pollutants** or in any way respond to or assess the effects of **pollutants** or contamination of any kind.

V.  any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the actual or alleged loss of value of any securities.

W.  any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to caused by or resulting from unauthorized trading. "Unauthorized trading" means trading by an **insured**, which at the time of the trade is:

   1.  in excess of permitted financial limits; or

   2.  outside of permitted product lines.

Page 7 of 24  © 2015 MedPro Group. All rights reserved.

X.  any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the actual or alleged purchase, sale, offer of, or solicitation of an offer to purchase or sell securities, or violation of any securities law including, but not limited to, the provisions of the Securities Act of 1933, the Securities Exchange Act of 1934, the Sarbanes-Oxley Act of 2002, or any regulation promulgated under the foregoing statutes, or any federal, state, local, or foreign laws similar to the foregoing statutes, including 'Blue Sky' laws, whether such law is statutory, regulatory, or common law.

Y.  any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the actual or alleged government enforcement of any state or federal regulation including, but not limited to, regulations promulgated by the United States Federal Trade Commission, Federal Communications Commission, or the Securities and Exchange Commission. This exclusion does not apply to any **claim** triggering coverage under Coverage C.

Z.  any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to any employer-**employee** relations, policies, practices, acts or omissions; any actual or alleged refusal to employ any person; or any misconduct with respect to **employees**.

AA. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to any actual or alleged harassment or discrimination of any kind including, but not limited to, age, color, race, gender, creed, national origin, marital status, sexual preferences, disability or pregnancy.

BB. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the violation of any pension, healthcare, welfare, profit sharing, mutual, or investment plans, funds, or trusts; or any violation of any provision of the Employee Retirement Income Security Act of 1974 and its amendments and/or the Pension Protection Act of 2006 and its amendments, or any regulation, ruling, or order issued pursuant thereto.

CC. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to:

1.  strikes or similar labor actions;

2.  war, invasion, act of foreign enemy, hostilities or warlike operations (whether declared or not), civil war, mutiny, civil commotion assuming the proportions of, or amounting to, a popular uprising, military uprising, insurrection, rebellion, revolution, military or usurped power, or any action taken to hinder or defend against these actions;

3.  confiscation or nationalization or requisition or destruction of, or damage to, property by or under the order of any government or public or local authority; or

4.  any action taken in controlling, preventing, suppressing or in any way relating to any of 1. through 3. Above.

This exclusion shall not apply to an **act of terrorism**.

DD. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to an **insured's** commercial decision to cease providing a particular product or service, but only if the **insured** is contractually obligated to continue providing such products or services.

EE. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to gambling or pornography or the sale or provision of prohibited, restricted or regulated items including, but not limited to, alcoholic beverages, tobacco or drugs.

FF. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to:

1.  any fine or penalty arising out of any agreement by an **insured** to comply with or follow the Payment Card Industry Standard or any Payment Card Company Rules; or

2.  the implementation, maintenance, or compliance with any security measures or standards relating to any payment card data including, but not limited to, any fine or penalty imposed by a payment card company on a merchant bank or payment processor that an **insured** has paid or agreed to reimburse or indemnify.

This exclusion shall not apply to civil penalties and fines to the extent insurable by law arising out of an otherwise covered **claim** under Coverage C.

GG. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to any actual or alleged unfair competition, price fixing, antitrust violations, deceptive trade practices, or restraint of trade or antitrust statute, legislation, or regulation.

HH. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to any actual or alleged infringement of any patent or the misappropriation, theft, copying, display or publication of any trade secret by, or with the active cooperation, participation or assistance of any **insured**.

II. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to:

1. any wear or tear, latent or time-delayed damage arising from services an **insured** provided prior to the **policy period**;

2. gradual deterioration of an **insured business's computer system**; or

3. an **insured business's** failure, or the failure of those acting on an **insured business's** behalf, to maintain any **computer system** or network, computer software or any other equipment.

JJ. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the manufacturing, mining, use, sale, installation, removal, distribution of, or exposure to, asbestos, materials or products containing asbestos or asbestos fibers or dust or any **claim** alleging **bodily injury** or **property damage** arising out of asbestos or asbestos containing materials including, but not limited to:

1. inhaling, ingesting, or being physically exposed to asbestos or goods or products containing asbestos;

2. the use of asbestos in constructing or manufacturing any goods, products, or structures;

3. the removal of asbestos from any goods, products or structures;

4. the manufacture, encapsulation, transportation, storage, handling, distribution, sale, application, mining, consumption, or disposal of asbestos or goods or products containing asbestos;

5. any governmental direction or request that the **insured** or any other party, test for, monitor, clean up, remove, contain, treat, detoxify or neutralize asbestos or asbestos containing products; or

6. manufacturing or mining or the use, sale, installation, removal, distribution of or exposure to asbestos, materials, or products containing asbestos, asbestos fibers or dust.

KK. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the use of programs that are not **operational programs**.

LL. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the use of programs that are not **delivered programs**.

MM. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to any **insured's** intentional use of illegal or unlicensed programs that are in violation of the provisions or laws referring to software protection.

NN. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the confiscation, commandeering, requisition, destruction of, or damage to, **computer hardware** by order of a government de jure or de facto, or by any public authority for whatever reason.

OO. any **claim** alleging **bodily injury** or **property damage** resulting from exposure to or the manifestation, release, dispersal, seepage, migration, discharge, appearance, presence, reproduction or growth of mold, mildew, spores, mycotoxins, fungi, organic pathogens, or other micro organisms of any type, nature, or description, including:

1. any cost, expense, or charge to test, monitor, clean up, remediate, remove contain, treat, detoxify, neutralize, rehabilitate, or in any way respond to or assess the effects of mold, mildew, spores, mycotoxins, fungi, organic pathogens, or other micro organisms of any type, nature, or description; or

2. any resulting cost, expense, charge, fine or penalty, incurred, sustained, or imposed by order, direction, request, or agreement of any court, governmental agency, or any civil, public, or military authority.

With respect to this exclusion, 'organic pathogens' means any organic irritant or contaminant including, but not limited to, mold, fungus, bacteria, virus, or their byproducts such as mycotoxins, mildew, or biogenic aerosol. 'Organic pathogens' include, but are not limited to, Aspergillus, Penicillium, Stachybotrys Chartarum, Stachybotrys Atra, Trichodema, and Fusarium Memnoniella.

PP. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the existence, emission or discharge of any electromagnetic field, electromagnetic radiation, or electromagnetism

that actually or allegedly affects the health, safety or condition of any person or the environment or that affects the value, marketability, condition or use of any property.

QQ. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to any legal liability directly or indirectly caused by, involving, attributed to, arising from:

1. ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel; or

2. the radioactive, toxic, explosive or other hazardous properties of any explosive nuclear assembly or nuclear component thereof.

RR. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to any criminal prosecution against an **insured**. For purposes of this exclusion, "criminal prosecution" shall mean any governmental action for enforcement of criminal laws, including those offenses for which conviction could result in imprisonment and/or criminal fine.

SS. with respect to Coverage E.1. Loss of Digital Assets:

1. any amount incurred in restoring, updating or replacing **digital assets** to a level beyond that which existed prior to the **covered cause of loss**;

2. physical damage to the **computer hardware** or data center, other than that covered under **covered cause of loss**, under paragraph E.1.a.;

3. contractual penalties or consequential damages;

4. any liability to third parties for whatever reason, including legal costs and expenses of any type;

5. fines or penalties imposed by law;

6. the economic or market value of **digital assets**, unless the **company** has agreed by endorsement to reimburse an **insured business** based upon an agreed value amount for defined categories or specific **digital assets**;

7. costs or expenses incurred to identify, patch or remediate software program errors or **computer system** vulnerabilities;

8. costs to upgrade, redesign, reconfigure or maintain an **insured business's computer system** to a level of functionality beyond that which existed prior to the **covered cause of loss**; or

9. any losses paid under Coverage E.2. Non-Physical Business Interruption and Extra Expense.

TT. with respect to Coverage E.2. Non-Physical Business Interruption and Extra Expense:

1. any loss arising out of a physical cause or natural peril, including, but not limited to fire, wind, water, flood, subsidence or earthquake, which results in physical damage to **computer hardware** and/or any data center;

2. any loss expense arising out of updating or replacing **digital assets** to a level beyond that which existed prior to the **covered cause of loss**;

3. contractual penalties or consequential damages;

4. any liability to third parties for whatever reason, including legal costs and expenses of any type;

5. fines or penalties imposed by law;

6. costs or expenses incurred to identify, patch or remediate software program errors or **computer system** vulnerabilities;

7. loss of goodwill and reputational harm;

8. costs to upgrade, redesign, reconfigure or maintain an **insured business's computer system** to a level of functionality beyond that which existed prior to the **covered cause of loss**; or

9. any losses paid under Coverage E.1. Loss of Digital Assets.

UU. with respect to Coverage H:

1. any amounts incurred in connection with a **shadow audit** not previously approved by the **company**;

Page 10 of 24   © 2015 MedPro Group. All rights reserved.

2.  **restitution** or repayment of monies received by an **insured**, to which the **insured** was not entitled as a result of billing errors made by such **insured**;

3.  any amounts incurred by a consulting professional whose services were not previously approved by the **company**; or

4.  billing errors for medical services or items which are not provided or prescribed by the **First Named Insured** or any subsidiary.

VV. with respect to Coverage M:

1.  any loss, cost, liability or expense incurred by the **insured business** in an effort to re-establish the **reputation** of the **insured business**, other than **public relations expenses**;

2.  any loss, cost, liability or expense incurred in any **claim** that is insured by any other insurance, except excess insurance;

3.  any loss, cost, liability or expense incurred in connection with an **adverse media report** that also affects or refers in similar terms to a general security issue, an industry or specific competitors of an **insured business**, without any specific allegations regarding an **insured business's** breach of data protection of its customers;

4.  any civil or regulatory liability to third parties for whatever reason, including legal costs and expenses of any type;

5.  contractual penalties or consequential damages;

6.  **customer notification expenses**;

7.  fines or penalties imposed by law or regulation; or

8.  any losses paid under Coverage D.

## III. LIMITS OF LIABILITY AND RETENTIONS

A.  The Limits of Liability applicable to each Coverage of this Coverage Part is the **company's** maximum Limit of Liability, including **claim expenses** where applicable, for each **claim** first made during the **policy period** under each Coverage and in the aggregate for all **claims** first made during the **policy period** under each Coverage, regardless of the number of:

1.  claimants;

2.  **claims**; or

3.  **insureds** involved.

B.  The Aggregate Limit for this Coverage Part is the **company's** maximum Limit of Liability, including **claim expenses** where applicable, for all **claims** first made during the **policy period** under this Coverage Part, regardless of the number of:

1.  claimants;

2.  **claims**;

3.  **insureds** involved; or

4.  Coverages under this Coverage Part.

C.  All payments made under this Coverage Part will reduce the Aggregate Limit for this Coverage Part. In no event will the **company** pay more than the Aggregate Limit for this Coverage Part.

D.  All **claims** made under any one Coverage, which arise out of the same, related or continuing acts, facts, events or circumstances, without regard to the number of **insureds, claims**, or claimants, shall be considered a single **claim** and only one Limit of Liability and **retention** will apply to such **claim**. Such **claim** shall be deemed to be first made at the earliest of the following times:

1.  the time at which the earliest **claim** arising out of the same, related or continuing acts, facts, events or circumstances is first made; or

© 2015 MedPro Group. All rights reserved.

    2.  the time at which the **claim** arising out of the same, related or continuing acts, facts, events or circumstances shall be deemed to have been made pursuant to Section IV., A.2. of this Coverage Part.

E.  In the event that any **claim** shall be covered, in whole or in part, under two or more Coverages of this Coverage Part, the total applicable Limit of Liability shall not exceed the single largest applicable Limit of Liability. Such largest applicable Limit of Liability shall apply only once to such **claim**. The **company** has the sole discretion to allocate **claims** paid, if any, against the appropriate Limit of Liability.

F.  The Limits of Liability for the **extended reporting period**, if exercised, shall be part of, and not in addition to, the Limits of Liability applicable to this Coverage Part. The exercise of the **extended reporting period** shall not in any way increase or reinstate the Limits of Liability applicable to this Coverage Part.

G.  The applicable **retention** amount for each Coverage of this Coverage Part shall apply separately to each **claim**. The **retention** shall be satisfied by an **insured's** monetary payments of any amounts covered under this Coverage Part, including **claim expenses** where applicable. If a **claim** attaches to more than one Coverage of this Coverage Part, only the highest **retention** applies.

H.  An **insured's** payment of the applicable **retention** is a condition precedent to payment by the **company** of any amounts covered under this Coverage Part, and the **company** shall only be liable for the amount in excess of such **retention**, not to exceed the total applicable Limit of Liability. The **insured** shall make direct payments within the **retention** to the appropriate parties designated by the **company**.

I.  With respect to Coverages E.1. and G, the **time retention** shall apply to each **period of restoration**. Once the **time retention** is met, the **insured** will be responsible to pay any co-insurance percentage or **retention** applicable to Coverages E.1. and G.

## IV. ADDITIONAL CONDITIONS

In addition to the terms contained in the Conditions section of the Common Policy Provisions and Conditions, the following conditions apply to this Coverage Part:

A.  NOTICE PROVISIONS

    1.  <u>Notice of Claim.</u>

        Except as otherwise provided in any Coverage of this Coverage Part, the Chief Information Officer, Chief Technology Officer, Chief Security Officer, Risk Manager or General Counsel of the **insured business** shall give to the **company** written notice of any **claim** during the **policy period**, but in no event later than 30 days after expiration of the **policy period**.

    2.  <u>Notice of Potential Claim.</u>

        If, during the **policy period**, an **insured** first becomes aware of any acts, facts or circumstances that could reasonably be the basis for a **claim**, and if the Chief Information Officer, Chief Technology Officer, Chief Security Officer, Risk Manager or General Counsel of the **insured business** gives the **company** written notice during the **policy period**, of:

        a.  specific details of the acts, facts or circumstances that could reasonably be the basis for a **claim**;

        b.  possible **damages**, penalties or other amounts potentially covered under this Coverage Part that may result or that have resulted from the acts, facts or circumstances; and

        c.  details regarding how the **insured** first became aware of the acts, facts or circumstances,

        then any **claim** made subsequently arising out of such acts, facts or circumstances shall be deemed to have been made at the date the written notice complying with the above requirements was first given to the **company**.

B.  LOSS DETERMINATION UNDER COVERAGE E

    1.  <u>Loss Determination under Coverage E.1.</u>

        For any and all coverage(s) provided under Coverage E.1., **digital assets loss** will be determined as follows:

        a.  if the impacted **digital asset** was purchased from a third party, the **company** will pay only the lesser of

             © 2015 MedPro Group. All rights reserved.

the original purchase price of the **digital asset** or the reasonable and necessary **digital assets loss**; or

b. if it is determined that the **digital assets** cannot be replaced, restored or recreated, then the **company** will only reimburse the actual and necessary **digital assets loss** incurred up to such determination.

2. Loss Determination under Coverage E.2.

For any and all coverage(s) provided under Coverage E.2., **income loss** will be determined as the reduction of the **insured business's income** during the **period of restoration**, which is:

a. an **insured business's** net **income** (**net profit** or loss before income taxes) that would have been reasonably projected, but which has been lost directly as a result of total or partial interruption, degradation in service or failure of the **insured business's computer system** caused directly by a **covered cause of loss**. The revenue projection will take into account the prior experience of the **insured business's** business during the previous 12 months immediately before the date of the **covered cause of loss** and the probable experience had no **covered cause of loss** occurred. Revenues include the amount of money paid or payable to the **insured business** for goods, products or services sold, delivered or rendered in the normal course of the **insured business's** business. Revenue projection will be reduced by the extent to which the **insured business** uses substitute methods, facilities or personnel to maintain its revenue stream. The **company** will take into consideration the **insured business's** documentation of the trends in the business and for variations in or other circumstances affecting the business before or after the **covered cause of loss**, which would have affected the **insured business's** business had no **covered cause of loss** occurred; and

b. any fixed operating expenses (including ordinary payroll) incurred, but only to the extent that such operating expenses must continue during the **period of restoration**.

C. LOSS DETERMINATION UNDER COVERAGE M

For any and all coverage(s) provided under Coverage M, the net loss of value suffered by the **insured business** during a **period of indemnity** shall be assessed and ascertained by auditors or adjusters appointed by the **company**. Their assessment in respect of the loss of **net profit** shall be based upon the difference between the anticipated **net profit** for the **period of indemnity**, as established during the pre-bind underwriting process, and the actual **net profit** for the **period of indemnity**. An **insured business** will provide accounting information to identify the potential loss of the **insured business's reputation** insured hereunder following an **adverse media report**.

D. EXTENDED REPORTING PERIOD

1. If this Coverage Part is cancelled or non-renewed by the **First Named Insured** or if the **company** refuses to renew the policy for reasons other than non-payment of premium or noncompliance with the terms and conditions of this Coverage Part, then the **First Named Insured** shall have the right, upon payment of an additional premium, to an extension of the coverage granted by this Coverage Part with respect to any **Claim** first made during the period of time elected after the effective date of such cancellation or, in the event of such refusal to renew, after the policy's expiration date, but only with respect to:

a. any **multimedia peril** under Coverage A;

b. any **security and privacy wrongful act** under Coverage B;

c. any **security breach**, **privacy breach** or **breach of privacy regulations** under Coverage C;

d. any **covered cause of loss** under Coverage E;

e. any **cyber extortion threat** under Coverage F;

f. any **act of terrorism** under Coverage G;

g. any acts, errors or omissions under Coverages H and L;

h. any **evacuation** under Coverage I;

i. any **disinfection event** under Coverage J;

j. any **public relations event** under Coverage K; or

© 2015 MedPro Group. All rights reserved.

    k.   any **data protection breach** under Coverage M;

committed before the effective date of cancellation or, in the event of a refusal to renew, before the policy's expiration date.

2.   The quotation of a different premium, **retention** or Limits of Liability for renewal does not constitute a cancellation or refusal to renew.

3.   As a condition precedent to the right to purchase the **extended reporting period**, the total premium for the policy must have been paid. The right to purchase the **extended reporting period** shall terminate unless written notice, together with full payment of the premium for the **extended reporting period**, is received by the **company** within 30 days after the effective date of cancellation, or, in the event of a refusal to renew, within 30 days after the Policy expiration date. If such notice and premium payment is not so given to the **company**, there shall be no right to purchase the **extended reporting period**.

4.   In the event of the purchase of the **extended reporting period**, the entire premium therefore shall be deemed earned at its commencement.

5.   The exercise of the **extended reporting period** shall not in any way increase the **company's** Limits of Liability under this Coverage Part.

## V.  <u>ADDITIONAL DEFINITIONS</u>

Only with respect to coverage provided under this Coverage Part, the following additional definitions apply:

A.  **Act of terrorism** means an act, including but not limited to, the use of force or violence and/or the threat thereof, by any person or group(s) of persons, whether acting alone or on behalf of, or in connection with any organization(s) or government(s), which is committed for political, religious, ideological, or similar purposes including the intention to influence any government and/or put the public, or any section of the public, in fear.

B.  **Administrator** means an owner, partner, stockholder, director, trustee, executive officer, medical director, department head or faculty member of an **insured business**.

C.  **Adverse media report** means:

1.   with respect to Coverage D, any unpredictable report or communication of an actual or potential **security breach**, **privacy breach** or **breach of privacy regulations**, which has been publicized through any media channel including, but not limited to, television, **print media**, radio or electronic networks, the **internet**, and/or electronic mail, that threatens material damage to an **insured business's reputation** and which results in the incurring of **privacy breach response costs**;

2.   with respect to Coverage M, extracts or completed versions of communications, which have been publicized through any media channel including, but not limited to, television, **print media**, radio or electronic networks, the **internet**, and/or electronic mail, that cause negative perception or harm to an **insured business's reputation**, leading to **income loss**.

D.  **Assumed under contract** means liability for **damages** resulting from a **multimedia peril** where such liability has been assumed by an **insured** in the form of a written hold harmless or indemnity agreement that predates the first **multimedia peril**.

E.  **Billing errors proceeding** means:

1.   civil or administrative investigations or other civil or administrative proceedings instituted against an **insured** by a **qui tam plaintiff**, **government entity** or **commercial payer** alleging the presentation of, causing or allowing to be presented, or being liable for the presentation of any actual or alleged erroneous billings by an **insured** to a government health benefit payer or **commercial payer** from which the **insured** seeks and/or has received payment or reimbursement for medical services or items provided or prescribed by the **insured**; or

2.   any of 1. above instituted against an **insured** as a result of **voluntary self disclosure**.

F.  **BPO service provider** means any third party independent contractor that provides business process outsourcing

services for the benefit of an **insured business** under a written contract with the **insured business**, including, but not limited to, call center services, fulfillment services, and logistical support.

G. **Breach of privacy regulations** means a breach by an **insured**, a **BPO service provider** or **outsourced IT service provider** of any of the following regulations as well as similar statutes and regulations, as they currently exist and as amended, associated with the confidentiality, access, control, and use of personally identifiable, non-public information:

    1.  Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191), known as HIPAA, and related state medical privacy laws;

    2.  Gramm-Leach-Bliley Act of 1999 (G-L-B), also known as the Financial Services Modernization Act of 1999;

    3.  state and Federal statutes and regulations regarding the security and privacy of consumer information;

    4.  governmental privacy protection regulations or laws associated with the control and use of personal information;

    5.  privacy provisions of consumer protection laws, including the Federal Fair Credit Reporting Act (FCRA) and similar state laws;

    6.  Children's Online Privacy Protection Act or similar laws; and

    7.  the EU Data Protection Act or other similar privacy laws worldwide.

H. **Claim** means:

    1.  with respect to Coverages A or B:

        a.  a written demand received by an **insured** for monetary damages or non-monetary relief against any **insured**;

        b.  a written request to toll or waive a statute of limitations relating to a potential **claim** against an **insured**;

        c.  the service of a civil suit or the institution of arbitration proceedings against an **insured** seeking **damages** or a temporary restraining order or a preliminary or permanent injunction against an **insured**

    A **claim** under Coverages A or B will be deemed to be first made when notice of any of the foregoing is first received by an **insured**.

    2.  with respect to Coverage C, a **privacy regulatory proceeding** instituted against an **insured**. A **claim** under Coverage C will be deemed to be first made when it is first received by an **insured**.

    3.  with respect to Coverage D, a written report by an **insured** to the **company** of an **adverse media report**, **security breach**, **privacy breach** or **breach of privacy regulations**. A **claim** under Coverage D will be deemed to be first made when such written report is received by the **company**;

    4.  with respect to Coverage E, a written report by an **insured** to the **company** of the occurrence of a **covered cause of loss**. A **claim** under Coverage E will be deemed to be first made when such written report is received by the **company**.

    5.  with respect to Coverage F, a written report by an **insured** to the **company** of a **cyber extortion threat**. A **claim** under Coverage F will be deemed to be first made when such written report is received by the **company**.

    6.  with respect to Coverage G, a written report by an **insured** to the **company** of an **act of terrorism**. A **claim** under Coverage G will be deemed to be first made when such written report is received by the **company**.

    7.  with respect to Coverages H and L, a **regulatory proceeding** instituted against an **insured**. A **claim** under Coverage H will be deemed to be first made when it is first received by an **insured**.

    8.  with respect to Coverages I, J, K and M, a written report by an **insured** to the **company** of an **evacuation**, a **disinfection event**, a **public relations event** or **data protection breach**. A **claim** under Coverages I, J, K and M will be deemed to be first made when such written report is received by the **company**.

I. **Claims expenses** means:

    1.  reasonable and necessary fees incurred with the **company's** consent and charged by an attorney(s) designated by the **company** to defend a **claim**; and

 © 2015 MedPro Group. All rights reserved.

2. all other reasonable and necessary fees, costs, and expenses resulting from the investigation, adjustment, defense, and appeal of a **claim**, if incurred by the **company**, or by an **insured** with the **company's** prior written consent.

**Claims expenses** do not include any wages, salaries, fees, overhead or other charges incurred by, or paid to, any **insured** for any time spent in cooperating in the defense and investigation of any **claim** or any circumstance which might lead to a **claim** notified under this Coverage Part. With respect to Coverage H, **claim expenses** do not include the costs associated with the adoption and implementation of any corporate integrity agreement, compliance program or similar provision regarding the operations of an **insured's** business, negotiated as part of a settlement with or by order of a **government entity**.

J. **Commercial payer** means ay private health insurance company.

K. **Committee member** means a person serving as a member of a committee or board formed or controlled by an **insured business**. **Committee member** also includes any person executing the directives of such a committee or board.

L. **Computer hardware** means the physical components of any **computer system** including CPU's, memory, storage devices, storage media, and input/output devices and other peripheral devices and components, including, but not limited to, cable, connectors, fiber optics, wire, power supply units, keyboards, display monitors and audio speakers.

M. **Computer program(s)** means an organized set of instructions that, when executed, causes a computer to behave in a predetermined manner. **Computer program(s)** include, but are not limited to, communications, networking, operating system and related **computer programs** used to create, maintain, process, retrieve, store and/or transmit electronic **data**.

N. **Computer system(s)** means interconnected electronic, wireless, web or similar systems (including all **computer hardware** and software) used to process and store **data** or information in an analogue, digital, electronic or wireless format including, but not limited to, **computer programs**, electronic data, operating systems, **firmware**, servers, media libraries, associated input and output devices, mobile devices, networking equipment, websites, extranets, off line storage facilities (to the extent that they hold electronic **data**), and electronic backup equipment.

O. **Computer virus** means a program that possesses the ability to create replicas of its self (commonly known as 'auto-reproduction' program) within other programs or operating system areas or which is capable of spreading copies of its self wholly or partly to other **computer systems**.

P. **Counseling** means formal therapy rendered to a patient by a licensed professional approved and credentialed by the **insured** to provide such therapy.

Q. **Covered causes of loss** means:

1. Accidental Damage or Destruction

    a. accidental physical damage or destruction of **electronic media**, so that stored **digital assets** are no longer machine-readable;

    b. accidental damage or destruction of **computer hardware**, so that stored **data** is no longer machine-readable;

    c. failure in power supply or under/over voltage only if such power supply is under the direct operational control of an **insured business**. Direct operational control includes back-up generators;

    d. **programming error** of **delivered programs**; or

    e. electrostatic build-up and static electricity.

2. Administrative or Operational Mistakes

    An accidental, unintentional or negligent act, mistake, error or omission by an **insured**, a **BPO service provider** or **outsourced IT service provider** in:

    a. the entry, or modification of an **insured business's** electronic **data**, which causes damage to such **data**;

    b. the creation, handling, development, modification or maintenance of an **insured business's digital assets**; or

    c.  on-going operation or maintenance of an **insured business's computer system**, excluding the design, architecture, or configuration of an **insured business's computer system**;

  3.  <u>Computer Crime and Computer Attacks</u>

An act, mistake, negligent error or omission by an **insured**, a **BPO service provider** or **outsourced IT service provider** in the operation of an **insured business's computer system** or in the handling of an **insured business's digital assets**, which fails to prevent or hinder any of the following attacks intended to maliciously cause harm to an **insured business's computer system**:

    a.  a **denial of service attack**;

    b.  **malicious code**;

    c.  **unauthorized access**; or

    d.  **unauthorized use**.

R.  **Customer notification expenses** means those reasonable and necessary legal expenses, forensic and investigation fees, **public relations expenses**, postage expenses, and related advertising expenses an **insured** incurs, with the **company's** prior written consent, to comply with governmental privacy legislation mandating customer notification in the event of a **security breach**, **privacy breach**, or **breach of privacy regulations**.

S.  **Customer support and credit monitoring expenses** means those reasonable and necessary expenses an **insured** incurs, with the **company's** prior written consent, for the provision of customer support activity, including the provision of credit file monitoring services and identity theft education and assistance for up to a period of 12 months from the date of enrollment in such credit file monitoring services, in the event of a **privacy breach**.

T.  **Cyber extortion expenses** means all reasonable and necessary costs and expenses an **insured business** incurs, with the **company's** prior written consent, as a direct result of a **cyber extortion threat**, other than **cyber extortion monies**.

U.  **Cyber extortion monies** means any funds or property paid by an **insured business**, with the **company's** prior written consent, to a person(s) or entity(ies) reasonably believed to be responsible for a **cyber extortion threat**, for the purpose of terminating such a **cyber extortion threat**.

V.  **Cyber extortion threat** means a credible threat or series of related credible threats, including, but not limited to, a demand for **cyber extortion monies**, directed at an **insured business** to:

  1.  release, divulge, disseminate, destroy or use the confidential information of a third party taken from an **insured** as a result of **unauthorized access** to, or **unauthorized use** of, an **insured business's computer system**;

  2.  introduce **malicious code** into an **insured business's computer system**;

  3.  corrupt, damage or destroy an **insured business's computer system**;

  4.  restrict or hinder access to an **insured business's computer system**, including, but not limited to, the threat of a **denial of service attack**; or

  5.  electronically communicate with an **insured business's** customers and falsely claim to be the **insured business** or to be acting under the **insured business's** direction in order to falsely obtain personal confidential information of the **insured business's** customers (also known as "pharming," "phishing," or other types of false communications).

W.  **Damages** mean a monetary judgment, award or settlement, including prejudgment and post judgment interest and punitive **damages** to the extent insurable under the law pursuant to which this Coverage Part is construed.

**Damages** do not include:

  1.  any **insured's** future profits or royalties, restitution or disgorgement of any **insured's** profits;

  2.  the costs to comply with orders granting injunctive or non-monetary relief, including specific performance, or any agreement to provide such relief;

  3.  loss of any **insured's** fees or profits, return or offset of any **insured's** fees or charges or any **insured's** commissions or royalties provided or contracted to be provided;

4. taxes, fines or penalties or sanctions;

5. the multiple portion of any multiplied **damages**;

6. liquidated **damages**;

7. any amount which an **insured** is not financially or legally obligated to pay;

8. disgorgement of any remuneration or financial advantage to which an **insured** was not legally entitled;

9. settlements negotiated without the **company's** consent; or

10. monetary judgments, awards, settlements or any other amounts which are uninsurable under the law pursuant to which this Coverage Part is construed or any legal fees and costs awarded pursuant to such judgments, awards or settlements.

X. **Data** means any machine readable information, including ready for use programs, applications, account, customer, health and medical information or electronic information subject to back up procedures, irrespective of the way it is used and rendered including, but not limited to, text or digital media.

Y. **Data protection breach** means the appearance of any **adverse media report** that there has been a failure, error, omission, neglect or breach of duty by an **insured**, a **BPO service provider** or **outsourced IT service provider** to protect the security and confidentiality of non-public proprietary corporate information, personally identifiable non-public information of customers or other personal or confidential paper records of customers.

Z. **Delivered programs** means programs, applications, and software where the development stage has been finalized, having passed all test-runs and been proven successful in a live environment.

AA. **Denial of service attack** means an event caused by unauthorized or unexpected interference or a malicious attack intended by the perpetrator to overwhelm the capacity of a **computer system** by sending an excessive volume of electronic **data** to such **computer system** in order to prevent authorized access to such **computer system**.

BB. **Digital assets** mean **data** and **computer programs** that exist in a **computer system**. **Digital assets** do not include **computer hardware**.

CC. **Digital assets loss** means reasonable and necessary expenses and costs an **insured business** incurs to replace, recreate or restore **digital assets** to the same state and with the same contents immediately before it was damaged, destroyed, altered, misused or stolen, including expenses for materials and machine time as well as costs associated with restoration, recreation and replacement. **Digital Assets Loss** also includes amounts representing **employee** work time to replace, recreate or restore **digital assets** which shall be determined on a predefined billable hours or per hour basis as based upon the **first named insured's** schedule of **employee** billable hours.


DD. **Disinfection event** means any case or series of cases of hospital-borne infectious bacteria, virus or disease that requires reporting of such case or series of cases to any local, state or federal governmental or healthcare oversight agency or entity.

EE. **Disinfection expense** means reasonable fees and costs incurred by an **insured business** to clean and disinfect such **insured business** as a result of any **disinfection event**. **Disinfection expense** includes costs to:

1. engage third party providers of cleaning/disinfection services; and

2. notify patients, visitors or other potentially affected persons.

    **Disinfection expense** does not include any salaries, overhead, fees, loss of earnings or benefit expenses incurred by, or paid to, any **insured** or the cost of cleaning and/or disinfecting supplies or products.

FF. **E-Discovery claim expenses** means **claim expenses** relating to the collection, processing, converting, reviewing and producing electronically stored information, which is performed solely by an e-discovery service provider designated by the **company** in connection with the investigation and defense of any **regulatory proceeding**.

GG. **E-Discovery consulting services** means e-discovery readiness assessment and consulting services rendered solely by an e-discovery service provider designated by the **company** in connection with the investigation and

                                       © 2015 MedPro Group. All rights reserved.

defense of any **regulatory proceeding**.

HH. **E-Discovery regulatory investigation expenses** means **claim expenses** incurred by an **insured business** for services rendered solely by an e-discovery service provider designated by the **company** in the collection, processing, converting, reviewing and producing electronically stored information in connection with any **regulatory proceeding**.

II. **Electronic media** means floppy disks, CD ROMs, hard drives, magnetic tapes, magnetic discs, or any other media on which electronic **data** is recorded or stored.

JJ. **Employee(s)** means any person employed by, or under contract with, an **insured business** at the time of a **claim**. **Employees** include:

1. any authorized volunteer worker;

2. any physician or dentist, including residents; and

3. any certified registered nurse anesthetist, nurse midwife, nurse practitioner, physician's assistant, podiatrist or surgical assistant.

**Employees** do not include any **administrator**, **committee member** or **student**.

KK. **EMTALA proceeding** means proceedings instituted against an **insured** by a **government entity** alleging violations of the Emergency Medical Treatment and Labor Act (EMTALA).

LL. **Evacuation** means:

1. the removal of 25% or more of an **insured business's** patients away from the **insured business's** premises to any other premises as a result of any natural or man-made occurrence that, in the reasonable judgment of the **insured business's** management staff, causes or could potentially cause such **insured business** to be unsafe for such patients; and

2. solely with respect to an **insured business's** patients as described in 1. above, the return of such patients to the **insured business's** premises when such premises are deemed safe for occupancy.

MM. **Evacuation expense** means reasonable costs incurred in connection with an **evacuation**, including the costs of transporting and lodging patients. **Evacuation expense** does not include any salaries, overhead, fees, loss of earnings or benefit expenses incurred by, or paid to, any **insured**.

NN. **Firmware** means the fixed programs that internally control basic low-level operations in a device.

OO. **Government entity** means:

1. any department, agency, task force or other organization created by any U.S. federal or state law, regulation, rule or executive order;

2. any department, agency, task force or other organization operated, funded or staffed, in whole or in part, by the U.S. federal government or any state government; or

3. any organization operating as a Medicare Integrity Program Contractor.

PP. **Income** means all income of an **insured business** within any given period which is derived from the exploitation of the **insured business's reputation** and/or from the **insured business's** business activities, products or services.

QQ. **Income loss** means financial loss sustained by an **insured business**, as determined in accordance with the provisions of Coverage E.2., Non-Physical Business Interruption and Extra Expense.

RR. **Increase in cost of working** means the additional expenditure (other than any advertising or marketing costs or the like undertaken to rehabilitate an **insured business's reputation** and/or any legal costs or expenses) necessarily and reasonably incurred by an **insured business** for the sole purpose of avoiding or minimizing a net trading loss or a reduction in **net profit** which would otherwise have occurred during the **policy period** as a consequence of a **data protection breach**. The amount of such additional expenditure recoverable hereunder shall in no case exceed the amount of the net trading loss or reduction in **net profit** thereby avoided.

SS. **Insured business** means any corporation, entity, partnership or professional association shown on the Declarations or listed in a Schedule of Named Insureds applicable to this Coverage Part.

TT. **Insured business's computer system** means:

1. a **computer system** operated by and either owned by, or leased to an **insured business**;

2. with respect to Coverage B only, a **computer system** operated by a **BPO service provider** or **outsourced IT service provider** and used for the purpose of providing hosted computer application services to an **insured business** or for processing, maintaining, hosting or storing an **insured business's** electronic **data**, pursuant to a written contract with the **insured business** for such services.

UU. **Internet** means the worldwide public network of computers which enables the transmission of electronic **data** between different users, including a private communications network existing within a shared or public network platform.

VV. **Interruption expenses** means those expenses, excluding **special expenses**, incurred by an **insured business**, in accordance with the provisions of Coverage E.2., Non-Physical Business Interruption and Extra Expense, to:

1. avoid or minimize the suspension of business as a result of the total or partial interruption, degradation in service or failure of an **insured business's computer system** caused directly by a **covered cause of loss**, which the **insured business** would not have incurred had no **covered cause of loss** occurred. **Interruption expenses** include, but are not limited to, the use of rented/leased external equipment, substitution of other work or production procedures, use of third party services or additional staff expenditures or labor costs; and/or

2. minimize or avoid a **covered cause of loss** and continue an **insured business's** business.

The amount of **interruption expenses** recoverable under subparagraph 1 above shall in no case exceed the amount by which the covered **income loss** is reduced by such incurred **interruption expenses**.

WW. **Malicious code** means software intentionally designed to insert itself and damage a **computer system** without the owner's informed consent by a variety of forms including, but not limited to, virus, worm, Trojan horses, spyware, dishonest adware, and crime-ware.

XX. **Multimedia perils** means the release of, or display of, any **electronic media** on an **insured business's internet** site or **print media** for which an **insured business** is solely responsible, which directly results in any of the following:

1. any form of defamation or other tort related to the disparagement or harm to the **reputation** or character of any person or organization, including libel, slander, product disparagement or trade libel, and infliction of emotional distress, mental anguish, outrage or outrageous conduct, if directly resulting from any of the foregoing;

2. invasion, infringement or interference with an individual's right of privacy or publicity, including false light, intrusion upon seclusion, commercial misappropriation of name, person, or likeness, and public disclosure of private facts;

3. plagiarism, piracy or misappropriation of ideas under an implied contract;

4. infringement of copyright, trademark, trade name, trade dress, title, slogan, service mark or service name; or

5. domain name infringement or improper deep-linking or framing.

YY. **Net profit** means an **insured business's** net trading profit (exclusive of all capital receipts and accretions and all outlay improperly chargeable to capital) within any given period generated from an **insured business's income** after due provision has been made for all standing and other charges including depreciation, but before the deduction of any taxation chargeable on profits.

ZZ. **Operational programs** means programs and software which are ready for operational use, having been fully developed, tested, and accepted by an **insured business**.

AAA. **Outsourced IT service provider** means a third party independent contractor that provides information technology services for the benefit of an **insured business** under a written contract with the **insured business**. Outsourced services include, but are not limited to, hosting, security management, co-location, and **data** storage.

BBB. **Period of indemnity** means the period of time elected by an **insured business** which both begins and ends within the period commencing with the date of the first **adverse media report** of a **data protection breach** and continuing thereafter for the time period specified in the policy schedule and not limited by the expiration date

of the policy. During the **period of indemnity**, coverage against any further occurrence of any **data protection breach** shall continue only until the expiration date of this policy.

CCC. **Period of restoration** means the period of time that commences on the date when the interruption, degradation or failure of an **insured business's computer system** began and ends on the later of:

1.  the date when an **insured business's computer system** is restored or could have been repaired or restored with reasonable speed to the same condition, functionality and level of service that existed prior to a **covered cause of loss** plus no more than 30 consecutive days after the restoration of an **insured business's computer system** to allow for restoration of the business; or

2.  120 consecutive days after notice of a **covered cause of loss** is received by the **company**.

DDD. **Print media** means newspapers, newsletters, magazines, books and literary works in any form, brochures or other types of publications, and advertising materials, including packaging, photographs, and digital images.

EEE. **Privacy breach** means a common law breach by an **insured**, a **BPO service provider** or **outsourced IT service provider** of confidentiality, infringement or violation of any right to privacy including, but not limited to, a breach of an **insured business's** privacy policy, breach of a person's right of publicity, false light, intrusion upon a person's seclusion or public disclosure of a person's private information. A series of continuing **privacy breaches** or related or repeated **privacy breaches** shall be considered a single **privacy breach** and shall be deemed to have occurred at the time of the first such **privacy breach**.

FFF. **Privacy breach response costs** means those reasonable and necessary fees an **insured** incurs, with the **company's** prior written consent, for the employment of a public relations consultant if an **insured** reasonably considers that action is needed in order to avert or mitigate any material damage to an **insured business's reputation** that results or reasonably will result from an **adverse media report** that has been notified to the **company**.

GGG. **Privacy regulatory proceeding** means a formal civil administrative proceeding or regulatory action instituted against an **insured** by a federal, state or local governmental regulatory body for a **security breach**, **privacy breach** or **breach of privacy regulations**.

HHH. **Programming error** means an error which occurs during the development or encoding of a **computer program**, software, or application, which would, when in operation, result in a malfunction or incorrect operation of a **computer system**.

III. **Property damage** means physical injury to, impairment, destruction, or corruption of any tangible property, including the loss thereof. **Data** is not considered tangible property.

JJJ. **Public relations event** means:

1.  any event in which an **insured business** has paid any:

    a.  **evacuation expense**; or

    b.  **disinfection expense;**

2.  any event that results in the publication or broadcast of information which can reasonably be expected to damage an **insured business's reputation,** if such event is caused by:

    a.  an actual or alleged act, error or omission in the furnishing or failure to furnish **treatment**;

    b.  an abusive act; or

    c.  workplace violence or threat of workplace violence.

KKK. **Public relations expenses** means:

1.  with respect to Coverage D, reasonable and necessary expenses incurred by an **insured business** to re-establish its **reputation**, which was damaged as a direct result of an **adverse media report**.

2.  with respect to Coverage K, reasonable fees and costs incurred by an **insured business** in the investigation and mitigation of a **public relations event** including the costs:

    a.  of attorneys, experts and consultants, including third-party media consultants and security consultants;

 © 2015 MedPro Group. All rights reserved.

     b.   to notify third parties directly affected by such **public relations event**;

     c.   incurred in the management of public relations with respect to such **public relations event**; and

     d.   **employee counseling** expenses.

  3.  with respect to Coverage M, reasonable and necessary expenses incurred by an **insured business** to re-establish its **reputation**, which was damaged as a direct result of a **data protection breach**.

However, **public relations expenses** do not include:

  1.  any salaries, overhead, fees, loss of earnings, or benefit expenses incurred by, or paid to, any **insured**; or

  2.  **disinfection expense** or **evacuation expense**.

LLL. **Qui tam plaintiff** means a private plaintiff under the U.S. False Claims Act.

MMM. **Recoverable costs** mean, within any period in which an **insured business's net profit** is nil, any standing and other charges incurred by an **insured business** in excess of its **income**, up to, but not exceeding, 20% of its anticipated **net profit** for such period.

NNN. **Regulatory compensatory award** means a sum of money which an **insured** is legally obligated to pay as an award or fund for affected individuals, including a regulatory agency's monetary award to a third party due to an adverse judgment or settlement arising out of a **privacy regulatory proceeding**. **Regulatory compensatory award** does not include a criminal penalty or fine issued by a regulatory agency of any kind, including federal, state, or local governmental agencies.

OOO. **Regulatory fines and penalties** mean civil fines or penalties imposed against an **insured** by a **government entity** as a result of a **privacy regulatory proceeding** triggering coverage under Coverage C or a **regulatory proceeding** triggering coverage under Coverage H.

PPP. **Regulatory proceeding** means:

  1.  With respect to Coverage H, any of the following instituted against an **insured** during the **policy period**:

     a.   **billing errors proceeding**;

     b.   **EMTALA proceeding**; or

     c.   **Stark proceeding**.

  2.  With respect to Coverage L, any of the following instituted against an **insured** during the **policy period**:

     a.   any investigation or request for information by the Office for Human Research Protection (OHRP) under Title 45, Part 46, Code of Federal Regulations (45 CFR part 46);

     b.   any request for information by the Office of Inspector General (OIG) as part of its audits, investigations, inspections and evaluations; or

     c.   any request for information by the Food and Drug Administration (FDA) as part of its audits, investigations, inspections and evaluations.

QQQ. **Reputation** means the estimation of trust that patients, customers or clients have in doing business with an **insured business** or in purchasing the products or services of an **insured business**.

RRR. **Restitution** means repayment of fees, reimbursement, profits, charges or other benefit payments:

  1.  received by an **insured** from:

     a.   a governmental health benefit payer or program, carrier or intermediary making payments as part of, or in connection with, any such program;

     b.   a **commercial payer**; or

     c.   any patient.

  2.  to which such **insured** was not legally entitled by reason of a billing error or errors, the return of which is sought in a **billing errors proceeding**.

SSS. **Retention** means the amount shown on the Declarations applicable to this Coverage Part, which must be borne

by the **insureds** uninsured and at their own risk in respect to **damages, claim expenses** and any other amounts covered under this Coverage Part. The **company** has no liability to pay **damages, claim expenses** or any other amounts covered under this Coverage Part until the **retention** has been fully paid and satisfied by the **insureds**, unless otherwise provided in this Coverage Part. The **retention** shall apply separately to each **claim** under each of the Coverages of this Coverage Part. If a **claim** attaches to more than one of the Coverages of this Coverage Part, only the highest **retention** applies.

TTT. **Retroactive date** means the date shown on the Declarations applicable to this Coverage Part that an **insured** has no coverage under Coverages A, B, C, H or L.

UUU. **Security and privacy wrongful act** mean any of the below, whether actual or alleged, but only if committed or alleged committed by an **insured** in their capacity as such:

1. the failure to prevent or hinder **unauthorized access** to or **unauthorized use** of an **insured business's computer system**; security failures; or social engineering techniques devised to trick the user into surrendering personal information ('phishing' or 'pharming') that in turn results in:

   a. the alteration, copying, corruption, destruction, deletion, or damage to electronic **data** stored on an **insured business's computer system**;

   b. theft, loss or unauthorized disclosure of electronic and non-electronic confidential commercial, corporate, personally identifiable, or private information that is in the care, custody or control of an **insured business**;

   c. theft, loss or unauthorized disclosure of electronic and non-electronic confidential commercial, corporate, personally identifiable, or private information that is in the care, custody or control of a **BPO service provider** or **outsourced IT service provider** that is holding, processing or transferring such information on behalf of an **insured business**; provided, however, that the theft, loss or unauthorized disclosure occurs while an **insured business's** written contract with such **BPO service provider** or **outsourced IT service provider** is still in effect; or

   d. **unauthorized use** of or **unauthorized access** to a **computer system** other than an **insured business's computer system**.

2. an **insured business's** failure to timely disclose a **security breach** affecting personally identifiable, nonpublic information, or the failure to dispose of personally identifiable information within the required time period, in **breach of privacy regulations** in effect now or in the future;

3. the failure to prevent the transmission of **malicious code** or **computer virus** from an **insured business's computer system** to the **computer system** of a third party;

4. a **privacy breach** or **breach of privacy regulations**;

5. the failure to prevent or hinder participation by an **insured business's computer system** in a **denial of service attack** directed against **internet** sites or the **computer system** of any third party; or

6. loss of **employee** information.

VVV. **Security breach** means:

1. **unauthorized access** to or **unauthorized use** of an **insured business's computer system**, including **unauthorized access** or **unauthorized use** resulting from the theft of a password from an **insured business's computer system** or from any **insured**;

2. a **denial of service attack** against an **insured business's computer system**; or

3. infection of an **insured business's computer system** by **malicious code** or the transmission of **malicious code** from an **insured business's computer system**,

   whether any of the foregoing is a specifically targeted attack or a generally distributed attack. A series of continuing **security breaches**, related or repeated **security breaches**, or multiple **security breaches** resulting from a continuing failure of computer security, shall be considered a single **security breach** and be deemed to have occurred at the time of the first such **security breach**.

WWW. **Shadow audit** means an audit performed by a qualified professional, which examines the same billing records

and related documents as those subject to an ongoing **billing errors proceeding**, with the intent of providing an **insured** with a private expert opinion. Such **shadow audits** are subject to the **company's** prior approval.

XXX. **Shadow audit expenses** means the fees for the services of a qualified audit professional and associated expenses incurred by an **insured** in the course of a **shadow audit**.

YYY. **Social services** means programs provided by an **insured** to help maintain or improve the quality of life for the patient, including family counseling and educational programs. These programs do not include therapy for the direct benefit of anyone other than the patient.

ZZZ. **Special expenses** means reasonable and necessary costs and expenses an **insured business** incurs to:

1. prevent, preserve, minimize, or mitigate any further damage to an **insured business's digital assets**, including the reasonable and necessary fees and expenses of specialists, outside consultants or forensic experts an **insured business** retains;

2. preserve critical evidence of any criminal or malicious wrongdoing;

3. purchase replacement licenses for **computer programs** because the copy protection system and/or access control software was damaged or destroyed by a **covered cause of loss**; or

4. notify customers of a total or partial interruption, degradation in service or failure of an **insured business's computer system** resulting from a **covered cause of loss**.

AAAA. **Stark proceeding** means proceedings instituted against an **insured** by a **government entity** alleging violation of any federal, state or local anti-kickback or self-referral laws.

BBBB. **Student** means an unlicensed person, other than a resident, enrolled in a licensed or accredited training program operated by an **insured business** relative to the delivery of **treatment**.

CCCC. **Time retention** means the number of hours that must elapse, as shown on the Declarations applicable to this Coverage Part, before the recovery of loss under Coverage E.2., Non-Physical Business Interruption and Extra Expense, or Coverage G, can be considered.

DDDD. **Unauthorized access** means the gaining of access to a **computer system** by an unauthorized person or persons.

EEEE. **Unauthorized use** means the use of a **computer system** by an unauthorized person or persons or an authorized person in an unauthorized manner.

FFFF. **Voluntary self disclosure** means an **insured** discloses information, without inquiry, to any **government entity** or **commercial payer**, which may serve as grounds for a **billing errors proceeding** against an **insured**. Such information must have become known to the **insured** fortuitously and subsequent to the initial effective date of this insurance.



<div align="right">

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

</div>

### *THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.*

| | |
|---|---|
| **Endorsement No.:** | 1 |
| **Forming Part of Policy No.:** | HN021513 |
| **Issued to:** | National Event Services, Inc |
| **Effective Date of Endorsement:** | 02/01/2018 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## DISCIPLINARY, LICENSING AND CREDENTIALING ACTIONS ENDORSEMENT
## (PROFESSIONAL LIABILITY)

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **insureds**, the **company** and the **insureds** agree to amend the policy as follows:

The following provision is added to the Insuring Clause section of the Professional Liability Coverage Part:

DISCIPLINARY, LICENSING, AND CREDENTIALING ACTIONS

The **company's** duty to defend a **claim** includes the defense of any disciplinary, licensing, or credentialing action brought against an **insured** by (1) a state board of medical examiners or state dental board responsible for investigating and disciplining licensees, (2) a hospital or facility professional review board or committee through formally adopted, written procedures, or (3) the United States Drug Enforcement Administration, subject to the following additional conditions:

A. If the policy provides coverage to an **insured** on a Claims-Made and Reported basis:

    1. the action must arise from the **insured's** rendering of, or failure to render, **professional services**, after the **retroactive date**, but before the end of the **policy period**, and for which there is no other insurance available; and

    2. the action must be first initiated against the **insured** during the **policy period**.

B. If the policy provides coverage to an **insured** on an Occurrence basis, the action must arise from the **insured's** rendering of, or failure to render, **professional services** during the **policy period,** and for which there is no other insurance available.

C. The payment of **claims expense** for such actions will be in addition to the applicable Limit of Liability. However, the **company** will not pay more than $25,000 in **claims expense** on behalf of an **insured** for any single action. Furthermore, the **company** will not pay more than $100,000 for **claims expense** on behalf of all **insureds** for all such actions covered under the policy.

D. The **company** has no duty to pay any fines, penalties, or other costs assessed against an **insured** as a result of any such action.

However, payments for **claims** under this Insuring Clause shall not be subject to any Deductible or Self-Insured Retention.

### **All other terms and conditions of the policy remain unchanged.**



**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

### *THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.*

| | |
|---|---|
| **Endorsement No.:** | 2 |
| **Forming Part of Policy No.:** | HN021513 |
| **Issued to:** | National Event Services, Inc |
| **Effective Date of Endorsement:** | 02/01/2018 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## BLANKET ADDITIONAL INSURED ENDORSEMENT
## (GENERAL LIABILITY)

Only with respect to coverage provided under this endorsement and under the General Liability Coverage Part, and in consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **insureds**, the **company** and the **insureds** agree to amend the policy as follows:

The definition of **additional insured** in the Definitions section of the Common Policy Provisions and Conditions is deleted and replaced with the following:

**Additional insured** means any person or organization with which the **insured** has entered into a written contract or agreement prior to the **loss** agreeing:

1. to add the person or organization as an **additional insured**; or

2. to hold harmless or indemnify such person or organization.

However, such person or organization is not an **additional insured** with respect to **losses** arising from, or in connection with, any acts or omissions alleged to have been committed by that **additional insured**.

The following subparagraph is added to all Insuring Clauses of the General Liability Coverage Part:

The **company's** duty to defend and pay **losses** or **claims expense** on behalf of any **insured** shall extend to any **additional insured** meeting the terms and conditions of this policy, but only with respect to any **loss** or **claims expense** payable as the result of the **additional insured's** vicarious liability for the acts or omissions of an **insured** otherwise covered under this Coverage Part.

However, the coverage provided to an **additional insured** shall not be broader than that which an **insured** is required by written contract or agreement to provide to that **additional insured**. Additionally, coverage shall not apply to structural alterations, new construction or demolition operations performed by or on behalf of an **additional insured**.

The following provision is added to the Limits of Liability section of the General Liability Coverage Part:

ADDITIONAL INSUREDS

All **additional insureds** share the Limits of Liability applicable to any **claim** with any **insured** for which the **additional insured** is alleged to be vicariously liable with respect to that same **claim**.

## All other terms and conditions of the policy remain unchanged.



**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

### *THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.*

| | |
|---|---|
| **Endorsement No.:** | 3 |
| **Forming Part of Policy No.:** | HN021513 |
| **Issued to:** | National Event Services, Inc |
| **Effective Date of Endorsement:** | 02/01/2018 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## BLANKET WAIVER OF SUBROGATION ENDORSEMENT
## (GENERAL LIABILITY)

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **insureds**, the **company** and the **insureds** agree to amend the policy as follows:

Only with respect to coverage provided under the General Liability Coverage Part, the following condition is added to the Conditions section of the Common Policy Provisions and Conditions:

WAIVER OF SUBROGATION

The **company** shall waive any right of recovery the **company** may have against a person or organization to the extent that the **insured** has agreed in writing prior to the date of loss to waive the **insured's** rights of recovery against that person or organization.

### All other terms and conditions of the policy remain unchanged.



<div align="right">

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

</div>

### *THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.*

| | |
|---|---|
| **Endorsement No.:** | 4 |
| **Forming Part of Policy No.:** | HN021513 |
| **Issued to:** | National Event Services, Inc |
| **Effective Date of Endorsement:** | 02/01/2018 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM ENDORSEMENT
## (GENERAL LIABILITY)

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **insureds**, the **company** and the **insureds** agree to amend the policy as follows:

The following provision is added to the Limits of Liability section of the General Liability Coverage Part:

CERTIFIED ACTS OF TERRORISM

If losses covered by insurance that are attributable to **certified acts of terrorism** in a calendar year exceed $100 billion in the aggregate, and the **company** has met its deductible amount under the **TRIA Act** for that calendar year, the **company** shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion. In such case, the losses are subject to pro rata allocation in accordance with the procedures established by the Secretary of the Treasury.

Only with respect to coverage provided under the General Liability Coverage Part, the following definitions are added to the Definitions section of the Common Policy Provisions and Conditions:

**Certified act of terrorism** means an act that is certified by the Secretary of the Treasury in accordance with the provisions of the **TRIA Act**, to be an act of terrorism pursuant to the **TRIA Act**. The **TRIA Act** sets forth the following criteria for a **certified act of terrorism**:

1. The act resulted in losses covered by insurance in excess of $5,000,000 in the aggregate, attributable to all types of insurance subject to the **TRIA Act**;

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. The act must have resulted in damage within the United States including its territories and possessions and Puerto Rico, or outside the United States in cases of an air carrier or vessel meeting the definitions of such as provided in the **TRIA Act**, or the premises of a United States mission; and

3. No act of terrorism shall be certified if the act is committed as a part of the course of a war declared by Congress.

**TRIA Act** means the federal Terrorism Risk Insurance Act of 2002, as extended on December 22, 2005, and amended on December 31, 2007 and January 12, 2015.

### All other terms and conditions of the policy remain unchanged.

 MedPro Group
*a Berkshire Hathaway company*

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

### *THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.*

| | |
|---|---|
| **Endorsement No.:** | 5 |
| **Forming Part of Policy No.:** | HN021513 |
| **Issued to:** | National Event Services, Inc |
| **Effective Date of Endorsement:** | 02/01/2018 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## PENNSYLVANIA AMENDATORY ENDORSEMENT

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **insureds**, the **company** and the **insureds** agree to amend the policy as follows:

The Cancellation, Nonrenewal and/or Termination of Coverage condition in the Conditions section of the Common Policy Provisions and Conditions is deleted and replaced with the following:

CANCELLATION AND NONRENEWAL OF COVERAGE

1. This policy may be canceled by the **first named insured**. The **first named insured** shall provide written notice to the **company** requesting cancellation. The cancellation shall be effective on the date requested by the **first named insured** or the date the notice is received by the **company**, whichever is later.

2. Any coverage contained within this policy may be terminated by the **first named insured**. The **first named insured** shall provide written notice to the **company** requesting the coverage termination. The termination shall be effective on the date requested by the **first named insured** or the date the notice is received by the **company**, whichever is later.

3. This policy, or any coverage contained therein, may be canceled or terminated by the **company** by providing a notice titled "Notice of Cancellation," including the reason for cancellation, by registered mail, first class mail, or hand delivery, to the **first named insured** at the last address on record with the **company**:

   a. at least 15 days prior to the effective date of cancellation:

      (1) if the premium has not been paid when due, whether the premium is payable directly to the **company** or indirectly under a premium finance plan or extension of credit; or

      (2) if an **insured's** license or approval by the Commonwealth to provide health care services has been suspended or revoked if the license is held by a health care provider as defined by the Mcare Act.

   b. at least 30 days prior to the effective date of cancellation if the policy has been in effect for less than 60 days, and the **company** cancels for any reason other than specified in subparagraph 3.a. above; or

   c. at least 60 days prior to the effective date of cancellation if the policy has been in effect for 60 days or more or is a renewal policy, and the **company** cancels for any reason other than specified in subparagraph 3.a. above.

4. If the **first named insured** cancels this policy, or terminates any coverage contained therein, earned premium shall be computed in accordance with the standard short rate tables and procedure. If the **company** cancels this policy, or terminates any coverage contained therein, earned premium shall be computed pro rata. Premium adjustments shall be made within a reasonable period of time after cancellation. However, payment or tender of unearned premium shall not be a condition of cancellation.

5. If the **company** nonrenews an **insured's** policy for any reason other than non-payment of premium, the **company** shall provide written notice of the renewal labeled "Notice of Nonrenewal," including the reason for nonrenewal, to

the **first named insured** not less than 60 days prior to the effective date of such nonrenewal.

6. If the **company** cancels or nonrenews an **insured's** policy, the **insured's** coverage under that policy shall terminate on the earlier of:

    a. the date stated on the cancellation or nonrenewal notice; or

    b. the date the **insured** procures replacement coverage.

7. The **company** may not condition renewal of the policy on a premium increase unless it has provided notice of the new terms or rates to the **first named insured** at least 30 days prior to the end of the **policy period**.

8. The **company** may not offer renewal with changes that substantially alter the terms of the policy unless it has provided notice of the changed terms to the **first named insured** at least 60 days prior to the end of the **policy period**.

9. Within 10 days of receipt of midterm cancellation or nonrenewal notice, at the **first named insured's** request, the **company** shall provide loss information to the **first named insured** within 30 days of request for at least 3 years or the period of time during which the **company** provided coverage. Loss information shall consist of:

    a. information on closed **claims** or **potential claims**, including date and description of event and amount(s) of payment, if any;

    b. information on open **claims** or **potential claims**, including date and description of event, amount of payment, if any, and amount of reserve, if any; and

    c. information on notices of **events**, including date and description of **event** and amount of reserves, if any.

**All other terms and conditions of the policy remain unchanged.**

© 2015 MedPro Group. All rights reserved.



**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

### *THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.*

| | |
|---|---|
| **Endorsement No.:** | 6 |
| **Forming Part of Policy No.:** | HN021513 |
| **Issued to:** | National Event Services, Inc |
| **Effective Date of Endorsement:** | 04/17/2018 at 12:01 a.m. at the address of the First Named Insured stated herein. |

### CHANGE ENDORSEMENT

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **insureds**, the **company** and the **insureds** agree to amend the policy as follows:

The Cyber Liability Coverage A Limit - Multimedia Liability shown on the Declarations is changed to $1,000,000.

The Cyber Liability Coverage B Limit - Security and Privacy Liability shown on the Declarations is changed to $1,000,000.

The Cyber Liability Coverage C Limit - Privacy Regulatory Defense and Penalties shown on the Declarations is changed to $1,000,000.

The Cyber Liability Coverage D Limit - Privacy Breach Response Costs, Customer Notification Expenses, and Customer Support and Credit Monitoring Expenses shown on the Declarations is changed to $1,000,000.

The Cyber Liability Coverage E Limit - Network Asset Protection shown on the Declarations is changed to $500,000.

The Cyber Liability Coverage F Limit - Cyber Extortion shown on the Declarations is changed to $1,000,000.

The Cyber Liability Coverage G Limit - Cyber Terrorism shown on the Declarations is changed to $1,000,000.

The Cyber Liability Aggregate Limit shown on the Declarations is changed to $1,000,000.

Premium Adjustment:                    $ 2,100   Additional Premium

### All other terms and conditions of the policy remain unchanged.



Issuing Company:
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

### *THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.*

| | |
|---|---|
| **Endorsement No.:** | 7 |
| **Forming Part of Policy No.:** | HN021513 |
| **Issued to:** | National Event Services, Inc |
| **Effective Date of Endorsement:** | 04/27/2018 at 12:01 a.m. at the address of the First Named Insured stated herein. |

### CHANGE ENDORSEMENT

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **insureds**, the **company** and the **insureds** agree to amend the policy as follows:

The following person(s), organization(s) or location(s) are added to the Schedule of Named Insureds – Professional Liability

| SCHEDULE OF NAMED INSUREDS | | | | | | |
|---|---|---|---|---|---|---|
| NAMED INSURED | ID NUMBER | RETRO-ACTIVE DATE | TERMIN-ATION DATE | LIMITS OF LIABILITY (PER EVENT LIMIT/ AGGREGATE LIMIT) | RETENTION (PER EVENT/ AGGREGATE) | PREMIUM |
| Physician FTEs: | | | | | | |
| Physician FTE 1 | | 02/01/2015 | | FNI | $Nil / $Nil | $26,567 |
| Patrick M Webb MD | 615204 | | | Physician FTE 1 | $Nil / $Nil | Included |

* Indicates any applicable surcharges, taxes or fees.

Premium Adjustment:                    $ 0

### All other terms and conditions of the policy remain unchanged.

 **MedPro** Group
*a Berkshire Hathaway company*

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

### *THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.*

| | |
|---|---|
| **Endorsement No.:** | 8 |
| **Forming Part of Policy No.:** | HN021513 |
| **Issued to:** | National Event Services, Inc |
| **Effective Date of Endorsement:** | 06/06/2018 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## CHANGE ENDORSEMENT

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **insureds**, the **company** and the **insureds** agree to amend the policy as follows:

The following person(s), organization(s) or location(s) are added to the Schedule of Named Insureds – Professional Liability

### SCHEDULE OF NAMED INSUREDS

| NAMED INSURED | ID NUMBER | RETRO-ACTIVE DATE | TERMIN-ATION DATE | LIMITS OF LIABILITY (PER EVENT LIMIT/ AGGREGATE LIMIT) | RETENTION (PER EVENT/ AGGREGATE) | PREMIUM |
|---|---|---|---|---|---|---|
| Physician FTEs: | | | | | | |
| Physician FTE 1 | | 02/01/2015 | | FNI | $Nil / $Nil | $26,567 |
| Andrew Simon Mickler MD | 438908 | | | Physician FTE 1 | $Nil / $Nil | Included |

\* Indicates any applicable surcharges, taxes or fees.

Premium Adjustment:                    $    0

### **All other terms and conditions of the policy remain unchanged.**



**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

### *THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.*

| | |
|---|---|
| **Endorsement No.:** | 9 |
| **Forming Part of Policy No.:** | HN021513 |
| **Issued to:** | National Event Services, Inc |
| **Effective Date of Endorsement:** | 06/22/2018 at 12:01 a.m. at the address of the First Named Insured stated herein. |

### CHANGE ENDORSEMENT

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **insureds**, the **company** and the **insureds** agree to amend the policy as follows:

The following person(s), organization(s) or location(s) are added to the Schedule of Named Insureds – Professional Liability

| | | | | | | |
|---|---|---|---|---|---|---|
| **SCHEDULE OF NAMED INSUREDS** | | | | | | |
| NAMED INSURED | ID NUMBER | RETRO-ACTIVE DATE | TERMIN-ATION DATE | LIMITS OF LIABILITY (PER EVENT LIMIT/ AGGREGATE LIMIT) | RETENTION (PER EVENT/ AGGREGATE) | PREMIUM |
| Physician FTEs: | | | | | | |
| Physician FTE 1 | | 02/01/2015 | | FNI | $Nil / $Nil | $26,567 |
| Stuart Etengoff DO | 1409169 | | | Physician FTE 1 | $Nil / $Nil | Included |
| Joel Lee Goldberg MD | 905082 | | | Physician FTE 1 | $Nil / $Nil | Included |

* Indicates any applicable surcharges, taxes or fees.

Premium Adjustment:                    $     0

### All other terms and conditions of the policy remain unchanged.



**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

### *THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.*

| | |
|---|---|
| **Endorsement No.:** | 10 |
| **Forming Part of Policy No.:** | HN021513 |
| **Issued to:** | National Event Services, Inc |
| **Effective Date of Endorsement:** | 12/11/2018 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## CHANGE ENDORSEMENT

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **insureds**, the **company** and the **insureds** agree to amend the policy as follows:

The following person(s), organization(s) or location(s) are added to the Schedule of Named Insureds – Professional Liability

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | **SCHEDULE OF NAMED INSUREDS** | | |
| NAMED INSURED | ID NUMBER | RETRO-ACTIVE DATE | TERMIN-ATION DATE | LIMITS OF LIABILITY (PER EVENT LIMIT/ AGGREGATE LIMIT) | RETENTION (PER EVENT/ AGGREGATE) | PREMIUM |
| Physician FTEs: | | | | | | |
| Physician FTE 1 | | 02/01/2015 | | FNI | $Nil / $Nil | $26,567 |
| Janae Elaine Phelps Dark MD | 1462004 | | | Physician FTE 1 | $Nil / $Nil | Included |

* Indicates any applicable surcharges, taxes or fees.

Premium Adjustment:                    $      0

### **All other terms and conditions of the policy remain unchanged.**